**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

DORA JACKSON, on behalf of            :
herself and all others similarly      :
situated,                             :
                                      :       **C. A. No.  05-269 - JJF**
              Plaintiff,              :
                                      :       **Class Action**
       v.                             :
                                      :       **Jury Trial Demanded**
WAL-MART STORES, INC., a              :
Delaware corporation, and             :
SAM'S WEST, INC., an Arkansas         :
corporation,                          :
                                      :
              Defendants.             :


**COMPENDIUM OF UNPUBLISHED DECISIONS IN
<u>DEFENDANTS' MOTION TO DISMISS PURSUANT TO RULE 12(b)(6)</u>**

<u>Carlton Investments v. TLC Beatrice International Holdings, Inc.</u>, Civ. A. No. 13950,
       1995 WL. 694397 (Del. Ch. Nov. 21, 1995) .................................................................A

<u>Commerce National Insurance Services, Inc. v. Buchler</u>, Civ. A. No. 02-034-SLR, 2003
       U.S. Dist. LEXIS 22429 (D. Del. Dec. 10, 2003), <u>aff'd</u>, No. 04-1028, 2004
       U.S. App. LEXIS 24991 (3rd Cir. Dec. 6, 2004)..........................................................B

<u>In re Dean Witter Partnership Litigation</u>, Civ. A. No. 14816, 1998 WL 442456 (Del. Ch.
       July 17, 1998)...............................................................................................................C

<u>Grace v. Morgan</u>, Civ. A. No. 03C-05-260-JEB, 2004 WL 26858 (Del. Super. Ct. Jan. 6,
       2004) .............................................................................................................................D

<u>R.M. Williams Co., Inc. v. Frabizzio</u>, Civ. A. No. 90C-MY-10, 1993 WL 54423 (Del.
       Super. Feb. 8, 1993)......................................................................................................E

<u>Total Care Physicians, P.A. v. O'Hara</u>, Civ. A. No. 99C-11-201-JRS, 2002 WL 31667901
       (Del. Super. Oct. 29, 2002) .......................................................................................... F



1995 WL 694397, Carlton Investments v. TLC Beatrice Intern. Holdings, Inc., (Del.Ch. 1995)          **Page 1**

**\*694397**    Only the Westlaw citation is currently available.

UNPUBLISHED OPINION.    CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle County.

**CARLTON INVESTMENTS, derivatively on behalf of TLC Beatrice International Holdings, Inc., Plaintiff,**
**v.**
**TLC BEATRICE INTERNATIONAL HOLDINGS, INC., Loida Nicolas Lewis, as Executrix of the Estate of Reginald F. Lewis, Leslie N. Lewis, Individually and as Executrix of the Estate of Reginald F. Lewis, TLC Group, L.P., TLC Holdings Corp., TLC General Corp., TLC Transport, Inc., McCall Pattern Holdings, Inc., Lee A. Archer, Jr., Robert C. deJongh, James E. Obi, Ricardo J. Olivarez, Samuel P. Peabody, Jean S. Fugett, Jr., Anthony S. Fugett, Marilda G. Alfonso, Sanford Cloud, Jr., William S. Mowry, Jr., and Dumas M. Simeus, Defendants.**

Civ. A. No. 13950.
Submitted: Aug. 29, 1995.

Decided: Nov. 21, 1995.

Rodman Ward, Jr., Cathy L. Reese and Herbert W. Mondros of Skadden, Arps, Slate, Meagher & Flom, Wilmington, for plaintiff Carlton Investments.

Michael D. Goldman and Stephen C. Norman of Potter Anderson & Corroon, Wilmington, Gregory V. Varallo, and Matthew E. Fisher, of Richards, Layton & Finger, Wilmington, Henry E. Gallagher, Jr., of Connolly, Bove, Lodge & Hutz, Wilmington, David J. Margules of Wolf, Block, Schorr and Solis-Cohen, Wilmington, David C. McBride, and William D. Johnston, of Young, Conaway, Stargatt & Taylor, Wilmington, William M. McErlean, Richard S. Huszagh, and John F. Verhey, of Rudnick & Wolfe, Chicago, Illinois; of counsel: Thomas P. Puccio, New York City, for Defendants.

MEMORANDUM OPINION

ALLEN, Chancellor.

**\*\*1**    Carlton Investments L.P., has brought this action as a derivative suit on behalf of TLC Beatrice International Holdings, Inc., a publicly held Delaware Corporation, seeking recovery of amounts allegedly paid by TLC Beatrice to or on behalf of the late Reginald Lewis, who is alleged to have been a controlling shareholder of TLC Beatrice. Presently pending is a motion by various defendants to dismiss or stay this action. The motion has sub-parts:

First, it seeks to dismiss or stay the action on the basis of a prior pending New York suit and on the grounds of *forum non conveniens*.

Second, it asserts the inadequacy of Carlton Investments as a representative of TLC Beatrice in this suit. Defendants claim that Carlton's attempt to procure a judgment against TLC Beatrice in the New York litigation places Carlton's interests inherently at odds with those of the company and its public shareholders.

Third, defendants claim that this court lacks personal jurisdiction over named defendants the Lewis Estate, TLC Group, L.P., and Jean S. Fugett, Jr.

Fourth, defendants claim that Delaware statutes of limitations bars the claims asserted against the Lewis Estate, Marilda Alfonso, Sanford Cloud, and William Mowry.

Fifth, defendants move to dismiss Anthony Fugett, TLC Holdings, and TLC Transport as defendants for failure to allege facts stating a claim against them.

For the reasons set forth below, these motions will be denied, except that the motion to dismiss TLC Group L.P. for lack of *in personam* jurisdiction will be granted to the extent claims other than those directly relating to the alleged wrongful payment of some $2,000 of franchise fee payments to the Delaware Department of Corporations are alleged.

I. Factual and Procedural Background

On January 4, 1995, Carlton Investments ("Carlton"), a California Limited Partnership that owns approximately 22% of the stock of TLC Beatrice, filed a derivative complaint purporting to

© 2005 Thomson/West. No claim to original U.S. Govt. works.

allege breaches of fiduciary duties and waste of corporate assets. Named as defendants were (1) the Estate of Reginald Lewis, which is being administered in New York, the domicile of the late Mr. Lewis; (2) various individuals who serve or served as directors of TLC Beatrice; (3) TLC Transport, a wholly owned subsidiary of TLC Beatrice; (4) several companies separately owned by Lewis but alleged to have participated in or benefitted from the misappropriation and waste; and (5) TLC Beatrice, as a nominal defendant.

The complaint particularly alleges that the various defendants have engaged in waste and misappropriation of assets, breach of fiduciary duties of care and loyalty, aiding and abetting, conversion, and civil conspiracy. Plaintiff contends that these wrongs led to a severe depletion of TLC Beatrice's cash and negatively impacted its overall financial condition.

This suit follows Carlton's filing of an individual (non-derivative) action in the state of New York against TLC Beatrice and the Lewis Estate. In that suit, Carlton seeks recovery of approximately $11 million for alleged breaches of a stockholder agreement signed by Mr. Lewis, Carlton, and the Company. Carlton alleges that between 1987 and 1992, TLC Beatrice made certain payments to Reginald Lewis, its founder, former Chairman and CEO in contravention of provisions in the stockholder's agreement strictly limiting transactions between the Company and its affiliates including Mr. Lewis. Carlton particularly challenges the propriety of a $22.1 million compensation package paid to Lewis in 1992. Roughly speaking, as I understand it, the theory of the New York case is that under the stockholders' agreement which Lewis, Carlton and TLC Beatrice signed, the payments to Lewis trigger a right to proportionate payments to Carlton.

**2** The theory of the present derivative action is that the payments in question were a breach of fiduciary duty and should be rescinded. Thus, the complaint in the present action similarly focuses on the allegedly improper payments to Mr. Lewis. A central element of this claim is the compensation package challenged in the separate New York suit. In addition, the complaint here alleges that TLC Beatrice improperly reimbursed Lewis for $2,147,932 in "living expenses" and $600,000 in other, unidentified expenses.

The complaint further catalogues a number of allegedly improper transactions between TLC Beatrice and Lewis or his affiliates: payment of salaries, bonuses, and severances for employees of TLC Group L.P (an entity separately owned and controlled by Lewis); reimbursement of TLC Group for paying taxes and governmental levies for other Lewis-owned entities; payments to a trust for the benefit of Mr. Lewis' daughters; payments to affiliated law firms on matters for which TLC Beatrice had no liability; payments to McCall Pattern Holdings (an entity owned by Mr. Lewis but otherwise unaffiliated with TLC Beatrice); reimbursement of $2.5 million in legal fees incurred by Lewis in an action unrelated to TLC Beatrice; payment of rent for office facilities for Lewis' affiliates; the lease, purchase and maintenance of a corporate jet for the personal use of Lewis; and excessive employment and severance agreements with certain directors.

## II. Motion to Stay or Dismiss: Prior Pending Action

Coordination of related litigation pending in several states, is of course a cost of our federal system. Generally the grant or denial of motions of this type falls within the sound discretion of each trial court. That discretion is, however, not uninformed by legal principles. On the contrary settled principles govern its exercise. *See Chrysler First Business Credit Corporation v. 1500 Locust Limited Partnership,* Del.Supr., --- A.2d ---- (1995).

Ordinarily a stay of action will be granted where there is a prior action between the same parties, arising out of the same subject matter, pending before a court capable of doing prompt and complete justice. *McWane Cast Iron Pipe Corp. v. McDowell-Wellman Eng'g Co.,* Del.Supr., 263 A.2d 281, 283 (1970). Unless there is present an unusual circumstance (such as may be present in an action under Section 225 of our corporation law) the presence of these factors will indicate that the fair and efficient result is for the second-filed law suit to be stayed, so long as the first filed suit is proceeding reasonably promptly to an adjudication of claims that will eliminate or substantially reduce the need to pursue the second litigation.

In my opinion, however, this principle of comity has no application to the facts of this case as it is

© 2005 Thomson/West. No claim to original U.S. Govt. works.

presently pleaded. The present case is fundamentally different from the pending New York litigation because this is a suit brought in the name of TLC Beatrice itself and seeks the recovery of substantial amounts paid-out by the company. The New York suit seeks recovery from Beatrice and Lewis for breach of the shareholders' agreement that allegedly limited the right of signatories to accept disproportionate distributions from Beatrice. But even if Carlton were to win that suit, I do not understand that the New York court would have had to adjudicate the question whether the payments to Lewis, etc., that would have been held to violate the agreement were necessarily a breach of fiduciary duty to the corporation itself and all of its stockholders. Similarly were Carlton to lose that suit I don't understand that a necessary intermediate step in such a determination would be a binding adjudication that the payments that would have been held not to breach the shareholders agreement also did not constitute a waste or breach of fiduciary duty.

**\*\*3**  That is, the New York litigation is structured to adjudicate the rights of the corporation as a contracting party--a signatory to the stockholders agreement--but not in the legal capacity that this suit is designed to address: as the primary beneficiary of the fiduciary duty of the directors and controlling persons who authorized certain self-interested payments. Thus final judgment in the New York action would not preclude this derivative adjudication of TLC Beatrice's rights, nor is it clear that as a practical matter the doctrine of collateral estoppel would render it highly efficient for this court to pause in its process to allow the earlier suit to reach judgment. Thus, even though the principal parties to the New York litigation are also parties to this litigation the different status that they hold in this suit renders the *McWane* principle inapplicable in my opinion.

Defendants also seek a dismissal on *forum non conveniens ground.* The legal standard is well established. *E.g., Monsanto Co. v. Aetna Cas. & Sur. Co.,* Del.Supr., 559 A.2d 1301 (1988); *Parvin v. Dorfman,* Del.Supr., 236 A.2d 425, 427 (1967). The grant of such a motion is a rarity which may properly occur only where genuine hardship is present. *Chrysler First Business Credit Corp. v. 1500 Locust LP, supra; St. Joe Mineral Corp. v. Horsehead Industries, Inc.,* Del.Ch., C.A. No. 10522, Allen, C. (Apr. 7, 1989). Having

considered the record as it presently appears, I conclude that this case, with its witnesses and documents largely in New York, does not present even a colorably correct application of that doctrine. No hardship whatsoever would be occasioned by the litigation of this case in this jurisdiction.

### III. Carlton's Standing As A Representative Plaintiff

Defendants assert that Carlton is an inappropriate person to sue them in this derivative action; it might not be a faithful agent of the TLC Beatrice shareholders whom it purports to represent in this derivative suit. The claim is that Carlton's interest in its New York suit *against* TLC Beatrice and the Lewis Estate compromises its pursuit of this derivative suit *on behalf of* the company. Moreover, it is said that the concurrent adjudication of the two suits create a situation rife with opportunities for procedural gamesmanship.

I have considered this argument carefully. For the reasons set forth below I conclude that in light of all the circumstances, including the mechanisms that permit judicial supervision of representative litigation under Rule 23.1, that Carlton is an appropriate shareholder to represent the interests of the corporation and its stockholders in the adjudication of these claims.

Obviously there are grounds for courts' to view with a certain suspicion motions by defendants grounded on the claim that the plaintiff who has forced them into litigation is an inappropriate representative of a plaintiff class. The same characteristics that might make a faithful champion energetic would incline a defendant to like to see that representative replaced. There is reason to believe, for example, that Carlton, as a 22% shareholder of TLC Beatrice has a better incentive structure than any other shareholder energetically to pursue the claims of waste etc., here put forward. (FN1) This observation is not intended as a final answer to defendants' motion because it is nevertheless possible for the defendants to raise legitimate issues concerning the identity of a representative plaintiff. The observation simply provides a certain initial orientation. In all events the qualification of a party to represent others is a question addressed to the informed judgment of the court, which in deciding it should consider all of the relevant circumstances, including the presence or absence of alternative parties to carry the suit

© 2005 Thomson/West. No claim to original U.S. Govt. works.

forward.

**\*\*4** Certainly the presence of a substantial conflict of interest would supply a most salient consideration in reaching such a judgment. If "the plaintiff cannot be expected to act in the interest of [the] other [shareholders] because doing so would harm his other interests," it is unlikely that a court would permit the interests of others to be adjudicated by that person. *Youngman v. Tahmoush,* Del.Ch., 457 A.2d 376, 381 (1983).

In *Youngman,* this court made a listing, not intending it to be exhaustive, of factors that may be relevant to a determination of the adequacy of a derivative plaintiff to represent the interests of the corporation. That list included:

economic antagonism between representatives and class; the remedy sought by plaintiff in the derivative action; indications that the named plaintiff was not the driving force behind the litigation; plaintiff's unfamiliarity with the litigation; other litigation pending between the plaintiffs and the defendants; the relative magnitude of plaintiff's personal interests as compared to his interest in the derivative action itself; plaintiff's vindictiveness toward the defendants and, finally, the degree of support plaintiff was receiving from the shareholders he purported to represent.

*Youngman,* 457 A.2d at 379-80.

Defendants focus on two of these elements in attempting to argue that Carlton is unfit to represent the other shareholders: (1) economic antagonism between representative and class, and (2) vindictiveness toward the defendants. Defendants further argue that Carlton previously acquiesced to the wrongs alleged in this suit and should thus be precluded from presently asserting these rights.

A. Economic Antagonism and Vindictiveness

Defendants argue that the present action is an attempt to gain leverage in the New York litigation. That is, that this suit "raises the ante" in New York and could in effect be traded for consideration to Carlton in the settlement of the New York case. In addition, defendants assert that the New York suit against TLC Beatrice would provide relief inconsistent with that sought in this derivative suit,

by which Carlton, as a shareholder and on behalf of the Company itself, seeks the return of allegedly wasted and misappropriated funds to the corporate treasury. Neither of these points appear to have sufficient weight to warrant disabling this large shareholder from suing on behalf of the corporation.

Defendants hope to construct a conflict of interest argument out of the difference in Carlton's positions in the respective litigations, (*i.e.,* seeking judgment against TLC Beatrice in New York, but seeking a judgment in favor of TLC Beatrice in Delaware) has been effectively thwarted by Carlton's offer voluntarily to stay the New York case, if all relevant parties will consent to the jurisdiction of this court, or in the alternative, to hold any recovery awarded in New York in escrow pending this court's adjudication of the rights of the corporation and all of its public shareholders.

**\*\*5** Moreover, even assuming that neither of these steps could be taken, I am not impressed that litigation of this claim by Carlton in this jurisdiction would sufficiently involve threats to the interests of other shareholders as to warrant disabling this plaintiff from carrying on this suit. Certainly the court's powers are substantial in such a case to assure that active good faith prosecution of the suit occurs. Primarily this means that the court can assure that any consideration paid for release of the claims is distributed to the corporation (and its shareholders *pro rata* ); because the court has *in personam* jurisdiction over the representative plaintiff, the court has the means to assure that Carlton acts only as directed with respect to any settlement that might be reached in the New York litigation. Thus the opportunity for Carlton to "sell out" the other shareholders in exchange for consideration paid through the New York action is quite limited, if it exists. (FN2)

B. Acquiescence

Defendants assert that Carlton is an inappropriate plaintiff because it acquiesced in the acts of which it now complains, since (it is claimed) it had a representative on the TLC Beatrice board at all relevant times. This aspect of the matter raises fact issues that preclude a legal judgment at this time.

Critical to this acquiescence claim is proof that Carlton had knowledge of the acts to which it purportedly acquiesced.    3 SPENCER W.

© 2005 Thomson/West. No claim to original U.S. Govt. works.

Case 1:05-cv-00269-JJF    Document 3-2    Filed 05/12/2005    Page 7 of 36

1995 WL 694397, Carlton Investments v. TLC Beatrice Intern. Holdings, Inc., (Del.Ch. 1995)    **Page 5**

SYMONS, POMEROY'S EQUITY JURISPRUDENCE, § 817 at 246 (5th ed. 1941). (FN3) Defendants assert that Carlton had knowledge of the various instances of waste and misappropriation of which it now complains because it had appointed a representative to serve on the TLC Beatrice board prior to these acts. Specifically, defendants argue that Carlton had effectively appointed Dean Kehler as its representative to the Board by virtue of the right of the institutional investors--which group is said to include Carlton--to elect a director representative. The second affidavit of W. Kevin Wright similarly indicates that Dean Kehler "was appointed by Carlton as its director on TLC Beatrice's Board of Directors and served as a director from 1988 through late 1990,...." Wright 2d Aff. ¶ 14.

Plaintiff points to contrary language in a Form 10-K and an S-1 Registration statement: "Mr. Dean C. Kehler is the director designated by the stockholder*other than Carlton Investments* and Mr. Lewis and his affiliates. *No director has been designated by Carlton Investments.*" Form 10-K, TLC Beatrice International Holdings, Inc. December 31, 1989; Form S-1 Registration Statement, January 19, 1990 (emphasis added).

As the claim that Kehler served as Carlton's representative on the TLC Beatrice board is presently subject to dispute, I cannot now conclude that Carlton is subject to a special defense that would somehow disable it from effectively representing the interests of the corporation in this litigation.

IV. Personal Jurisdiction Over The Lewis Estate, TLC Group L.P., And Anthony Fugett

**\*\*6** I turn next to the motion of various defendants for dismissal predicated upon a lack of personal jurisdiction over them. Those defendants are the Lewis Estate, TLC Group, L.P. (a New York limited partnership), and Anthony Fugett.

When a motion to dismiss on grounds of lack of personal jurisdiction is decided without an evidentiary hearing, plaintiff has the burden to adduce from the record (*i.e.*, depositions, affidavits, admissions etc.) sufficient evidence to support a *prima facie* determination as to the existence of jurisdictional facts. *Hart Holding Company v. Drexel Burnham Lambert, Inc.,* Del.Ch., 593 A.2d

535, 539 (1991).

The assertion that there is no *in personam* jurisdiction over the listed defendants raises two major sub-issues. The first relates to the constitutionality of the exercise of *in personam* jurisdiction over each of the defendants. This sub-issue involves the factual and legal question whether there exists such contacts between each defendant, the disputes to be adjudicated, and the forum jurisdiction as to render it fundamentally fair for this court to insist that those defendants answer and defend these claims in this jurisdiction. This is the constitutional inquiry dictated first by the United States Supreme Court in *International Shoe Co. v. Washington,* 326 U.S. 310 (1945). The second sub-issue required to be answered is whether under the statutes of Delaware the processes of this court have been duly issued and served so that the court is authorized by the law of Delaware to adjudicate claims against these defendants. *See LaNuova D & B S.p.A. v. Bowe Co., Inc.,* Del.Supr., 513 A.2d 764, 768 (1986). I address these issues separately with respect to each of the defendants below.

A. Personal Jurisdiction Over the Lewis Estate

The Lewis Estate is being administered in and under the laws of the State of New York; no Delaware ancillary administrator has been appointed. Furthermore, so far as the record shows, the Lewis Estate itself has not undertaken any action subjecting it directly to the jurisdiction of this court under 10 *Del.C.* § 3104 (Personal jurisdiction by acts of nonresidents) or 12 *Del.C.* § 1569 (Jurisdiction by act of foreign personal representative). Obtaining jurisdiction over the Lewis Estate therefore turns on whether the decedent would have been amenable to suit in this jurisdiction on the claims now asserted. 12 *Del.C.* § 1570 (1987).

Whether a person is subject to the jurisdiction of this court turns on the dual inquiry: whether Delaware law provides a means effectively to serve the defendant with legal process and, secondly, whether the exercise of such coercive power does, in the circumstances, satisfy the constitutional requirement of due process of law.

1. Lewis Estate: Statutory Service of Process

The parties have focused their arguments

concerning the amenability of Mr. Lewis, and therefore the Lewis estate, to service of process on the scope and applicability of the Delaware long-arm statute, 10 *Del.C.* § 3104(c) (Supp.1994). Reliance on section 3104, however, forces the parties into a metaphysical assessment of whether various acts outside of this jurisdiction, of Mr. Lewis or persons acting for one of a large number of legal entities formed under Delaware law, qualify as "contacts" with this state and if they do, whose contacts are they.

**\*\*7**    Plaintiff's brief lists the alleged contacts between Lewis and Delaware upon which it seeks to premise jurisdiction over the Lewis Estate:    (1) diverting TLC Beatrice funds (held elsewhere) through Group L.P. to make at least 20 franchise tax payments (about $2,000 worth) to the Delaware Secretary of State (in Delaware) on behalf of companies unrelated to TLC Beatrice but in which Lewis held some interest;   (2) incorporating at least 21 Delaware entities;   (3) causing or directing a series of transactions involving the rental, delivery, later purchase, and subsequent sale of a corporate jet in Delaware (including the alleged incorporation of TLC Transport, Inc. and TLC Transport International, Inc. to facilitate the rental and purchase of the jet);  and (4) selecting TLC General Corp., a Delaware Corporation, as the sole general partner of TLC Group L.P.

All of these acts appear to have been the acts of several distinct legal actors.  But even if all of these acts were attributable to a single non-resident, there is room to doubt whether those contacts with Delaware would provide either a statutory or a constitutionally sufficient basis to require that person to adjudicate these claims in this jurisdiction.  One is entitled to doubt it.  *See World-Wide Volkswagen v. Woodson,* 444 U.S. 286, 297 (1980).

Plaintiff's reliance on Section 3104 for authority to serve process on the Lewis Estate eschews the seemingly logical alternative of basing jurisdiction on Mr. Lewis' status as a director of a Delaware corporation.  Under the director consent statute, 10 *Del.C.* § 3114 (Supp.1994) (FN4) this court may exercise jurisdiction over a director or former director of a Delaware corporation for claims of breach of directors' duties, based upon her implied consent to substituted service of process.

Plaintiff has doubtless invoked Section 3104 and

not Section 3114 because the holding in *Tabas v. Crosby,* Del.Ch., 444 A.2d 250 (1982) may be thought to preclude application of Section 3114 to the instant case.  *See id.* at 252-53.  *Tabas* noted that, although the implied consent provisions of Section 3114 plainly do subject a director to substituted service of process in suits premised upon breach of a legal or equitable duty as a director, even if she no longer serves as a director at the time suit is commenced, Section 3114 does *not* itself provide a means to effectuate substituted process upon the personal representative of a *deceased* director.  *Id.*  In *Tabas* this court interpreted the absence of any language in Section 3114 providing for substituted service upon the personal representative of a deceased director as requiring the conclusion that this section could not be applied to nonresident directors who die before suit or service of process is commenced.  *Id.*

In *Tabas* the parties apparently did not argue, or in all events the court did not consider the effect 12 *Del.C.* § 1570 and 12 *Del.C.* § 1571, which provides as follows:

**\*\*8**    § 1570 Jurisdiction by act of decedent.  In addition to jurisdiction conferred by § 1569 of this title, a foreign personal representative is subject to the jurisdiction of the courts of this State to the same extent that his decedent was subject to jurisdiction immediately prior to death.  (59 Del.Laws, c. 384, § 1.)

§ 1571 Service on foreign personal representative. (a) Service of process may be made upon the foreign personal representative by certified mail, addressed to his last reasonably ascertainable address, requesting a return receipt signed by the addressee only.  Notice by ordinary first-class mail is sufficient if certified mail service to the addressee is unavailable.  Service may be made upon a foreign personal representative in the manner in which service could have been made under other laws of this State on either the foreign personal representative or his decedent immediately prior to death.

In my opinion because Mr. Lewis was at the time of his death "subject to the jurisdiction of the courts of this state" with respect to claims asserting a breach of his fiduciary duty as a director (Section 3114), this court is authorized by Section 1570 to exercise jurisdiction over Mr. Lewis' estate and

© 2005 Thomson/West. No claim to original U.S. Govt. works.

Case 1:05-cv-00269-JJF    Document 3-2    Filed 05/12/2005    Page 9 of 36

1995 WL 694397, Carlton Investments v. TLC Beatrice Intern. Holdings, Inc., (Del.Ch. 1995)    **Page 7**

Section 1571 authorizes service of process for that purpose. I believe that the substances of Section 1571 was complied with in this instance.

The record contains sufficient evidence to satisfy the court for the limited jurisdictional purposes of this motion, that Mr. Lewis violated his duties as a director of TLC Beatrice so as to subject him to substituted service under Section 3114. (FN5) Mr. Lewis served as a director from the acquisition of TLC Beatrice through his death in 1992. Plaintiff has alleged that Lewis authorized or acquiesced in waste, misappropriation, and conversion of TLC Beatrice assets, and that he has breached his directoral duties to TLC Beatrice and its stockholders. These claims all arise from actions by him as a director of a Delaware corporation and fundamentally relate to internal affairs and corporate governance issues of particular concern to the state in which TLC Beatrice has been formed. The allegations and record clearly would place Mr. Lewis himself within the jurisdiction of this court under the provisions of Section 3114.

Since Section 1571 permits service of process on a foreign personal representative "in the manner in which service could have been made under other laws of this State on ... his decedent immediately prior to death," 12*Del.C.* § 1571 (1987), plaintiff may properly serve the Lewis Estate under Section 1571 *via* the Section 3114 provisions that would have permitted substituted service of process on Lewis himself prior to his death. Thus, 12 *Del.C.* § 1571 cures the service of process defect that this court recognized in *Tabas,* so that under it an estate of a director may be served with process as effectively as the director himself during his life.

2. Lewis Estate: Constitutional Requirements

**\*9** It is of course elementary that for any court to exercise coercive jurisdiction over a nonresident defendant, it is necessary that some minimum level of contacts exist between the defendant and this jurisdiction, such that the exercise of personal jurisdiction over that defendant comports with traditional notions of fair play and substantial justice. *See World-Wide Volkswagen v. Woodson,* 444 U.S. 286, 292 (1980). The touchstone of this fundamental fairness requirement is foreseeability: whether a person should have reasonably anticipated that her actions might result in the forum state asserting personal jurisdiction over her to adjudicate

disputes arising from these actions. *Id.* at 297.

By accepting appointment or election to the board of TLC Beatrice, Reginald Lewis impliedly consented to jurisdiction for cases in which he is a necessary or proper party, or actions for breach of directoral duties. Since plaintiff's claims all relate to alleged breaches in fiduciary duties, they fall squarely within Lewis' implied consent to jurisdiction. Thus, Mr. Lewis could clearly have expected to be hailed into Delaware courts to answer the type of claims asserted by plaintiff against him. Lewis' implied consent to service of process under the terms of Section 3114 would relieve any constitutional concerns over unfairness or injustice in requiring him to defend suit in Delaware.

The constitutionality of exercising jurisdiction over the Lewis Estate similarly follows from Lewis' implied consent to jurisdiction. Plaintiff here sues the co-executrices of the Lewis Estate--Loida Nicolas Lewis and Leslie N. Lewis--not personally but as the personal representatives of Lewis (FN6) for claims relating to Lewis' acts as a director. Sued in this capacity, the Lewis Estate is fairly bound by Lewis' consent to jurisdiction and the exercise of personal jurisdiction over the Lewis Estate passes constitutional scrutiny. It can hardly fail to satisfy fundamental fairness to require an estate to answer charges of delect or breach of duty of the decedent in a forum to which the decedent consented to such adjudication.

B. Personal Jurisdiction Over TLC Group L.P.

Defendant TLC Group L.P. ("Group") is a New York limited partnership with a Delaware corporation--TLC General Corp.--serving as its general partner. While the general partner can be personally served in this State, plaintiff relied on the general long-arm statute, 10 *Del.C.* § 3104 to serve Group. Group has now moved to be dismissed on the ground that it is not amenable to suit on the claims asserted in this jurisdiction.

As with the Lewis Estate, in order to justify the employment of Section 3104, plaintiff attributes various contacts to Group that in the first instance are acts of others. The only direct contacts between Group and Delaware that are alleged are (1) the payment of franchise taxes to the Delaware Secretary of State, and (2) the selection of a Delaware corporation as its general partner (which

© 2005 Thomson/West. No claim to original U.S. Govt. works.

of course is not an act of limited partnership's both of its partners). In addition, plaintiff argues that this court should attribute to Group the contacts of its alleged co-conspirators.

### 1. Group: Jurisdiction Under 10 *Del.C.* § 3104(c)

**\*\*10** Three subsections of the Delaware long-arm statute, (§ 3104(c)) are relied upon. It is contended that TLC Group (1) transacted business in Delaware [§ 3104(c)(1) ]; (2) caused tortious injury in Delaware by an act or omission in Delaware [§ 3104(c)(3) ]; and (3) caused tortious injury inside or outside of Delaware by an act or omission outside of Delaware and was doing business in Delaware [§ 3104(c)(4) ]. (FN7) I conclude that none of the provisions have been shown, *prima facie,* to be applicable.

* * *

* * *

Section 3104 is, in most of its aspects, a "single act" statute that establishes jurisdiction over nonresidents on the basis of a single act or transaction engaged in by the nonresident within the state. *Eudaily v. Harmon,* Del.Supr., 420 A.2d 1175, 1180 (1980); *Tabas v. Crosby,* Del.Ch., 444 A.2d 250, 254 (1982). Thus, this section permits the exercise of *specific* personal jurisdiction over the claims arising from the jurisdictional contacts listed in the relevant subsections. Subsection (c)(4) contemplates a general affiliating circumstance and thus permits the exercise of *general* personal jurisdiction over parties that qualify under its terms. *See, e.g., LaNuova D & B, S.p.A. v. Bowe Co., Inc.,* Del.Supr., 513 A.2d 764, 768 (1986); *Colonial Mtg. Serv. Co. v. Aerenson,* 603 F.Supp. 323, 327 (D.Del.1981).

*Subsection (c)(4).*

To prevail on plaintiff's assertion that Group's contacts with this State are such as to warrant the exercise of jurisdiction under subsection (c)(4), plaintiff must present evidence that Group "regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State."

First, the service of a Delaware corporation as a general partner does itself constitute "doing business" or "a persistent course of conduct" in the state. Plainly the law of its incorporation is an important body of law for the general partner, but the fact of Delaware incorporation alone surely does not establish that the foreign limited partnership is "doing business" in this jurisdiction.

Second, plaintiff asserts that Group was a link in a practice that violated TLC Beatrice's rights and had a Delaware connection in the following way. It allegedly made payments (and was reimbursed by TLC Beatrice) to the Delaware Secretary of State for annual franchise fee obligations of various Reginald Lewis-affiliated enterprises. Together these payments amount to about $2,000. While these payments do, in my opinion, afford a basis for the exercise of specific jurisdiction over Group (addressed below) they do not meet the statutory test for general jurisdiction of subsection (c)(4). The contact itself--the repeated delivery of a $50 fee--is too insignificant to serve as a predicate for "presence" or "doing business." Moreover, to construe the statute as conferring generally affiliated status on Group on these facts would give rise to a constituted problem. (FN8) The exercise of judicial power must satisfy "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945). The franchise tax payments fail, in my opinion, to satisfy the constitutional standards. *See Afros S.p.A. v. Kraus-Muffei Corp.,* 624 F.Supp. 464, 468 (D.Del.1985).

*Subsection (c)(1) and (c)(3).*

**\*\*11** These subsections authorize this court to exercise jurisdiction over a nonresident, or his personal representative, who directly or through an agent "transacts any business or performs any character of work or service in the State[,]" or "causes tortious injury in the State by an act or omission in this State[.]"

As noted the franchise fee payments do represent contacts sufficient to confer specific jurisdiction over the waste, misappropriation, and breach of fiduciary duty claims against Lewis arising from those payments. So limited jurisdiction here of such a claim would in my opinion be consistent with the constitutional test of minimum contacts.

© 2005 Thomson/West. No claim to original U.S. Govt. works.

1995 WL 694397, Carlton Investments v. TLC Beatrice Intern. Holdings, Inc., (Del.Ch. 1995)    **Page 9**

Specific personal jurisdiction over one claim, however, does not confer specific jurisdiction over plaintiff's other claims. *See Sears, Roebuck & Co. v. Sears plc,* 774 F.Supp. 1297, 1302 (D.Del.1990); CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1588 (1969). "Indeed, where general jurisdiction over a defendant is lacking, the constitutional analysis distinguishing between general and specific jurisdiction would become meaningless if the finding of specific jurisdiction over one claim provided the basis for extending jurisdiction over all other alleged claims." *Sears, Roebuck,* 774 F.Supp. at 1302.

\* \* \*

\* \* \*

### 2. Group: Section 17-911 of Limited Partnership Statute

Plaintiff also claims that this court has jurisdiction over Group because (1) a Delaware corporation, serves as Group's sole general partner and (2) Section 17-911, of our Limited Partnership Act, (FN9) provides for such jurisdiction. Plaintiff relies on *Macklowe v. Planet Hollywood, Inc.,* Del.Ch., C.A. No. 13689, Steele, V.C. (Oct. 4, 1994), contending it holds generally that a Delaware court may always exercise jurisdiction over an unregistered foreign limited partnership if a Delaware corporation serves as its general partner. I cannot read that precedent so broadly. Whether the "presence" of a "general partner" in the forum jurisdiction will, without more, subject the limited partnership to *in personam* jurisdiction is a question that turns on the further question whether the law of the creation of the limited partnership treats it as a jural entity. New York law, which forms and creates Group, does treat Group as a legal entity, *i.e.,* having a distinct legal existence from its general or limited partners. (*see* fn. 8) Therefore, like a corporation or other legal entity, the simple presence in this jurisdiction of a person with management authority with respect to the entity will not itself subject the entity to jurisdiction, unless that presence is in connection with the affairs of the entity.

### 3. Group: Conspiracy Theory of Jurisdiction

Plaintiff also attempts to attribute other contacts to Group (*i.e.,* transactions relating to the purchase of

a corporate jet and the incorporation of Delaware subsidiaries), but fails to present evidence that Group itself performed these acts or even that it "caused" or "directed" these actions. Instead, plaintiff alleges broadly that this court may exercise jurisdiction over Group based upon an *agency* among its alleged co-conspirators. By casting Group as a member of a conspiracy to defraud TLC Beatrice, plaintiff hopes to attribute the jurisdictional contacts of the alleged co-conspirators to Group.

**\*\*12** If the plaintiff can show *prima facie* the existence of a conspiracy in which Group participated, "a basis will have been shown to employ the Delaware long-arm Statute [10 *Del.C.* § 3104(c) ] on the view that one member of a conspiracy acts as the agent of others with respect to the aim of the conspiracy." *Hart Holding,* 593 A.2d at 542; *see also Hercules Inc. v. Leu Trust and Banking,* Del.Supr., 611 A.2d 476, 481 (1992). This court could then exercise personal jurisdiction over the nonresident based on the forum contacts of the co-conspirators. *See Mobile Oil Corp. v. Advanced Envtl. Recycling Technologies, Inc.,* 833 F.Supp. 437, 446 (D.Del.1993).

The Supreme Court has defined the conspiracy theory of jurisdiction in *Istituto Bancario Italiano v. Hunter Eng. Co.,* Del.Supr., 449 A.2d 210, 225 (1982). Under the conspiracy theory:

[a] conspirator who is absent from the forum state is subject to the jurisdiction of the court, …, if the plaintiff can make a factual showing that: (1) a conspiracy to defraud existed; (2) the defendant was a member of that conspiracy; (3) a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state; (4) the defendant knew or had reason to know of the act in the forum state or that acts outside the forum state would have an effect in the forum state; and (5) the act in, or effect on, the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy.

*Id.* This court has narrowly construed the conspiracy theory of jurisdiction, seeing in it an easy technique to evade the thrust of the *International Shoe* holding. Proper invocation of this basis of jurisdiction requires factual proof of each enumerated element. *See Newspan, Inc. v. Hearthstone Funding Corp.,* Del.Ch., C.A. No. 13304, Allen, C. (May 10, 1994), Mem.Op. at

© 2005 Thomson/West. No claim to original U.S. Govt. works.

1995 WL 694397, Carlton Investments v. TLC Beatrice Intern. Holdings, Inc., (Del.Ch. 1995)     **Page 10**

18-19 ("all of [the five elements of a conspiracy] must be satisfied before a Delaware court may exercise personal jurisdiction." *Id.*). *Istituto Bancario,* 449 A.2d at 225 (requiring that plaintiff make a "factual showing" of required elements).

Lewis' dominant ownership position in the limited partnership and his complete ownership and control over the corporate general partner of Group indicates a strong solidarity between Lewis and Group. However, even assuming elements (1) and (2) of conspiracy enumerated in *Istituto Bancario,* are satisfied, plaintiff must offer evidence that the contacts of the conspiratorial agents would themselves satisfy the Delaware long-arm statute elements (3 & 4) such that, if they were attributed to Group, this court could exercise jurisdiction over Group based on those contacts (element 5). *See Mobile Oil,* 833 F.Supp. at 446.

First, as to whose acts are considered as acts of Group for *in personam* jurisdiction, it is plaintiff's burden to show *prima facie* evidence that a conspiracy with another person existed and that the others act touching upon Delaware was in furtherance. In my view, the record does sufficiently establish an agreement between Lewis and Group with respect to franchise payments made through Group for the benefit of Lewis and Lewis affiliates. There is no evidence linking those payments by Group to the more substantial contact established by the receipt of an airplane in this State.

**13** Similarly, the incorporation of various Delaware entities, particularly the entities involved in the rental, purchase, delivery, and sale of the jet, have not been shown to fall within a "conspiracy" between Lewis and Group.

Plaintiff's attempt to define a broad plan "to defraud TLC Beatrice" fails because of its absence of specificity and evidence. Plaintiff neglects to trace the enumerated elements of conspiracy with respect to other alleged co-conspirators. Thus, left unanswered are questions such as (1) who the members of the conspiracy were and whether, in fact, the members of the alleged conspiracy "voluntarily participated in [the] conspiracy with knowledge of its acts in or effects on the forum state …" *Istituto Bancario,* 449 A.2d at 225; and (2) are any acts on effects in Delaware a part of a conspiracy and what is the scope of it.

I conclude that the conspiracy theory of jurisdiction is not sufficiently proven to require Group to appear and defend the panoply of claims asserted in this suit.

C. Personal Jurisdiction Over Anthony Fugett

1. Fugett: Statutory Basis: 10 *Del.C.* § 3114

Plaintiff asserts jurisdiction over Anthony Fugett ("Fugett") under 10*Del.C.* § 3114, the directors consent statute.

Carlton argues that Fugett's actions as a director to approve, ratify, and adopt resolutions previously considered by the TLC Beatrice board render him subject to the court's jurisdiction for adjudication of claims allegedly arising from those acts. These resolutions included (1) a $22.1 million payment to Lewis, (2) the award of stock appreciation rights to each director, and (3) a generous compensation agreement for his brother, Jean Fugett.

Mr. Fugett contends that ratification was not necessary for the resolutions to take effect. Therefore, he says, his action in ratifying them cannot form the basis of jurisdiction under Section 3114. He asserts that the holding in *Istituto Bancario,* 449 A.2d at 227-28, supports this position. There the Delaware Supreme Court held that a director's approval of the ministerial act of exchanging old share certificates for newly issued certificates, after the other parties to the conspiracy had already acted to issue and distribute the new shares, did not by itself constitute a wrongful action so as to subject the director to the personal jurisdiction under Section 3114. The Court specifically noted that this share exchange occurred after "all acts pursuant to, and necessary for completion of the conspiracy had been completed." The court additionally noted that, as regarding the share exchange, "board approval was not necessary and … in fact, no action was taken." *Id.* at 228.

The *Bancario* holding is not dispositive on these facts since it is not clear that all acts to complete the wrong had been accomplished by the time of the ratification. More basically this point involves the distinction between jurisdiction to consider a claim and the validity of the claim itself. The ability of a shareholder to invoke Section 3114 cannot turn upon whether the facts allege constitute a valid claim. If they do not, the director may have the case

© 2005 Thomson/West. No claim to original U.S. Govt. works.

1995 WL 694397, Carlton Investments v. TLC Beatrice Intern. Holdings, Inc., (Del.Ch. 1995)     **Page 11**

dismissed on its merits under Rule 12(b)(6), not under 12(b)(2) or (4). Although the efficacy or necessity of Mr. Fugett's ratification is not certain, his potential liability for effecting such ratification, supported by evidence sufficient to create a *prima facie* case of jurisdictional status, suffices to permit this court to take personal jurisdiction over him. "Jurisdiction, ..., is not defeated ... by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover.... Whether the complaint states a cause of action on which relief could be granted is a question of law and just as issues of fact it must be decided after and not before the court has assumed jurisdiction over the controversy." *Bell v. Hood,* 327 U.S. 678, 682 (1946).

V. Statute Of Limitations

A. Limitations: The Lewis Estate

**\*\*14** Defendants claim that this suit is barred against the Lewis Estate because the applicable statute of limitations has run. Mr. Lewis died in 1993; this suit was not instituted until 1995. The Lewis Estate argues that, under 10 *Del.C.* § 8121 (the "borrowing statute"), (FN10) an eight month limitations period of 12 *Del.C.* § 2102 applies to the instant case and bars the present claim.

Section 2102, however, has no bearing on the amenability of a suit in Delaware for breach of fiduciary duties against an estate administered in New York. If indeed Chapter 21 and its purpose fail to illustrate this principle, the language of Section 2102 with reference to Section 2104 should. Chapter 21 is part of the comprehensive regulation of the administration of Delaware estates. It does not apply to claims against foreign estates.

Under Section 2104 the presentation of claims requires mailing the proper documents to the personal representative or filing such claim with the Register of Wills. A foreign estate has no personal representative in Delaware and must open an ancillary proceeding in Delaware to establish a personal representative in Delaware. Furthermore, filing with the Register of Wills has no application to estates established and administered in foreign jurisdictions.

Consistent with this analysis, this court stated in *Wimpfheimer v. Goldsmith,* Del.Ch., 298 A.2d 778

(1972), that, "under well-established law, ... the domiciliary state, has the right to determine the validity and the timeliness of claims against the estate." *Id.* at 780. Because Lewis was a domiciliary of New York and his estate is being administered in New York, this general rule dictates that New York law, and not Delaware law, defines the period in which claims against the estate must be asserted. Insofar as this court is concerned in this suit claiming breach of fiduciary duty, the appropriate concept is *laches* not limitations. *Kahn v. Seaboard Corp.,* Del.Ch., 625 A.2d 209 (1993).

B. Limitations: Alfonso, Cloud, and Mowry

Defendants Alfonso, Cloud and Mowry contend that they should be dismissed as defendants since, they say, an applicable statute of limitations had expired with respect to any claims against them. In asserting this statute of limitations bar, defendants rely on 10 *Del.C.* § 8106, which, if it applies, bars claims seeking damages or other legal relief after three years. Alfonso, Cloud, and Mowry all left the TLC Beatrice board in 1989, almost five years before plaintiff brought this action.

Plaintiff responds that where a complaint alleges self-dealing by corporate fiduciaries, the three-year limitations period will not be employed by the Court of Chancery, until a reasonably diligent shareholder knew or had reason to know the facts giving rise to the alleged wrong. *See Kahn v. Seaboard Corp.,* Del.Ch., 625 A.2d 269, 276 (1993).

Plaintiff has the burden of pleading facts that will qualify the case for the tolling principle. *See Litman v. Prudential-Bache Properties, Inc.,* Del.Ch., C.A. No. 12137, Chandler, V.C. (Jan. 14, 1994), Mem.Op. at 8. Certainly proof of some affirmative act of concealment by the directors would entitle the court to not invoke statute of limitations. *Id.* at 5. Likewise, under the doctrine of equitable tolling, plaintiff may also qualify for tolling even absent an affirmative act of concealment, if it alleges (1) that defendants had a fiduciary relation with plaintiff, (2) self-dealing by the defendants, and (3) that plaintiff did not know or have reason to know of the facts giving rise to the alleged wrong. *E.g., Kahn,* 625 A.2d at 276. This principle of justifiable reliance by the beneficiary of a fiduciary duty on the integrity of the holder of the power subject to the duty, that plaintiff relies upon here.

© 2005 Thomson/West. No claim to original U.S. Govt. works.

1995 WL 694397, Carlton Investments v. TLC Beatrice Intern. Holdings, Inc., (Del.Ch. 1995)        **Page 12**

**\*\*15** Defendants attempt to dispose of the tolling claim by asserting that plaintiff had a representative on the board and thereby knew, or should have known the facts now claimed to constitute a breach of fiduciary duty.

The critical fact--whether Carlton knew relevant facts in circumstances in which it could not reasonably rely any longer on the board's integrity-- are subject to dispute in the record and not resolvable on this motion. Carlton asserts that it did not have a representative on the board. Carlton also claims that Lewis, in fact, failed to disclose information regarding the self-dealing transactions to the board of TLC Beatrice. Thus, even if Carlton had a representative on the board, that representative would not have had information sufficient to precipitate suit.

Does this fact question concerning what Carlton knew or should have known extend to the time at which defendants Alfonso, Cloud and Mowry served on the Beatrice board? If plaintiff was blamelessly unaware in 1989 of the facts and circumstances that it claimed when constituted a wrong when it filed this suit, then I believe that the directors must answer the claim, whether or not they as individuals concealed any action or misled anyone. When the issue is a time-bar in an action against a fiduciary. The emphasis in equity is upon the protection of the beneficiary of a fiduciary duty, so long as she is reasonably attentive to her interests, albeit trusting. *See Kahn v. Seaboard, supra.*

Thus, the unresolved state of the record leads me to decline to grant this motion at this time.

## VI. Dismissal Of Conversion And Aiding And Abetting/Conspiracy Claims

Defendants have moved to dismiss the conversion and aiding and abetting/civil conspiracy claims for failure to state valid claims for relief. In a motion to dismiss for failure to state a claim, the court will consider all well pleaded allegations as true, *see Del. State Troopers Lodge No. 6 v. O'Rourke,* Del.Ch., 403 A.2d 1109, 1110 (1979), and will construe the complaint and all inferences contained therein in the light most favorable to the plaintiff. *See id.* The moving party has the burden to show that the plaintiff could not prevail under any state of facts which could be proven to support his claim. *See Summers v. Beneficial Corp.,* Del.Ch., C.A.

No. 8788, Hartnett, V.C. (March 9, 1988).

### A. Civil Conspiracy/Aiding and Abetting

To establish this civil conspiracy or aiding and abetting claim, plaintiff must plead facts tending to show (1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, and (3) a knowing participation in the breach by the non-fiduciary defendant. *Weinberger v. Rio Grande Industries, Inc.,* Del.Ch., 519 A.2d 116, 131 (1986) ; *Gilbert v. El Paso Co.,* Del.Ch., 490 A.2d 1050, 1057 (1984). Such causes largely come down to what constitutes "knowing participation." (FN11)

The actions of Group and its general partner TLC Group Corp., as set forth in the complaint, clearly reveal a knowing participation in the alleged acts that are said to constitute breaches of fiduciary duties. The complaint sets forth a melange of payments made by Group to Lewis, his friends and family, his companies, and its own employees which were later reimbursed by TLC Beatrice. This participation as middleman for and beneficiary of improper disbursements by TLC Beatrice inextricably intertwines TLC Group L.P. and TLC Group Corp. with the defendant directors in this action for breach of fiduciary duties.

**\*\*16** As for the remaining entities, plaintiff has alleged sufficient facts to indicate their participation in a range of acts claimed to constitute waste and misappropriation. Specifically, they "participated" in receiving an improper benefit, directly or indirectly, from Beatrice: TLC Holdings allegedly obtained office space free of rent, and McCall Pattern Holdings allegedly had its legal expenses paid. Regardless of the possibly *de minimus* nature of the benefit conferred, the receipt of improper benefits suffices to prove their participation in the alleged breaches of fiduciary duties. Furthermore if one accepts the pleadings, TLC Transport participated in the breach of fiduciary duties in facilitating the lease of the corporate jet for TLC Beatrice and Lewis. For the purpose of assessing this motion to dismiss, this court infers their "knowing" participation from the factual allegations in the complaint as to the overarching control of Lewis over these entities. Any claims that the defendant companies unknowingly participated in the alleged breaches of fiduciary duties might be proven to be true later but for these purposes I conclude enough is alleged to state a claim.

© 2005 Thomson/West. No claim to original U.S. Govt. works.

B. Conversion

Defendants have moved to dismiss the conversion claim, arguing that conversion applies only to tangible property and not to the wrongful taking of money. ("The rule therefore is that an action for conversion of money will lie only where there is an obligation to return the *identical* money delivered by the plaintiff to the defendant." This is a traditional limitation of this ancient form of recovery. Plaintiff concedes that defendants could not have converted TLC Beatrice funds, but it argues that the "wrongful exercise of dominion over" (1) the services of the corporate jet, and (2) the leased office space, support its conversion claim.

Conversion is the "wrongful exercise of dominion over the property of another, in denial of his right, or inconsistent with it." *Drug, Inc. v. Hunt,* Del.Supr., 168 A. 87, 93 (1933). An action for conversion has traditionally applied to the wrongful exercise of dominion over tangible goods. *See* RESTATEMENT (SECOND) OF TORTS § 222A, cmt. a. Following a modern trend, Delaware courts have tentatively expanded the doctrine to encompass some intangible goods where the intangible property relations are merged into a document. *See Drug, Inc. v. Hunt,* Del.Supr., 168 A. 87, 93 (1933) (specific stock certificates); *see generally, Mastellone v. Argo Oil Corp.,* 82 A.2d 379, 382-83 (1951) (stock certificates). Plaintiff here argues for an expansion of conversion to encompass wrongful taking of the right to occupy space and the right to the services of the jet plane. We do not, however, have a shortage of available legal theories of recovery should plaintiff prove the factual elements of this case. There is no need to attempt to craft new theories of recovery of this type. Therefore I conclude that conversion is not an available theory of recovery to plaintiff insofar as it complains of the payment of money by TLC Beatrice or the intangibles not represented in an instrument.

VII. Motion To Dismiss Claims Against Anthony Fugett, TLC Holdings And TLC Transport

**17.** Defendants have moved to dismiss Anthony Fugett, TLC Holdings, and TLC Transport, claiming that the complaint fails to allege any wrongdoing on their part. In this context, the moving party must show that plaintiff could not prevail under any state of facts which could be

proven to support her claim. *Rabkin v. Philip A. Hunt Chemical Corp.,* Del.Supr., 498 A.2d 1099, 1004 (1985). Here, defendants contend that Fugett should be dismissed because the complaint fails to allege that he did anything wrong and because all the payments challenged by Carlton were authorized prior to his becoming a director. I addressed this above; questions remain as to whether Fugett's*spost hoc* ratification of certain resolutions regarding the challenged payments had any legal significance. The potential liability of Fugett remains an unsettled question of fact and law.

Defendants similarly move to dismiss TLC Holdings Corp. The complaint alleges that TLC Holdings Corp. occupied space in TLC Beatrice offices and had its taxes and other governmental levies paid by TLC Beatrice. As discussed above, this receipt of benefits from TLC Beatrice may subject it to liability under the aiding and abetting/ civil conspiracy claim alleged by plaintiff.

\* \* \*

\* \* \*

Plaintiffs shall submit a form or order on notice.

(FN1.) *See* Robert C. Clark, CORPORATE LAW § 9.5 (1986) (theory of shareholders' collective action problems in public corporations).

(FN2.) Defendants alternatively and additionally argue that Carlton's vindictiveness should disqualify it as an adequate shareholder representative. Defendants allege that this derivative suit serves only as another action in a larger pattern of harassment that includes allegedly unjustified demands that TLC Beatrice seek registration of its stock and the initiation of contempt proceeding against TLC Beatrice for asserting affirmative defenses in the New York suit purportedly in violation of a previous court order. However, the record falls far short of establishing facts that would disqualify Carlton as a representative of the shareholder class based on its alleged "vindictiveness" or any other such motive.

(FN3.) "[A]cquiescence must be with knowledge of the wrongful acts themselves, and of their injurious consequences; it must be voluntary, not the result of accident, nor of causes rendering it a physical, legal, or moral necessity, and it must last for an

© 2005 Thomson/West. No claim to original U.S. Govt. works.

Case 1:05-cv-00269-JJF    Document 3-2    Filed 05/12/2005    Page 16 of 36

1995 WL 694397, Carlton Investments v. TLC Beatrice Intern. Holdings, Inc., (Del.Ch. 1995)    **Page 14**

unreasonable length of time, so that it will be inequitable even to the wrong-doer to enforce the peculiar remedies of equity against him, after he has been suffered to go on unmolested, and his conduct apparently acquiesced in." 3 SPENCER W. SYMONS, POMEROY'S EQUITY JURISPRUDENCE, § 817 at 246 (5th ed. 1941).

(FN4.) "Every nonresident of this State who after September 1, 1977 accepts election or appointment as a director, trustee or member of the governing body of a corporation organized under the laws of this State or who after June 30, 1978, serves in such capacity and every resident of this State who so accepts election or appointment or serves in such capacity and thereafter removes his residence from this State shall, by such acceptance or by such service, be deemed thereby to have consented to the appointment of the registered agent of such corporation (or, if there is none, the Secretary of State) as his agent upon whom service of process may be made in all civil actions or proceedings brought in this State, by or on behalf of, or against such corporation, in which such director, trustee or member is a necessary or proper party, or in any action or proceeding against such director, trustee or member for violation of his duty in such capacity, whether or not he continues to serve as such director, trustee or member at the time suit is commenced. Such acceptance or service as such director, trustee or member shall be a signification of the consent of such director, trustee or member that any process when so served shall be of the same legal force and validity as if served upon such director, trustee or member within this State and such appointment of the registered agent (or, if there is none, the Secretary of State) shall be irrevocable." 10 *Del.C.* § 3114(a).

(FN5.) That is to say sufficient allegations have been made and the record is sufficient to allow Section 3114 to be invoked. I mean to suggest no more with respect to the merits.

(FN6.) Plaintiff also sues defendant Leslie N. Lewis in her individual capacity as a director of TLC Beatrice.

(FN7.) "As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident or his personal representative, who in person or through an agent:

(1) Transacts any business or performs any character of work or service in the State;

(3) Causes tortious injury in the State by an act or omission in this State;

(4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if he *regularly does or solicits business, engages in any other persistent course of conduct in the State* or derives substantial revenue from services, or things used or consumed in the State;

10 *Del.C.* § 3104(c).

(FN8.) "[A] limited partnership that is accorded the right to sue or be sued in its own name, is a 'person' under the due process clause of the Fourteenth Amendment for the purpose of determining whether it possesses a constitutional privilege against suit in the forum jurisdiction." *Hart Holding Company Incorp. v. Drexel Burnham Lambert Incorp.,* Del.Ch., C.A. No. 11514, Allen, C. (May 28, 1992), Mem.Op. at 10. As previously noted, Group L.P. is a New York limited partnership and, under New York law, a limited partnership may be sued in its own name. *See* N.Y.Civ.Prac.L. & R. § 1025 (McKinney 1976) ("Two or more persons conducting a business as a partnership may sue or be sued in the partnership name, and actions may be brought by or against the president or treasurer of an unincorporated association on behalf of the association in accordance with the provisions of the **17.** general associations law." *Id.*).

**17_**  (FN9.) 6 *Del.C.* § 17-911 states:

Any foreign limited partnership which shall do business in the State without having registered under § 17-902 of this title shall be deemed to have thereby appointed and constituted the Secretary of State of the State as its agent for the acceptance of legal process in any civil action, suit or proceeding against it in any state or federal court in the State arising or growing out of any business done by it within the State.

*Id.*

(FN10.) Section 8121 holds in relevant part:

© 2005 Thomson/West. No claim to original U.S. Govt. works.

1995 WL 694397, Carlton Investments v. TLC Beatrice Intern. Holdings, Inc., (Del.Ch. 1995)    **Page 15**

"Where a cause of action arises outside of this State, an action cannot be brought in a court of this State to enforce such cause of action after the expiration of *whichever is shorter,* the time limited by the law of this State, *or* the time limited by the law of the state or country where the cause of action arose, for bringing an action upon such cause of action."

10 *Del.C.* § 8121 (1975) (emphasis added).

(FN11.) In some occasions this court has dilated upon the "knowing participation" element by employing the following test of a civil conspiracy (1) the participation of two or more persons, (2) some object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more overt acts, and (5) damages as a proximate result thereof. *See Tuckeran v. AeroSonic Corp.,* Del.Ch., C.A. No. 8094, Hartnett, V.C. (June 29, 1981), Mem.Op. at 2; *Weinberger v. UOP, Inc.,* Del.Ch., 426 A.2d 1333, 1348 (1981), *rev'd on other grounds,* Del.Supr., 457 A.2d 701 (1983). For the purposes of the instant case, however, analysis under the civil conspiracy test mirrors the analysis under the civil conspiracy/aiding and abetting standard. Both primarily focus on the understanding of the parties with respect to their complicity in any scheme to defraud or in any breach of fiduciary duties.

© 2005 Thomson/West. No claim to original U.S. Govt. works.

B

LEXSEE 2003 U.S. DIST LEXIS 22429

COMMERCE NATIONAL INSURANCE SERVICES, INC., Plaintiff, v. MICHAEL BUCHLER, NEW CASTLE INSURANCE, LTD., and MARIANNE PISTORIA, Defendants.

Civ. No. 02–037–SLR

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2003 U.S. Dist. LEXIS 22429

December 10, 2003, Decided

**SUBSEQUENT HISTORY:** Affirmed by Commerce Nat'l Ins. Servs. v. Buchler, 2004 U.S. App. LEXIS 24991 (3d Cir. Del., Dec. 6, 2004)

**DISPOSITION:** [*1] Plaintiff's motion for summary judgment denied. Defendants' motions for summary judgment granted.

**LexisNexis(R) Headnotes**

**COUNSEL:** Lynne M. Parker, Esquire of Hollstein, Keating, Cattell, Johnson and Goldstein, P.C., Wilmington, Delaware. Counsel for Plaintiff.

Matthew F. Boyer, Esquire of Connolly, Bove, Lodge & Hutz, Wilmington, Delaware. Counsel for Defendant Buchler.

Francis J. Trzuskowski, Esquire of Trzuskowski, Kipp, Kellerher & Pearce of Wilmington, Delaware. Counsel for Defendant New Castle Insurance, Ltd.

David Jr. Ferry, Jr., Esquire of Ferry, Joseph & Pearce, P.A. of Wilmington, Delaware. Counsel for Defendant Pistoria.

**JUDGES:** Sue L. Robinson, United States District Judge.

**OPINIONBY:** Sue L. Robinson

**OPINION:**

   **MEMORANDUM OPINION**

Wilmington, Delaware

**ROBINSON, Chief Judge**

**I. INTRODUCTION**

Plaintiff Commerce National Insurance Services, Inc. initiated suit against defendants Michael Buchler, Marianne Pistoria and New Castle Insurance, Ltd., after defendants Buchler and Pistoria left the employ [*2] of Commerce and commenced an employment relationship with defendant New Castle, which relationship lasted less than six months. Plaintiff has asserted five causes of action against defendants. In count I, plaintiff alleges that defendants Buchler and Pistoria breached their employment contracts, specifically, the non–solicitation and confidential information sections of said contracts. In count II, plaintiff asserts that defendants tortiously interfered with plaintiff's existing contracts. In count III, plaintiff asserts that defendants tortiously interfered with prospective economic advantage. In count IV, plaintiff asserts that defendants have caused plaintiff to be defamed. In count V, plaintiff asserts that defendant Buchler converted and misappropriated to his personal use commissions due and owing plaintiff. Jurisdiction is premised on diversity of citizenship, pursuant to 28 U.S.C. § 1332. Pending before the court are motions for summary judgment filed by all parties. For the reasons that follow, the court shall grant defendants' motions and deny plaintiff's motion.

**II. STANDARD OF REVIEW**

A court shall grant summary judgment only if "the pleadings, [*3] depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." Horowitz v. Fed.

Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying [*4] facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).

## III. STATEMENT OF FACTS

For purposes of these motions, the material facts are essentially undisputed.

In 1995, defendant Buchler was hired by J.A. Montgomery, Inc. as an insurance producer in its employee benefits operation. At all pertinent times, defendant was responsible for generating new business in the employee health insurance area and for servicing [*5] current customers. In connection with his employment with J.A. Montgomery, defendant signed a standardized employment contract. Of relevance to the instant litigation are the following provisions:

E. Termination of Employment. Employment under this Contract may be terminated by either party upon 30 days' written notice to the other party.

1. In the event that either party gives notice of termination, "Employer" shall have the right, at its option, to elect to waive the services of "Employee" during all or part of the period following the date of such notice, and, in such event, "Employee" shall have no further access to the premises of "Employer" except as "Employer" otherwise specifically authorizes.

F. Confidential Information and Trade Secrets. "Employee" will, during the term of Employee's employment, be working with confidential information and trade secrets belonging to "Employer", including for example, internal procedures, programs and forms ...."Employee" acknowledges and agrees that all such information is confidential and is the exclusive property of "Employer." "Employee" covenants and agrees that Employee will not disclose to anyone, either directly or [*6] indirectly, during the term of this Contract, or, at any time thereafter, any such confidential information, nor will Employee use the same for any purpose other than in the course of this employment and for the exclusive benefit of "Employer."

G. Post Termination Limitations

3. Non-Solicitation Agreement
To protect the interests of "Employer" in "Employer's" accounts, as hereinabove described, "Employee" convants [sic] and agrees as follows:

A. For a period of 365 days following **termination of "Employee's" employment by "Employer"**, "Employee" will not publish, distribute, or cause or allow to be published or distributed, notice to any of "Employer's" accounts to the effect that "Employee" is not [sic] longer employed by "Employer" or that "Employee" has relocated "Employee's" business or is affiliated with or employed by any direct or indirect competitor of "Employer."

B. For a period of 36 months following **termination of employment,** "Employee" shall neither call upon or solicit, either for "Employee" or for any other person or firm, any "Class A, Class B, or Class C Accounts", nor shall "Employee" make known to any other person or firm, [*7] either directly or indirectly, the names or addresses of any such "Accounts" or any confidential information relating to any of them; provided, however, that

2003 U.S. Dist. LEXIS 22429, *7

the foregoing limitation is not intended to prevent "Employee" from soliciting [sic] "Class A, Class B, or Class C Accounts" which have not had any business in force with "Employer" during the 12-month period preceding termination of employment.

Post-Termination Purchase of Accounts

The parties recognized [sic] that there may be accounts that desire, with or without solicitation by "Employee", to follow "Employee" with their insurance business if "Employee" leaves "Employer", and that **such accounts are free to select their insurance representatives.** "Employee" agrees that it would be unfair, as between "Employer" and "Employee" not to compensate "Employer" when such an event occurs. Accordingly, "Employee" agrees that if, **during the 36 month period following termination of employment by "Employer",** an account which "Employee" is otherwise not permitted to solicit pursuant to the provisions of Agreement G of this Contract, nevertheless places business through "Employee" either directly or with an entity [*8] with which "Employee" is affiliated or employed, "Employer" as fair compensation for such account [shall be paid] an amount equal to the following: ...

(D.I. 153, Ex. A-A) (emphasis added)

In August 1998, Commerce Bancorp, the parent company of plaintiff, acquired J.A. Montgomery. In connection with the acquisition, defendant Buchler executed an "Acknowledgment" that the J.A. Montgomery Agreement "shall remain in full force and effect" and that he would be "bound by all the terms and provisions of the Agreement as an employee of Commerce National." (D.I. 153, Ex. A-A) n1 From 1998 to 2001, the number of employees at plaintiff's Delaware division, formerly J.A. Montgomery,

decreased in number as operations were centralized with plaintiff's New Jersey headquarters.

n1 In October 2000, defendant Pistoria signed a separate confidentiality and non-solicitation agreement with plaintiff, by which she agreed to not call on, solicit, or accept for her benefit, any client of plaintiff's for a period of 24 months following termination of her employment for any reason. (D.I. 153, Ex. A-D)

[*9]

Defendant Pistoria, who worked with defendant Buchler as a customer service representative, left plaintiff's employ on December 18, 2001. On December 31, 2001, defendant Buchler announced his decision to resign. He left plaintiff on January 4, 2002. In January 2002, defendant Buchler advised his clients that he was leaving and referred them to plaintiff's New Jersey office, as he was instructed to do. During the week of January 7, 2002, defendant New Castle sent out an announcement that defendants Buchler and Pistoria were joining the firm. (D.I. 153, Ex. A-C) During that same week, defendant contacted multiple customers, many of whom followed defendant Buchler to his new employ at New Castle. (D.I. 153, Ex. E at 127-173) On January 14, 2002, the instant lawsuit was filed.

IV. ANALYSIS

A. Count I: Breach of Contract

1. Standard of review.

Defendant Buchler's employment contract is governed by Delaware law. n2 Under Delaware law, where the language of a contract is plain and clear on its face, the writing itself is the sole source for gaining an understanding of its intent. Citadel Holding Corp. v. Roven, 603 A.2d 818, 822 (Del. 1992). Where no ambiguity [*10] exists, the court will not resort to extrinsic evidence as an aid to interpretation, but will enforce the contract in accordance with the plain meaning of its terms. City Investing Co. Liquidating Trust v. Continental Casualty Co., 624 A.2d 1191, 1198 (Del. 1993). A contract will not be considered ambiguous unless "the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." Rhone-Poulenc Basic Chemicals Co. v. American Motorists Ins. Co., 616 A.2d 1192, 1196 (Del. 1992). If the court finds ambiguity in a contractual provision, it will consider extrinsic evidence and apply rules of construction. Phillips Home Builders, Inc. v. Travelers Ins. Co., 700 A.2d 127, 129 (Del. 1997). Employment contracts which restrict a person's ability to pursue a livelihood are "scrutinized

2003 U.S. Dist. LEXIS 22429, *10

with particular care because they are often the product of unequal bargaining power and because the employee is likely to give scant attention to the hardship he may later suffer through loss of his livelihood. This is especially so where, as here, the restraint is imposed by the employer's [*11] standardized printed form." RHIS v. Boyce, Civ. No. 18924, 2001 Del. Ch. LEXIS 118, 2001 WL 1192203 at *5 (Del. Ch. 2001).

n2 Defendant Pistoria's contract is governed by the law of New Jersey. The parties have not indicated that New Jersey contract law is substantially different from that of the State of Delaware. Therefore, the court will apply the same principles of contract interpretation to both contracts.

**2. Non-solicitation provisions.**

**a. Defendant Buchler.**

The non-solicitation provisions at issue in defendant Buchler's contract are included under the caption "Post Termination Limitations". There is no question but that the non-solicitation limitations are applicable when employment is involuntarily terminated by the employer. The question is whether the non-solicitation limitations also are applicable when an employee voluntarily resigns. The court recognizes that the language of the non-solicitation agreement is somewhat inconsistent in this regard; nevertheless, the court concludes that the structure [*12] of the entire section (as poorly written as it is) only makes sense if construed as limited to involuntary terminations. Although subparagraph G.3.B is not specifically limited to an involuntary termination of employment (as is subparagraph G.3.A), subparagraph "B" is immediately followed by another provision which refers to subparagraph "B" and is specifically limited to "the 36 month period following termination of employment by 'Employer'". Moreover, because subparagraphs "A" and "B" limit different conduct, they are not redundant. Based on the language of the contract, the court concludes that the non-solicitation limitations are applicable only when employment is terminated by the employer. n3 Therefore, defendant Buchler's motion for summary judgment shall be granted in this regard and plaintiff's motion for summary judgment shall be denied.

n3 Plaintiff argues in this regard that, because defendant Buchler did not give 30 days' written notice as required by the contract and plaintiff waived his services for the remainder of the 30-day period, defendant's voluntary termination should be considered an involuntary termination, making the non-solicitation provision applicable. Although a creative argument, it is clear from the contract that the only purpose of the waiver of services provision is to allow plaintiff to deny further access to its premises by a departing employee. There is nothing in the contract that supports plaintiff's interpretation.

[*13]

**b. Defendant Pistoria**

Unlike defendant Buchler, defendant Pistoria signed plaintiff's standard employment contract which does not make a distinction between voluntary and involuntary termination of employment. The court finds that the plain meaning of the non-solicitation provision in defendant Pistoria's employment contract precludes her from calling on, soliciting, or accepting for her benefit any client of plaintiff's. Nevertheless, there is no evidence of record that defendant Pistoria breached this provision. More specifically, plaintiff cites to nothing in the record indicating that defendant Pistoria called on or solicited any of plaintiff's clients. Neither is there any evidence of record that defendant Pistoria actually benefitted from the solicitation of clients done by defendant Buchler. (See D.I. 153, Ex. I at 24-56) Therefore, defendant Pistoria's motion for summary judgment is granted in this regard, and plaintiff's motion is denied.

**3. Confidentiality provisions.**

Plaintiff alleges that both defendants breached those provisions of their respective employment contracts prohibiting them from using for their benefit any of plaintiff's confidential information, [*14] as described in the contracts. Despite the benefit of a completed discovery period, plaintiff has yet to identify any specific confidential information used or disclosed by defendants. n4 Finding no evidence that either defendant disclosed or used confidential information and trade secrets following their departure from plaintiff's employ, the court shall grant defendants' motions for summary judgment in this regard and deny plaintiff's motion.

n4 The court agrees with defendant Buchler that his personal binder of business cards is not the type of confidential information contemplated by either contract. See generally Total Care Physicians, P.A. v. O'Hara, 798 A.2d 1043, 1055-1056 (Del. Super. 2001) (a Rolodex containing identifying information compiled by defendant and available elsewhere does not constitute a "trade secret" under Delaware law).

**B. Counts II and III: Tortious Interference**

### 1. Standard of review.

To prevail on counts II and III, plaintiff must prove: "(1) the existence [*15] of a valid business relation or expectancy; (2) the interferer's knowledge of the relationship or expectancy; (3) intentional interference that (4) induces or causes a breach or termination of the relationship or expectancy and that (5) causes resulting damages to the party whose relationship or expectancy is disrupted. Delaware Express Shuttle, Inc. v. Older, Civ. No. 19596, 2002 Del. Ch. LEXIS 124, 2002 WL 31458243, *22 (Del Ch. 2002). As explained by the court in the above case, there is a distinction between the two torts, that "being the availability to the defendant of a privilege to interfere within the limits of fair competition with prospective business opportunities." Id. (citation omitted) Thus, in determining whether defendants interfered with plaintiff's prospective contractual relations, "each element 'must be considered in light of [the defendants'] privilege to compete or protect [their] business interests in a fair and lawful manner.'" Id.

### 2. Analysis

Having had the benefit of discovery, plaintiff has failed to establish either of the tortious interference causes of action. In the first instance, defendant Buchler's employment contract specifically recognizes [*16] that existing clients may choose their insurance representative and, therefore, may give their business to a terminated employee. The contract further provides a remedy for that situation, the "post termination purchase of accounts" formula. Under these circumstances, the court concludes that, as a matter of law, plaintiff cannot establish that defendants intentionally interfered with plaintiff's valid business relationships such as to cause damage. Likewise, plaintiff has failed to identify any prospective business relations that, but for defendants' conduct, would have become clients. For these reasons, the court shall grant defendants' motions for summary judgment on these counts and deny plaintiff's motion.

### C. Count IV: Defamation

In order to establish a cause of action for business defamation, plaintiff must show (1) a defamatory communication; (2) publication; (3) the communication refers to plaintiff; (4) a third party's understanding of the communication's defamatory character; and (5) injury. 2002 Del.Ch. LEXIS 124, [WL] at *21. In this case, plaintiff avers that defendant Buchler represented to at least one client that plaintiff was going to service the account out of its New Jersey office, [*17] rather than from the Wilmington office. Plaintiff supports this claim through the hearsay testimony of one of its employees, rather than through the testimony of said client. (D.I. 153, Ex. G at

51–53) Plaintiff offers no evidence of any third party's understanding that this communication was defamatory, or any evidence of any injury. Based upon this record, the court finds that plaintiff has failed to carry its burden of proof. Therefore, the court shall grant defendants' motions for summary judgment on this count and deny plaintiff's motion.

### D. Count V: Conversion

In order to establish a conversion claim under Delaware law, plaintiff must establish that: (1) it had a property interest in the converted goods; (2) it had a right to possession of the goods, and (3) it sustained damages. Goodrich v. E.F. Hutton Group, Inc. 542 A.2d 1200, 1203 (Del. Ch. 1988). No Delaware court has "recognized a cause of action for conversion of money, as opposed to goods." Id. For this reason, as well as the fact that the matter was previously resolved by the Delaware Insurance Commissioner, n5 the court finds in favor of defendant Buchler.

N5 Defendant Buchler returned the Fortis funds and there is no claim that more is due.

[*18]

## V. CONCLUSION

For the reasons stated, defendants' motions for summary judgment are granted and plaintiff's motion is denied. An order shall issue.

## ORDER

At Wilmington this 10th day of December, 2003, for the reasons stated in the memorandum opinion issued this same date;

IT IS ORDERED that:

1. Plaintiff's motion for summary judgment (D.I. 151) is denied.

2. Defendant Buchler's motion for summary judgment (D.I. 154) is granted.

3. Defendant New Castle Insurance, Ltd.'s motion for summary judgment (D.I. 147) is granted.

4. Defendant Pistoria's motion for summary judgment (D.I. 158) is granted.

5. The clerk is directed to enter judgment in favor of defendants and against plaintiff.

Sue L. Robinson

United States District Judge

C

1998 WL 442456, Dean Witter Partnership Litigation, In re, (Del.Ch. 1998)                 **Page 1**

**\*442456**    UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.

**In re DEAN WITTER PARTNERSHIP LITIGATION**

**No. CIV. A. 14816.**
July 17, 1998.

Pamela S. Tikellis, Esquire, and Robert J. Kriner, Jr., Esquire, of Chimicles, Jacobsen & Tikellis, Wilmington, Delaware; of Counsel: Nicholas E. Chimicles, Esquire, Denise Davis Schwartzman, Esquire, Francis J. Farina, Esquire, and M. Katherine Meermans, Esquire, of Chimicles, Jacobsen & Tikellis, Haverford, Pennsylvania, Attorneys for Plaintiffs.

Kenneth J. Nachbar, Esquire, of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware; of Counsel: Martin London, Esquire, Richard A. Rosen, Esquire, Robert N. Kravitz, Esquire, and Tracy Anbinder Baron, Esquire, of Paul, Weiss, Rifkind, Wharton & Garrison, New York, New York, Attorneys for Defendants.

MEMORANDUM OPINION

CHANDLER, Chancellor.

**\*\*1** Investors, owners of interests in numerous real estate limited partnerships, seek an accounting and damages from general partners and financial advisors for breaches of the fiduciary duties of care, loyalty and candor. Information available to the investors long before these lawsuits were instituted put the investors on notice of the wrongs about which they now complain. Therefore, all of the investors' claims are barred by operation of the applicable statute of limitations.

I. BACKGROUND

This action is a consolidation of several actions brought by plaintiff investors against defendants Dean Witter, Discover & Co. ("Dean Witter Discover"), Dean Witter Reynolds, Inc. ("Dean Witter Reynolds"), Dean Witter Realty, Inc. ("Dean Witter Realty") (collectively "Dean Witter"), the managing and associate general partners of seven Dean Witter real estate limited partnerships, and

Tempo-GP, Inc. ("Tempo-GP"), the general partner of Dean Witter/Coldwell Banker Tax Exempt Mortgage Fund, L.P. ("Tax Exempt Mortgage Fund"). (FN1)

Plaintiffs are customers of Dean Witter Reynolds, who between 1984 and 1989, purchased from Dean Witter Reynolds units of the following limited partnerships: Dean Witter Realty Income Partnership I, L.P. ("Income I"); Dean Witter Realty Income Partnership II, L.P. ("Income II"); Dean Witter Realty Yield Income Partnership III, L.P. ("Income III"); Dean Witter Realty Income Partnership IV, L.P. ("Income IV"); Dean Witter Realty Yield Plus, L.P. ("Yield Plus"); Dean Witter Realty Yield Plus II, L.P. ("Yield Plus II"); Dean Witter Realty Growth Properties, L.P. ("Growth Properties"); and Falcon Classic Cable Income Properties, L.P. ("Falcon Classic Cable"). (FN2) With the exception of Falcon Classic Cable, each of these Partnerships is a wholly-owned direct or indirect subsidiary of Dean Witter and is organized in the State of Delaware.

Defendant Dean Witter Discover, a Delaware corporation, is a publicly-held financial services company providing credit and investment products. Defendant Dean Witter Reynolds, a Delaware corporation, is a broker-dealer and member of the New York Stock Exchange and other major securities, futures and options exchanges in the United States. Dean Witter Reynolds operates the securities business of Dean Witter Discover and acted as the offeror and/or underwriter for the sale of the Partnerships to plaintiffs. Dean Witter Reynolds also organized the Proprietary Partnerships that it sold to plaintiffs and acted as the exclusive selling agent for Falcon Classic Cable, which it did not sponsor.

Defendant Dean Witter Realty, a Delaware corporation, is a wholly-owned subsidiary of Dean Witter Discover. Dean Witter Realty is responsible for the creation, marketing and oversight of the Proprietary Partnerships. It is also the parent of the Delaware corporate subsidiaries formed to serve as the managing general partners of the Proprietary Partnerships. These corporate subsidiaries are, in turn, the general partners of the Delaware limited partnerships or corporations formed to serve as the associate general partners of the Proprietary Partnerships. (FN3) Officers and employees of Dean Witter Realty served as officers and employees

© 2005 Thomson/West. No claim to original U.S. Govt. works.

of these general partners. Dean Witter Realty was in charge of the day-to-day operations of each of the general partners of the Proprietary Partnerships.

**\*\*2**    Defendants Dean Witter Realty Income Properties I Inc. and Dean Witter Realty Income Associates I, L.P. are the managing and associate general partners, respectively, of Income I. Defendants Dean Witter Realty Income Properties II Inc. and Dean Witter Realty Income Associates II, L.P. are the managing and associate general partners, respectively, of Income II. Defendants Dean Witter Realty Income Properties III Inc. and Dean Witter Realty Income Associates III, L.P. are the managing and associate general partners, respectively, of Income III. Defendants Dean Witter Realty Fourth Income Properties Inc. and Dean Witter Realty Income Associates IV, L.P. are the managing and associate general partners, respectively, of Income IV. Defendants Dean Witter Realty Yield Plus Inc. and Dean Witter Realty Yield Plus Associates, L.P. are the managing and associate general partners, respectively, of Yield Plus. Defendants Dean Witter Realty Yield Plus II Inc. and Dean Witter Realty Yield Plus Associates II, L.P. are the managing and associate general partners, respectively, of Yield Plus II. Defendants Dean Witter Realty Growth Properties Inc. and Dean Witter Realty Growth Associates, L.P. are the managing and associate general partners, respectively, of Growth Properties.

In addition, plaintiffs named as defendants Dean Witter Realty Income Associates I Inc. and Dean Witter Realty Income Associates II Inc.--the general partners of the associate general partners of Income I and Income II, respectively. Each of these defendant general partners is a Dean Witter affiliate, or wholly-owned direct or indirect subsidiary, organized in Delaware.

Defendant Tempo-GP, a Delaware corporation, was originally owned jointly by a Dean Witter Discover subsidiary and Coldwell Banker Commercial Group, Inc. Today, Tempo-GP is a wholly-owned subsidiary of Dean Witter Discover. Tempo-GP is the general partner of the Tax Exempt Mortgage Fund and directed and controlled its activities. (FN4)

Plaintiffs purport to bring this action on behalf of all persons and entities who purchased units of the Partnerships sold by or through Dean Witter

Reynolds or other selling agents affiliated with Dean Witter from 1984 through the present. (FN5) Plaintiffs allege that defendants breached their fiduciary duties in connection with the Partnerships organized, sold and operated by defendants, in which plaintiffs invested. Among other things, plaintiffs allege that defendants breached the duties of loyalty, candor and care they owed to plaintiffs as their fiduciaries. Plaintiffs complain that they relied--to their detriment--upon the good faith of defendants in their roles as fiduciaries, as general partners, financial advisors and agents, and as officers and directors of the general partners. According to plaintiffs, defendants' breaches have caused plaintiffs to suffer the losses of substantial portions of their investments and have failed to realize the income, liquidity and security in their investments as promised them by defendants. (FN6)

**\*\*3**    Plaintiffs assert that Dean Witter sold the Partnerships through uniform sales materials that promoted sale of the Partnerships at the expense of candor. Specifically, plaintiffs claim that defendants misrepresented or failed to disclose to them at the time of purchase the nature of the risks involved in investing in the Partnerships, that defendants misrepresented or failed to disclose the financial condition of the Partnerships in order to conceal losses, mismanagement, fraud and self-dealing, and that defendants misled plaintiffs into believing that Dean Witter was recommending and selecting investments that presented low risk and were suitable for retirement accounts. (FN7) Plaintiffs further allege that although Dean Witter represented to plaintiffs that it would maintain a relationship with the Partnerships and oversee their operation, (FN8) Dean Witter failed to supervise the Partnerships in the plaintiff investors' best interests.

Plaintiffs insist that defendants were instead engaging in a systematic scheme designed to organize, sell and operate high risk, speculative limited partnerships in order to enrich themselves at the expense of plaintiff investors. According to plaintiffs, once defendants obtained investment capital from plaintiffs, defendants used the capital to purchase underperforming or failing investments owned by Dean Witter affiliates or to refinance underperforming loans owed to Dean Witter affiliates. Plaintiffs further allege that defendants channeled Partnership funds into faltering projects owned by earlier-formed Partnerships, to create the illusion of financial health for those Partnerships and

© 2005 Thomson/West. No claim to original U.S. Govt. works.

1998 WL 442456, Dean Witter Partnership Litigation, In re, (Del.Ch. 1998)    **Page 3**

to aid in marketing new ones.  (FN9)

Defendants filed a motion to dismiss on December 10, 1996.  (FN10) The motion cites several grounds for dismissal, including: (1) that the claims are time-barred; (2) that plaintiffs' allegations fail to state a claim; and (3) that plaintiffs have improperly brought this action as a direct, rather than derivative, action.  The parties briefed the motion, presented oral argument to the Court, and conducted a supplemental round of briefing specifically addressing the statute of limitations issue.  As explained below, I agree with defendants that the applicable statute of limitations bars plaintiffs' claims.  (FN11) Thus, plaintiffs' claims must be dismissed for failure to file within the statutory period.

## II. LEGAL STANDARD

There is clear legal precedent in Delaware for granting a motion to dismiss on the ground that a plaintiff's claims are barred by operation of the statute of limitations.  (FN12) This is so even in equity.  Although statutes of limitation do not generally apply directly in equity, equity follows the law and will apply a statute of limitations by analogy in appropriate circumstances.  (FN13) Moreover, it is "well settled that where the complaint itself alleges facts that show that the complaint is filed too late, the matter may be raised by [a] motion to dismiss."  (FN14)

**\*\*4**  In evaluating a motion to dismiss, I am required to assume the truthfulness of all well-pleaded (*i.e.,* nonconclusory) allegations of the complaint for purposes of the motion.  (FN15) I am also required to draw from the complaint all inferences or conclusions of fact that may reasonably be drawn from the specific facts alleged therein.   (FN16) Conclusions asserted in the complaint, however, will only be accepted as true if there are specific allegations of fact to support them.  (FN17) In the end, I may only dismiss the Amended Complaint if it is clear that plaintiffs will not be entitled to relief under any set of facts that could be proven based on the allegations of the complaint.  (FN18)

## III. ANALYSIS

### A. Statute of Limitations

It is well-settled under Delaware law that a three-year statute of limitations applies to claims for breach of fiduciary duty.   (FN19) With the exception of the Falcon Classic Cable claim, which was a brand new claim as of the filing of the Amended Complaint on October 7, 1996, plaintiffs filed their pre-consolidation complaints on February 6, 9 & 15, 1996, alleging breaches of fiduciary duty by Dean Witter and the general partners of the Partnerships.   (FN20) Applying the three-year statute of limitations, any claim that accrued prior to February 6, 1993 (or prior to October 7, 1993, with respect to the Falcon Classic Cable claim) is barred by operation of the statute.  If, however, plaintiffs' cause of action accrued on or after February 6, 1993 (or October 7, 1993, with respect to the Falcon Classic claim), then the claims are timely and can proceed.

### B. Time of Accrual

The general law in Delaware is that the statute of limitations begins to run, *i.e.,* the cause of action accrues, at the time of the alleged wrongful act, even if the plaintiff is ignorant of the cause of action.   (FN21) Plaintiffs here complain of two different types of injuries.  First, they allege that Dean Witter violated its fiduciary duties in the marketing and sale of the Partnerships.  Second, plaintiffs allege that defendants (FN22) committed post-offering breaches of their fiduciary duties in connection with the management and oversight of the Partnerships.

Plaintiffs allege that defendants breached their fiduciary duties in recommending and selling to plaintiffs Partnerships that would never (and could never) achieve their promised objectives.  Accepting this allegation as true, plaintiffs' injuries occurred *when they purchased* their Partnership interests as a result of defendants' alleged misrepresentations.  (FN23) Thus, plaintiffs' cause of action accrued when they invested in the allegedly fraudulent Partnerships.   The Partnerships at issue were marketed and sold to the plaintiffs in the mid-to-late 1980s.  The last of these sales was completed by the end of 1989.  (FN24) Thus, with respect to the marketing and sale of the Partnerships, plaintiffs' cause of action accrued no later than year-end 1989.  Absent tolling of the statute of limitations, these claims became stale at the end of 1992--years before plaintiffs filed their Amended Complaint.

© 2005 Thomson/West. No claim to original U.S. Govt. works.

**\*5** With respect to the allegations of post-offering breaches arising out of the management and oversight of the Partnerships, plaintiffs allege that defendants operated the Partnerships to benefit themselves at the expense of the investors. Among other things, plaintiffs complain that Partnership real estate investments were chosen solely for the purpose of benefiting other Dean Witter affiliates and that the Partnerships paid excessive commissions and fees. For each Partnership, these alleged violations of fiduciary duty began--and plaintiffs consequently began to suffer injury-- shortly after each Partnership was formed. The Amended Complaint is replete with allegations of injudicious mortgage loans and unwarranted management commissions throughout the mid-to-late 1980s. (FN25) Thus, as with the marketing and sales claims, plaintiffs' cause of action regarding the alleged post-offering breaches accrued no later than year-end 1989. (FN26) Plaintiffs filed their complaint on February 6, 1996--well past the expiration of the three-year limitations period. *Absent tolling,* therefore, all of plaintiffs' claims fall outside the statutory period and would be time-barred.

*C. Tolling*

Plaintiffs allege that their claims are timely because the statute of limitations was tolled until January 26, 1996, when an article in the *Wall Street Journal* (FN27)--reporting that the Securities and Exchange Commission ("SEC") was negotiating with Dean Witter Reynolds and two other brokerage firms concerning their limited partnership sales practices during the 1980s and that a settlement fund might be established--first put them on notice of their potential claims. (FN28) Plaintiffs assert three separate theories to support a tolling of the statute of limitations in this case: (1) inherently unknowable injuries; (2) fraudulent concealment; and (3) equitable tolling. Each of these doctrines permits tolling of the limitations period where the facts underlying a claim were so hidden that a reasonable plaintiff could not timely discover them. (FN29)

Under the doctrine of inherently unknowable injuries, the running of the statute of limitations is tolled while the discovery of the existence of a cause of action is a practical impossibility. (FN30) For the limitations period to be tolled under this doctrine, there must have been no observable or objective factors to put a party on notice of an injury, and plaintiffs must show that they were blamelessly ignorant of the act or omission and the injury. (FN31) Often, plaintiffs can establish "blameless ignorance" by showing justifiable reliance on a professional or expert whom they have no ostensible reason to suspect of deception. (FN32 ) This doctrine tolls the limitations period until a plaintiff had "reason to know" that a wrong has been committed. (FN33)

The statute of limitations will also be tolled if a defendant engaged in fraudulent concealment of the facts necessary to put a plaintiff on notice of the truth. (FN34) Unlike the doctrine of inherently unknowable injuries, fraudulent concealment requires an affirmative act of concealment by a defendant--an "actual artifice" that prevents a plaintiff from gaining knowledge of the facts or some misrepresentation that is intended to put a plaintiff off the trail of inquiry. (FN35) "Mere ignorance of the facts by a plaintiff, where there has been no such concealment, is no obstacle to operation of the statute [of limitations]." (FN36) Where there has been fraudulent concealment from a plaintiff, the statute is suspended until his rights are discovered or until they could have been discovered by the exercise of reasonable diligence. (FN37)

**\*6** Under the theory of equitable tolling, the statute of limitations is tolled for claims of wrongful self-dealing, even in the absence of actual fraudulent concealment, where a plaintiff reasonably relies on the competence and good faith of a fiduciary. (FN38) Underlying this doctrine is the idea that "even an attentive and diligent [investor] relying, in complete propriety, upon the good faith of [fiduciaries] may be completely ignorant of transactions that ... constitute self-interested acts injurious to the [Partnership]." (FN39) This doctrine tolls the limitations period until an investor knew or had reason to know of the facts constituting the wrong. (FN40)

As the party asserting that tolling applies, plaintiffs bear the burden of pleading specific facts to demonstrate that the statute of limitations was, in fact, tolled. (FN41) Significantly, if the limitations period is tolled under any of these theories, it is tolled *only until* the plaintiff discovers (or exercising reasonable diligence should have discovered) his injury. (FN42) Thus, the limitations period begins to run when the plaintiff is *objectively* aware of the facts giving rise to the wrong, *i.e.,* on inquiry

© 2005 Thomson/West. No claim to original U.S. Govt. works.

1998 WL 442456, Dean Witter Partnership Litigation, In re, (Del.Ch. 1998)                    **Page 5**

notice. (FN43) Accordingly, for plaintiffs to establish that this action was filed in a timely manner, under any one of these theories, they must convince the Court that they were *not* on inquiry notice of their claims before February 6, 1993 (or before October 7, 1993, with respect to the Falcon Classic Cable claim). (FN44)

### D. Were Plaintiffs on Inquiry Notice?

Defendants contend it is clear that, based on the allegations of the Amended Complaint, plaintiffs cannot under any circumstances show that the statute of limitations was tolled for the length of time necessary to render their action timely. First, defendants note that the very facts pleaded in the Amended Complaint demonstrate that plaintiffs were on inquiry notice of defendants' alleged wrongful conduct long before February 6, 1993 (or October 7, 1993, with respect to the Falcon Classic Cable claim). Second, defendants point out that other Partnership investors filed lawsuits against Dean Witter Reynolds alleging breach of fiduciary duty in connection with the same Proprietary Partnerships *before* the *Wall Street Journal* article was published. (FN45) That fact, defendants argue, shows conclusively that the existence of the claims was not beyond the grasp of the reasonably diligent investor. Finally, defendants make the practical argument that the *Wall Street Journal* article, touted by plaintiffs as their clarion call, could not possibly have provided the "essential missing information" that plaintiffs assert. The article simply did not disclose any information about Dean Witter's sales practices, nor did it identify any limited partnerships by name.

Defendants emphasize that the allegations of wrongful conduct asserted in the Amended Complaint are based on events that all occurred in the mid-to-late 1980s. Moreover, every fact cited by plaintiffs in the Amended Complaint comes from disclosures in documents that were either provided to plaintiffs contemporaneously with the wrongful conduct now being alleged or publicly available Securities Exchange Commission ("SEC") filings made by the Partnerships. (FN46) As a matter of law, defendants assert, disclosures in any of those documents--the sole source of plaintiffs' allegations--were sufficient to place plaintiffs on inquiry notice of their claims long before February 6, 1993.

**7** Although the information they now use to

support their allegations was publicly available at the time of the alleged wrongs, plaintiffs claim that they were prevented from discovering defendants' wrongful conduct prior to January 26, 1996, as a result of defendants' misrepresentations regarding the health of their Partnership investments. Until reading the *Wall Street Journal* article, plaintiffs assert that they relied--and were entitled to rely--on defendants' assurances that the Partnerships' properties were performing better than comparable properties, that the Partnerships' losses were only temporary, and that these losses were not caused by any wrongful conduct on the part of defendants. In fact, the Partnerships' losses were accompanied by an overall real estate market decline. It was the publication of the article, plaintiffs contend, that first alerted them to their potential claims, *i.e.,* to the idea that their investment losses were the result of defendants' wrongful conduct rather than a general downturn in the real estate market. And it was not until,*after reading the article,* plaintiffs hired a consulting expert, who sifted through "more than 300 publicly-filed documents," that plaintiffs were able to reconstruct the Partnerships and actually discover defendants' wrongful conduct. (FN47) Accordingly, plaintiffs argue they were not on inquiry notice until January 26, 1996 and, therefore, that is the date the statute of limitations began to run.

As noted above, the limitations period is tolled until such time that persons of ordinary intelligence and prudence would have facts sufficient to put them on inquiry which, *if pursued,* would lead to the discovery of the injury. (FN48) Inquiry notice does *not* require *actual* discovery of the reason for the injury. Nor does it require plaintiffs' awareness of all of the aspects of the alleged wrongful conduct. Rather, the statute of limitations begins to run when plaintiffs should have discovered the general fraudulent scheme. (FN49) Thus, the critical inquiry for purposes of this motion to dismiss is: were plaintiffs *entitled to rely* on defendants' representations for as long as they did, *i.e.,* up until publication of the January 26, 1996, *Wall Street Journal* article, or were they on inquiry notice before that date? (FN50)

The Partnerships sustained steady losses from the outset. Plaintiffs allege that defendants purposely put them off the trail of inquiry by notifying them of these losses, while at the same time reassuring plaintiffs that the Partnerships were returning

© 2005 Thomson/West. No claim to original U.S. Govt. works.

1998 WL 442456, Dean Witter Partnership Litigation, In re, (Del.Ch. 1998)                    **Page 6**

profits. (FN51) For example, plaintiffs "received regular distributions, falsely reassuring [them] regarding the financial condition of their investments." (FN52) In reliance on the fiduciary duties owed by defendants, plaintiffs assert that they "had no reason to go behind Defendants' campaign of misinformation" to discover the true source of the Partnership losses. (FN53)

**\*\*8** Plaintiffs specifically complain that the annual reports concealed the fact that these consistent cash distributions were actually a return of investors' capital rather than a "return on investment." (FN54) Pointing to the 1990 Annual Report for the Yield Plus II Partnership as an example, plaintiffs assert that they could not have known that Partnership capital was being impaired, in light of the statement that the "distribution ... was an annualized return on investment of 7.5%." (FN55) But in the same annual report, three pages away on page four, is a chart showing clearly that the partners' capital had declined from the previous year. Moreover, from a chart on page six, it is apparent from even the most cursory glance that the amount of the cash distributions for the year 1990 far exceeded the Partnership's net income for the same year. These charts are not, as plaintiffs suggest, hard to understand, nor are they buried at the back of a thick report. The typical annual report for the Partnerships is no more than fifteen pages in length. While the distributions were maintained at a fairly high level, looking beyond the language on the first page of these annual reports, the fact that the distributions are consistently greater than the Partnership income *should have alerted* plaintiffs to the fact that something was amiss.

Plaintiffs seek refuge in the proposition that where the statute of limitations inquiry involves claims of self-dealing by a fiduciary, "[t]he emphasis is upon the protection of the beneficiary of the fiduciary duty, so long as she is reasonably attentive to her interests, albeit trusting." (FN56) Accordingly, plaintiffs assert, the fiduciary relationship between plaintiffs and defendants in this case entitled plaintiffs to rely upon the presumed good faith and loyalty of defendants. Plaintiffs correctly point out that beneficiaries are entitled to trust their fiduciaries . (FN57) As a result, reasonable reliance on the competence and good faith of those who have assumed a legal responsibility toward a plaintiff can be sufficient to toll the running of the statute of limitations. (FN58) But, the trusting plaintiff still

must be *reasonably attentive* to his interests. " *[B]eneficiaries should not put on blinders to such obvious signals as publicly filed documents, annual and quarterly reports, proxy statements, and SEC filings. *" (FN59) Thus, even where defendant is a fiduciary, a plaintiff is on inquiry notice when the information underlying plaintiff's claim is readily available. (FN60)

It is not too much to ask investors to read beyond the first page of an annual report, to read past the rosy forecasts and actually look at the cold, hard figures provided to them. Had plaintiffs bothered, for example, to read past the first page of the 1989 Annual Report for Income II--a document that was delivered to investors by mid-1990 at the latest--they would have been alarmed. (FN61) Although large distributions were being made, with a quick glance it is clear that the amount of these distributions far exceeded the "net income" figure. (FN62) In fact, the figures show the amount of the "partners' capital" steadily declining from 1986 to 1989. (FN63) Yet, the first page of this annual report states so optimistically: "The cash distribution paid for the 1989 fiscal year [constituted] an annualized return of 7%." This blatant contradiction should have been a "red flag" to any investor--and should have prompted an inquiry by plaintiffs into the health of their investments. (FN64)

**\*\*9.** The presence of this inherently contradictory information in each Partnership's annual report starting in the late 1980s for the earlier Partnerships and its appearance in all of the Partnerships by 1990 compels the conclusion that plaintiffs were not reasonably attentive to their investment interests. (FN65) Plaintiffs were not entitled to sit idly by, blindly relying on defendants' assurances, when the documents and disclosures plaintiffs received regularly were so suggestive of mismanagement. (FN66) Whether accompanied by optimistic projections or not, these discrepancies alone were sufficient notice of wrongdoing to prompt inquiry into the Partnerships. Upon receipt for each Partnership of the first annual report revealing cash distributions in excess of net income, plaintiffs were on inquiry notice of their claims. (FN67)

## IV. CONCLUSION

On the basis of this record, I conclude that the information in the annual reports alone should have provided plaintiffs with adequate notice of any

© 2005 Thomson/West. No claim to original U.S. Govt. works.

1998 WL 442456, Dean Witter Partnership Litigation, In re, (Del.Ch. 1998)    **Page 7**

alleged misconduct by defendants. (FN68) Based on the facts alleged in the Amended Complaint, drawing all inferences in favor of plaintiffs, I conclude that plaintiffs were clearly on inquiry notice of their claims long before February 6, 1993 (or before October 7, 1993, with regard to the Falcon Classic Cable claim). (FN69) The limitations period for this cause of action is three years. Plaintiffs' February 1996 filing (the earliest of plaintiffs' filings) comes *more* than three years after they were placed on inquiry notice. For these reasons, I grant defendants' motion to dismiss on the ground that the plaintiffs' claims are time-barred by operation of the statute of limitations. (FN70)

IT IS SO ORDERED.

(FN1.) An Order of Consolidation dated August 16, 1996, consolidated three actions filed in the Court of Chancery--*Segel v. Dean Witter, Discover & Co.,* C.A. No. 14816 (filed Feb. 6, 1996); *Schectman v. Dean Witter, Discover & Co.,* C.A. No. 14829 (filed Feb. 9, 1996); *Dosky v. Dean Witter, Discover & Co.,* C.A. No. 14838 (filed Feb. 15, 1996)--and added to the consolidated action plaintiffs from two other suits, one pending in the Southern District of New York--*Grigsby v. Dean Witter Reynolds, Inc.,* S.D .N.Y., No. 96 Civ. 4064(LAP) (originally filed Dec. 27, 1995)-- and one pending in the District of Maryland--*Young v. Dean Witter, Discover & Co.,* C.A. No. H-96-1139 (D.Md.) (originally filed Feb. 6, 1996). *See* Order of Consolidation (Aug. 16, 1996) (Docket No. 9).

(FN2.) These limited partnerships will be referred to collectively as the "Partnerships." The Partnerships bearing the Dean Witter name, *i.e.,* all of the defendant partnerships except Falcon Classic Cable, will also be referred to as the "Proprietary Partnerships." All of the Proprietary Partnerships are real estate limited partnerships.

(FN3.) Managing and associate general partners will be referred to collectively as the "general partners."

(FN4.) In their Amended Complaint, none of the plaintiffs claims to have purchased units of the Tax Exempt Mortgage Fund. As such, plaintiffs do not have standing to assert any claims with respect to that fund or its general partner, Tempo-GP. *See Alabama By-Products Corp. v. Cede & Co.,*

Del.Supr., 657 A.2d 254, 264 (1995).

(FN5.) First Consolidated and Amended Class Action Complaint ¶ 37 (Docket No. 10) [hereinafter *Complaint* ]. All further references to "plaintiffs" shall include the named plaintiffs as well as the purported class of plaintiffs.

(FN6.) Complaint ¶ 3.

(FN7.) Pls.' Memo. in Opp. to Defs.' Motion to Dismiss at 6 (Docket No. 32) [hereinafter *Pls.' Memo. in Opposition* ].

(FN8.) Complaint ¶ 25.

(FN9.) Pls.' Memo. in Opposition at 2.

(FN10.) Defs.' Memo. in Support of Motion to Dismiss (Docket No. 21) [hereinafter *Defs.' Motion to Dismiss* ].

(FN11.) Because I have determined that defendants' claim of time-bar is dispositive, I need not address the other grounds offered by defendants in their motion to dismiss.

(FN12.) *Boeing Co. v. Shrontz,* Del. Ch., C.A. No. 11273, Berger, V . C. (Apr. 20, 1992) (dismissing breach of fiduciary duty claims on grounds of time-bar); *Halpern v. Barran,* Del. Ch., 313 A.2d 139 (1973) (same).

(FN13.) *Kahn v. Seaboard Corp.,* Del. Ch., 625 A.2d 269, 271 (1993). *See also United States Cellular Inv. Co. v. Bell Atlantic Mobile Sys., Inc.,* Del.Supr., 677 A.2d 497 (1996) ("Absent some unusual circumstances, a court of equity will deny a plaintiff relief when suit is brought after the analogous statutory period.").

**9_    (FN14.) *Seaboard,* 625 A.2d at 277 (dismissing, with permission to replead, complaint in equity on statute of limitations grounds).

(FN15.) *Loudon v. Archer-Daniels-Midland Co.,* Del.Supr., C.A. No. 88, 1996, at 11-12, Veasey, C.J. (Sept. 17, 1997) (en banc); *Grobow v. Perot,* Del.Supr., 539 A.2d 180, 187 & n. 6 (1988).

(FN16.) *Id.*

(FN17.) *In re Santa Fe Pac. Shareholders Litig.,*

© 2005 Thomson/West. No claim to original U.S. Govt. works.

1998 WL 442456, Dean Witter Partnership Litigation, In re, (Del.Ch. 1998)                    **Page 8**

Del.Supr., 669 A.2d 59, 65-66 (1995); *Grobow,* 539 A.2d at 187 & n. 6.

(FN18.) Ct. Ch. R. 12(b)(6); *Rabkin v. Philip A. Hunt Chem. Corp.,* Del.Supr., 498 A.2d 1099, 1105 (1985); *Litman v. Prudential-Bache Properties, Inc.,* Del. Ch., C.A. No. 12137, at 4-5, Chandler, V.C. (Jan. 14, 1994), *aff'd,* Del.Supr., 642 A.2d 837 (1994).

Plaintiffs cite *Snyder v. Butcher & Co.,* Del.Super., C.A. No. 91C-04-289, Goldstein, J. (Sept. 15, 1992), for the proposition that it is improper for a court to grant a motion to dismiss on statute of limitations grounds whenever the complaint alleges fraudulent concealment as part of its claims. Plaintiffs, however, misread *Snyder.* *Snyder* stated that granting a motion to dismiss on statute of limitations grounds would be inappropriate where a plaintiff has "*successfully pled* fraudulent concealment." *Id* . at 9 (emphasis added). Where a plaintiff has successfully alleged a claim of fraudulent concealment "the affirmative statute of limitations defense turns on a question of fact," rendering a summary disposal inappropriate. *Id. Snyder* does nothing, however, to alter the general rule that when it is clear from the face of the complaint that the statute of limitations bars a plaintiff's claims, despite an allegation of fraudulent concealment, dismissal is still appropriate. *See Boeing Co. v. Shrontz,* op. at 4-5 (dismissing breach of fiduciary duty claims on statute of limitations grounds, despite allegation of fraudulent self-dealing). *See also Shockley v. Dyer,* Del.Supr., 456 A.2d 798, 799 (1983) (affirming grant of summary judgment, despite plaintiff's allegation of fraudulent concealment, where viewing the facts in a light most favorable to plaintiffs, "it becomes clear that by an exercise of due diligence plaintiff could have discovered her rights.").

(FN19.) 10 *Del. C.* § 8106; *Dofflemyer v. W.F. Hall Printing Co.,* D. Del., 558 F.Supp. 372, 379 (1983) (applying Delaware law).

(FN20.) Under the Order of Consolidation, all documents previously filed and served in the cases consolidated by the Order were deemed filed, served and part of the record in the consolidated action. Only the three Court of Chancery cases were consolidated by that Order. The earliest of these cases--*Segel*--was filed February 6, 1996.

Thus, February 6, 1996, is the earliest operative date for statute of limitations purposes. *See* Order of Consolidation ¶ ¶ 1, 9.

(FN21.) *David B. Lilly Co. v. Fisher,* D. Del., 18 F.3d 1112, 1117 (1994); *Isaacson, Stolper & Co. v. Artisan's Sav. Bank,* Del.Supr., 330 A.2d 130, 132 (1974).

(FN22.) Plaintiffs do not allege post-offering mismanagement with respect to Falcon Classic Cable. Complaint ¶ ¶ 266-68.

(FN23.) *Seidel v. Lee,* D. Del., C.A. No. 93-494-JJF, at 16, Farnen, C.J. (Dec. 30, 1996) (applying Delaware law) (fiduciary duty claim accrues when breach accomplished). *See also In re Merrill Lynch Ltd. Partnerships Litig.,* S.D.N.Y., No. 95 Civ. 10657(MBM), at 11-20 (Aug. 26, 1997) (applying federal RICO law, which has same standard for statute of limitations accrual).

(FN24.) Complaint ¶ ¶ 9-23.

**9   (FN25.) *See, e.g.,* Complaint ¶ ¶ 91-121 (Yield Plus), ¶ ¶ 129-35 (Yield Plus II), ¶ ¶ 136-46 (Yield Plus & Yield Plus II), ¶ ¶ 156-79 (Growth Properties), ¶ ¶ 193-98 (Income I), ¶ ¶ 209-16 (Income II), ¶ ¶ 233-39 (Income II, III & IV).

(FN26.) *Dofflemyer,* 558 F.Supp. at 379 (fiduciary duty claim accrues at time of breach).

(FN27.) This article will be referred to as the "*Wall Street Journal* article" or the "article."

(FN28.) Pls.' Memo. in Opposition at 9.

(FN29.) *See, e.g., Playtex, Inc. v. Columbia Casualty,* Del.Super., C.A. No. 88C-MR-233, at 7, Del Pesco, J. (Sept. 20, 1993) ("Ignorance of the facts supporting a cause of action will not toll the statute, absent some special consideration such as 'inherently unknowable' injuries or fraudulent concealment.").

(FN30.) *Ruger v. Funk,* Del.Super., C.A. No. 93C-04-210, at 5-6, Lee, J. (Jan. 22, 1996).

(FN31.) *Seidel,* op. at 17.

(FN32.) *See, e.g., Isaacson,* 330 A.2d at 133-34

© 2005 Thomson/West. No claim to original U.S. Govt. works.

1998 WL 442456, Dean Witter Partnership Litigation, In re, (Del.Ch. 1998)                    **Page 9**

(applying "discovery rule" in light of relationship of "confidence and reliance by plaintiff on the expertise of defendant").

(FN33.) *Pack & Process, Inc. v. Celotex Corp.,* Del.Super., 503 A.2d 646, 650 (1985).

(FN34.) *Litman,* op. at 8.

(FN35.) *Halpern,* 313 A.2d at 143.

(FN36.) *Id.*

(FN37.) *Id.*

(FN38.) *Yaw v. Talley,* Del. Ch., C.A. No. 12882, at 10, Jacobs, V.C. (March 7, 1994) (Fiduciaries who benefit personally from their wrongdoing, especially as a result of fraudulent self-dealing, will not be afforded the protection of the statute of limitations.).

(FN39.) *Seaboard,* 625 A.2d at 275-76 (Given the fiduciary duties that the law imposes on corporate directors, stockholders are entitled to rely on the good faith of the directors when they act with respect to the corporation's property or processes.).

(FN40.) *In re Maxxam, Inc./Federated Dev. Shareholders Litig.,* Del. Ch., 659 A.2d 760, 769 (Feb. 13, 1995).

(FN41.) *United States Cellular,* 677 A.2d at 504; *Carlton Investments v. TLC Beatrice Int'l Holdings, Inc.,* Del. Ch., C.A. No. 13950, at 35, Allen, C. (Nov. 21, 1995).

(FN42.) *In re ML-Lee Acquisition Fund II, L.P. Litig.,* D. Del., 848 F.Supp. 527, 554 (1994) (inherently unknowable injuries); *United States Cellular,* 677 A.2d at 503 (equitable tolling); *Litman,* op. at 8 (fraudulent concealment).

(FN43.) *See Seidel,* op. at 16-17 (inherently unknowable injuries: statute tolled until such time as persons of ordinary intelligence and prudence would have facts sufficient to place them on inquiry notice of an injury); *Seaboard,* 625 A.2d at 275 (equitable tolling: statute of limitations does not run against plaintiff until he knows or has reason to know facts alleged to give rise to wrong); *Halpern,* 313 A.2d at 143 (fraudulent concealment: running of statute suspended only until plaintiff's rights are

discovered or would have been discovered by exercise of reasonable diligence). *See also Nardo v. Guido DeAscanis & Sons, Inc.,* Del.Super., 254 A.2d 254, 256 (1969) (standard for length of tolling is the same for fraudulent concealment, equitable tolling and inherently unknowable torts).

(FN44.) Where the tolling of the statute of limitations turns on controverted issues of fact, a pre-discovery dismissal of the claim would be inappropriate. *See, e.g., In re Asbestos Litig.,* Del.Super., 673 A.2d 159, 163 (1996) (only when the record is uncontroverted that plaintiff "discovered" his injury more than [three] years prior to filing his suit is summary judgment appropriate). However, when it is clear from the face of the complaint (and the documents incorporated by reference in it) that plaintiffs' tolling theories fail even to raise a legitimate doubt about the time the claims accrued, dismissal is appropriate if the claims were filed after the applicable limitations period expired. Plaintiffs cite *In re Maxxam* for the proposition that "a defendant should not be permitted to use the statute of limitations as a shield where the defendant possesses information critical to the existence of an actionable claim of wrongdoing and prevents the plaintiff from discovering that information in a timely fashion." *In re Maxxam, Inc./Federated Dev. Shareholders Litig.,* Del. Ch., C.A. Nos. 12111 & 12353, at 13, Jacobs, V.C. (June 21, 1995). The danger is in dismissing an action prematurely when plaintiffs do not yet have access to the information they need to state their claims fully. Here, it is clear to the Court that all of the necessary information was not only publicly available, but already in plaintiffs' hands at least as far back as 1990--an entirely different situation than the one presented in the *In re Maxxam* Court.

**\*9** (FN45.) *See, e.g., Grigsby v. Dean Witter Reynolds Inc.,* Cal.Super. Ct., C.A. No. 695777 (filed Dec. 27, 1995) (asserting claims with respect to the Proprietary Partnerships); *McCoy v. Dean Witter Reynolds, Inc.,* E.D. Tenn., C.A. No. 94-5779 (regarding demand for arbitration filed Dec. 28, 1989, asserting claims with respect to Income I & II); *Eno v. Dean Witter Reynolds, Inc.,* N.Y. Sup.Ct., Index No. 127300/95 (regarding demand for arbitration filed May 25, 1994, asserting claims with respect to Income II).

(FN46.) According to defendants, investors in each

© 2005 Thomson/West. No claim to original U.S. Govt. works.

1998 WL 442456, Dean Witter Partnership Litigation, In re, (Del.Ch. 1998)                    **Page 10**

Partnership received from Dean Witter a prospectus (and all applicable supplements), annual and quarterly reports, and periodic "property profiles" describing properties in which the Partnership had invested. Each Partnership also filed with the SEC (and made available to investors on request) reports on Form 10-K, reports on Form 10-Q, and reports on Form 8-K. Defs.' Motion to Dismiss at 7-8.

The Court may properly consider the contents of the *Wall Street Journal* article, Partnership prospectuses, property profiles, customer account statements, quarterly and annual reports and SEC filings in considering this motion to dismiss, because by expressly referring to and so heavily relying on these documents in the Amended Complaint, plaintiffs have incorporated them by reference into the Amended Complaint. *Glaser v. Norris,* Del. Ch., C.A. No. 9583, at 9 n. 1, Chandler, V.C. (Jan. 6, 1992).

(FN47.) Pls.' Memo. in Opposition at 3.

(FN48.) *In re ML-Lee Acquisition Fund II, L.P. Litig.,* 848 F.Supp. at 554 (defendants' misrepresentations were unknowable until publication of the Annual Report disclosing particular investment and its lack of success).

(FN49.) *McCoy v. Goldberg,* S.D.N.Y., 748 F.Supp. 146, 158 (1990) (statutory period does not await plaintiffs' leisurely discovery of the full details of the alleged scheme) (internal citations omitted). Although plaintiffs suggest that their claims were "unknowable" because it required an expert to uncover defendants' alleged wrongdoing, that argument is without merit. It may in fact have taken an expert to unravel the entire scheme alleged by plaintiffs. But having all of the facts necessary to articulate the wrong is *not* required. Rather, "[o]nce a plaintiff is in possession of facts sufficient to make him suspicious, or that ought to make him suspicious, he is deemed to be on inquiry notice." *Harner v. Prudential Secs. Inc.,* E.D. Mich., 785 F.Supp. 626, 633 (1992) (citations omitted), *aff'd,* 6th Cir., 35 F.3d 565 (1994).

(FN50.) Defendants assert that when plaintiffs read the article, they responded by doing what they could have done several years earlier--they read the public documents and hired an expert to review them. Defs.' Motion to Dismiss at 15-16.

(FN51.) *See, e.g.,* Income III, 1990 Annual Report at 1, attached to Affidavit of Ronald J. DiPietro (Dec. 10, 1996), Ex. 6-C (Docket No. 25) ("1990 was a difficult and disappointing year for real estate investments in general.... Fortunately, due to the high quality of its properties and size of its portfolio, the Partnership has been able to avoid the worst of the[ ] problems.... The cash distribution paid during the 1990 fiscal year was ... an annualized return of 6.25%.").

(FN52.) Pls.' Memo. in Opposition at 51.

(FN53.) *Id.* at 48.

(FN54.) *See, e.g.,* Pls.' Memo. in Opposition at 7, 23-24, 26-28, 51.

(FN55.) Yield Plus II, 1990 Annual Report at 1, attached to Affidavit of Ronald J. DiPietro (Dec. 10, 1996), Ex. 2-D (Docket No. 23).

(FN56.) *Carlton Investments v. TLC Beatrice Int'l Holdings, Inc.,* Del. Ch., C.A. No. 13950, at 37, Allen, C. (Nov. 21, 1995).

(FN57.) *See, e.g., Borden v. Sinskey,* 3d Cir., 530 F.2d 478, 489, n. 10 (1976) ("Shareholders have no duty to search a corporation's records for evidence of misconduct on the part of corporate officers and directors. Rather, they are entitled to assume that those standing in a fiduciary relationship to them will be faithful to their charge.").

**\*9_** (FN58.) *Seaboard,* 625 A.2d at 275.

(FN59.) *Seidel,* op. at 18 (emphasis added).

(FN60.) *Id.* (rejecting plaintiff's inherently unknowable tolling argument because "the public documents, which form the basis of many of Plaintiff's claims, could have provided Plaintiff with adequate notice of an alleged misconduct by Defendants."). In the instant case, the public documents provide the basis for *all* of plaintiffs' claims. *See also In re USACafes, L.P. Litig.,* Del. Ch., C.A. No. 11146, 18 Del. J. Corp. L. 1204, 1213 (1993) ("[I]nterest holders need not delve aggressively into the internal affairs of a ... limited partnership in order to assure that a non-public, self-dealing transaction is not foreclosed from

© 2005 Thomson/West. No claim to original U.S. Govt. works.

1998 WL 442456, Dean Witter Partnership Litigation, In re, (Del.Ch. 1998)                    **Page 11**

attack by limitations, but when facts are disclosed that give rise to inquiry, an applicable statute of limitations will require timely action to preserve rights.").

(FN61.) Income II, 1989 Annual Report at 1, attached to Affidavit of Ronald J. DiPietro (July 11, 1997), Ex. C (Docket No. 52).

(FN62.) For the fiscal year 1989, the Income II Partnership shows a net income figure of $7,043,996 and cash distributions of $13,768,450. *Id.* at 7.

(FN63.) *Id.*

(FN64.) *In re Prudential Sec. Inc. L.P. Litig.,* S.D.N.Y., 930 F.Supp. 68, 76 (1996) ("Where the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would have developed the truth, and shuts his eyes to the facts which call for investigation, knowledge of that fraud will be imputed to him.").

(FN65.) *See, e.g.,* Income I, 1989 Annual Report, Ex. A; Income II, 1989 Annual Report, Ex. C; Income III, 1989 Annual Report, Ex. L; Income IV, 1989 Annual Report, Ex. M; Growth Properties, 1989 Annual Report, Ex. D (attachments to the Affidavit of Ronald J. DiPietro (July 11, 1997) (Docket No. 52)); Yield Plus, 1989 Annual Report, Ex. 1-D; Yield Plus II, 1990 Annual Report, Ex. 2-D (attachments to Affidavit of Ronald J. DiPietro (Dec. 10, 1996) (Docket No. 23)); Falcon Classic Cable, 1990 Annual Report, Ex. B (attachment to Affidavit of Mary Lou Frick (Dec. 10, 1996) (Docket No. 26)).

(FN66.) *See, e.g., Playtex, Inc. v. Columbia Casualty,* Del.Super., C.A. No. 88C-MR-233, at 7, Del Pesco, J. (Sept. 20, 1993) ("inherently unknowable" theory of tolling did not apply where a "wealth of information regarding [the cause of action] was generally available" when the fraud occurred); *Halpern,* 313 A.2d at 143 (statute is tolled only for the "period of fraudulent concealment").

(FN67.) *See Ruger v. Funk,* op. at 6 ("Actual discovery surely commences the running of the statute; so will any change in circumstances that renders the injury no longer inherently unknowable, or the ignorance of the party-plaintiff no longer blameless.").

The Amended Complaint also alleges that such "deceptive" cash distributions were used to promote the sale of later Partnerships, and the purchasers of the later Partnerships would have no reason to review the financial information/materials for the earlier Partnerships. Assuming this is true, it still should have been obvious to the investors soon after receiving their annual reports that the cash distributions *they* were receiving were inflated and not reflective of actual earnings. Perhaps for one year, this would not raise too much concern, but certainly after the second or third straight year of cash distributions that far exceeded Partnership income, accompanied by a commensurate decline in partners' capital, plaintiffs should have been aware that the cash distributions they were receiving were not the result of investment gains-- and that they were most likely duped into purchasing the Partnerships in the first place. The inherent contradiction between the distributions-- described in these annual reports as "annualized returns"--and the declining partners' capital and net income lower than the distributions should have caused plaintiffs to question whether the touted cash distributions of the earlier partnerships were truly indicative of profits. That is inquiry notice. *Queen Anne Pier Condominium Council v. Raley,* Del.Super., C.A. No. 85C-JA10, at 8, Lee, J. (Jan. 26, 1988) (inquiry notice means the existence of facts sufficient to put person of ordinary intelligence and prudence on inquiry which, *if pursued,* would lead to the discovery).

**\*9** (FN68.) Although I conclude that the glaring inconsistencies contained in the annual reports were sufficient, in and of themselves, to place plaintiffs on inquiry notice of their potential causes of action, those discrepancies were not the only indications plaintiffs had of their potential claims. I need not address them in substance (as I find the material in the annual reports dispositive on the issue), but I am inclined to agree with defendants' other assertions of plaintiffs' inquiry notice: (1) that plaintiffs were on notice no later than 1992, when defendants changed the format of their monthly account statements to reflect the true, rather than par, value of the Partnerships. *See In re Prudential Sec. Inc. L.P. Litig.,* 930 F.Supp. at 76-77; (2) that some investors in the Partnerships did manage

© 2005 Thomson/West. No claim to original U.S. Govt. works.

1998 WL 442456, Dean Witter Partnership Litigation, In re, (Del.Ch. 1998)                                        **Page 12**

to file lawsuits against the very same limited partnerships *before* January 26, 1996, suggests the alleged wrongful conduct was detectable by the average investor; and (3) that the *Wall Street Journal* article neither disclosed any concrete information about sales practices or the investments in question, nor mentioned by name the limited partnership defendants in this case, thus raising a serous doubt as to how the article alone could have prompted such an inquiry.

(FN69.) Cf. *Carlton Investments v. TLC Beatrice Int'l Holdings, Inc.,* Del. Ch., C.A. No. 13950,

Allen, C. (Nov. 21, 1995) (motion to dismiss denied because issue of plaintiffs' inquiry notice was in dispute).

(FN70.) Plaintiffs' request, in the alternative, to amend their Amended Complaint is hereby denied. No amendment would cure the fatal flaw in plaintiffs' current Amended Complaint--that it was filed too late. *Glaser v. Norris,* Del. Ch., C.A. No. 9538, at 30-31, Chandler, V.C. (Jan. 6, 1992) ("A court should deny leave to amend a complaint when the amendment would be futile due to the insufficiency of the proposed amendment.")

© 2005 Thomson/West. No claim to original U.S. Govt. works.