D

2004 WL 26858, Grace v. Morgan, (Del.Super. 2004)                                    Page 1

*26858      Only the Westlaw citation is currently available.

UNPUBLISHED OPINION.    CHECK COURT RULES BEFORE CITING.

Superior Court of Delaware.

Joseph R. GRACE, Jr., 4000 Associates, LLC, and Gramor, LLC, Plaintiffs,
v.
Theodore S. MORGAN, Leslie P. Morgan, Brandywine Innkeepers, LLC, Brandywine Holding, LLC, Brandywine Hospitality, LLC, the Breckstone Group, Inc., and Howard L. Robertson, Inc., Defendants.

No. Civ.A. 03C05260JEB.
Submitted Aug. 19, 2003.

Decided Jan. 6, 2004.

Upon Defendants' Motion to Dismiss.    Granted in Part.  Denied in Part.

James F. Kipp, Trzuskowski Kipp Kelleher & Pearce, P.A., Wilmington, Delaware, for Plaintiffs.

Denise S. Kraft, and Richard D. Beck, Klehr, Harrison, Harvey, Branzburg & Ellers LLP, Wilmington, Delaware, for Defendants Theodore Morgan, Leslie Morgan, Brandywine Innkeepers, LLC, Brandywine Holding, LLC and Brandywine Hospitality, LLC.

John A. Elzufon, Elzufon Austin Reardon Tarlov & Mondell, P.A., Wilmington, Delaware, for Defendant Breckstone Group, Inc.

Victoria K. Petrone, Tighe Cottrell & Logan, P.A., Wilmington, Delaware, for Howard L. Robertson, Inc.

OPINION

BABIARZ, J.

**1  This action in tort and contract pertains to a land transaction.  Three individuals jointly owned two pieces of real estate.  One of the properties was the Holiday Inn located on Concord Pike in Wilmington, Delaware.  The other was an adjacent, undeveloped parcel of land ("the Property"), on which the three owners planned to construct buildings suitable for commercial use.  The owners established five limited liability companies (LLC's), (FN1) two for management of the Property and three for the Holiday Inn.

After construction on the Property had begun, the three owners entered into an agreement of sale.  This transaction left Plaintiff Joseph Grace as the sole owner of the property through his ownership of the LLC's, known as 4000 Associates and Gramor.  Defendants Theodore Morgan and Leslie Morgan (father and daughter, respectively) became the sole owners of the Holiday Inn through ownership of Brandywine Innkeepers, Brandywine Holding, and Brandywine Hospitality.  Prior to this transaction, Leslie Morgan had been managing partner of Gramor and was primarily responsible for the development of the Property.

As sole owner of the Property, Grace experienced numerous difficulties with the completion of the construction.  For this reason, Grace and the related LLC's filed suit against the Morgans, the Brandywine LLC's, Breckstone (the architectural firm) and Robertson (the engineering firm).  Plaintiffs allege negligence, breach of fiduciary duty, fraud, unjust enrichment, and breach of contract pertaining to events that occurred while the parties were joint owners of the Holiday Inn and the Property, as well as events leading up to the agreement of sale for the two properties.  The Morgans and the Brandywine LLC's have moved to dismiss Counts III through VI of the Complaint for lack of subject matter jurisdiction.  (FN2) In the alternative, they seek to transfer the case to the Court of Chancery.  For the reasons explained below, the Court grants the motion to dismiss the allegation of breach of fiduciary duty and denies the remainder of the motion.

For purposes of a motion to dismiss, the Court assumes that the material factual allegations set forth in the Complaint are true.  (FN3) All reasonable inferences are made in favor of Plaintiffs, who are the non-moving parties.  (FN4)

Count III is a direct claim that Leslie Morgan breached her fiduciary duty as managing partner of Gramor and 4000 Associates.  L. Morgan had complete responsibility for Gramor's day-to-day operations, as well as the overall development of the Property.  According to Plaintiffs, L. Morgan failed

© 2005 Thomson/West. No claim to original U.S. Govt. works.

to hire competent architectural and engineering firms to develop the Property and failed to consult with and oversee the architectural and engineering firms. Because of these alleged failures, Plaintiff Grace in curred substantial financial losses for which he seeks monetary relief.

Defendants argue that the Court of Chancery has exclusive jurisdiction over claims regarding a breach of a fiduciary duty. Plaintiffs respond that the Superior Court has jurisdiction over this claim because the requested relief is for money damages only. The issue before the Court is whether the fiduciary claim confers exclusive jurisdiction on the Court of Chancery or whether this Court may entertain the action.

**\*\*2** The parties raise the two primary factors to be considered when determining whether Chancery has exclusive jurisdiction over a given case. (FN5) According to statute, Chancery "shall not have jurisdiction to determine any matter wherein sufficient remedy may be had by common law, or statute, before any other court or jurisdiction of this State." (FN6) Plaintiffs argue that this statute is determinative of the jurisdictional issue because they seek money damages only. However, Delaware courts have consistently interpreted this statute to be a "declaration of the ancient rule of equity, [which] neither grants nor divests equity of any jurisdiction." (FN7)

While the nature of the remedy is relevant, the focus of the jurisdictional inquiry regarding a fiduciary claim is whether a special relationship of trust existed between the parties sufficient to establish the fiduciary duty. (FN8) The classic examples of such a relationship are the trustee responsible for the trust *res* for the beneficiary and the corporate officer or director responsible to shareholders. (FN9) Other fiduciary relationships recognized in Delaware include general partners; administrators or executors; guardians; and, in some instances, joint venturers or principals and their agents. (FN10) Where the relationship is a straightforward commercial relationship arising from a contract and involves no element of confidentiality, Chancery will not exercise jurisdiction even if the parties use the standard language used to articulate an equitable cause of action. (FN11)

In this case, Leslie Morgan, as managing partner of

Gram or, had more than an arms-length, commercial relationship with Joseph Grace. As a member of Gramor, Mr. Grace placed a very particular and special trust in L. Morgan in her position as managing partner to find and hire a competent architectural and engineering firm, to contribute meaningfully to the project plans, to oversee the planning and construction, and to ensure that goals as well as codes and specifications were met. As Chancery Court has said of the fiduciary duty of a general partner to a limited partner, "[t]he form of the enterprise does not diminish the duty of fair dealing by those in control of the investments." (FN12)

The Court concludes that as managing partner of Gramor, Leslie Morgan had a fiduciary duty to Grace. The Court of Chancery "still retains jurisdiction to hear nearly all claims for breach of a fiduciary duty and in many claims where a person by fraud, mistake or duress has been deprived of property." (FN13) For these reasons, Moving Defendants' motion to dismiss the allegation of breach of fiduciary duty is Granted.

Count IV alleges that the Morgans fraudulently induced Grace into trading his interest in the Holiday Inn for the Morgans' interest in the Property by failing to disclose significant defects and deficiencies of the construction. Plaintiffs allege that the Morgans knew that the new facility could not accommodate three commercial tenants and could not support any restaurant tenants, which were the most desirable tenants for that location.

**\*\*3** Defendants argue that this claim should be dismissed because Plaintiffs did not plead that the Morgans knowingly or recklessly misled Grace about the condition of the Property but merely asserted only they should have known about the Property's shortcomings. Defendants argue that only equity recognizes claims of fraud based on simple negligence or innocent misrepresentations. The Complaint clearly alleges that the Morgans were aware of numerous problems that they did not disclose to Grace in order to convince him to purchase the Property. The Court finds that the allegations meet the well-established pleading requirements for common law fraud. (FN14) The motion to dismiss Count IV is Denied.

Count V is a claim for unjust enrichment against the Morgans for legal fees allegedly paid to the law

© 2005 Thomson/West. No claim to original U.S. Govt. works.

**Page 3**

firms who set up the limited liability companies. Plaintiffs allege that they paid the total fee but were never reimbursed by the Morgans for their portion. Plaintiffs seek money damages. Defendants argue for dismissal because unjust enrichment is an equitable claim over which the Court of Chancery typically has jurisdiction.

The elements of unjust enrichment are (1) an enrichment; (2) an impoverishment; (3) a relation between the enrichment and impoverishment; (4) the absence of justification; and (5) the absence of a remedy at law. (FN15) The Court of Chancery has held that a claim for unjust enrichment is equitable and confers subject matter jurisdiction upon this Court. (FN16) However, Chancery has also found that where plaintiff has pled the first four elements of the claim but sought money damages in order to be made whole, Chancery has no jurisdiction because no equitable remedy is sought. (FN17) In this case, Plaintiffs seek a monetary award only and therefore have an adequate remedy at law. Unlike the claim for breach of fiduciary duty, this claim entails no special trust relationship between the parties, and therefore the nature of the remedy is dispositive. Defendants' motion to dismiss Count V is Denied.

Count VI alleges breach of contract. Plaintiffs assert that they paid for the construction of an easement and a storm management system, but received no contribution from the Morgans and were precluded from completing and using the easement. Plaintiffs seek reimbursement for half of the expenses pursuant to the contract.

Defendants argue that this issue should be handled by Chancery because Plaintiffs seek specific performance, an equitable remedy. Plaintiffs again reiterate that they seek a monetary judgment only and that this Court has jurisdiction over contractual disputes where the plaintiff seeks to be made whole by way of money damages. The Court agrees. (FN18) Defendants' motion to dismiss Count VI is Denied.

## CONCLUSION

For all these reasons, Defendants' motion to dismiss the allegation of breach of fiduciary duty is Granted without prejudice for lack of subject matter jurisdiction pursuant to Super.Ct.Civ.R. 12(b)(1), unless Plaintiffs seeks leave within 60 days to

transfer the matter to the Court of Chancery. The remainder of Plaintiffs' motion is Denied.

**\*\*4. It Is So ORDERED.**

(FN1.) *See* DEL.CODE ANN. tit. 6, ch. 18.

(FN2.) Counts I and II address the alleged conduct of Defendants Breckstone and Robertson, who have not moved to dismiss.

(FN3.) *Diebold Computer Leasing, Inc. v. Commercial Credit Corp.,* 276 A.2d 586, 588 (Del.1970).

(FN4.) *Ramunno v. Cawley,* 705 A.2d 1029, 1034 (Del.1998).

(FN5.) The Court notes that the Limited Liability Company Act grants members great flexibility in organizing an LLC, even allowing the members to select a forum for resolution of disputes such as the one at bar. *See, e.g., Elf Atochem North America, Inc. v. Jaffari,* 727 A.2d 286 (Del.1999) (affirming Chancery's holding that an LLC agreement was valid even to the extent that it provided that all disputes be resolved either by arbitration or in California courts because such provision does not vitiate the mandatory requirements of the Act). Since the parties make no reference to any of their LLC agreements, the Court assumes that none of the agreements specified a forum.

The Court also notes that Section 18-405 of the Act states that an LLC agreement may provide that a manager who fails to comply with the terms of the LLC agreement shall be subject to specialized penalties and consequences. Section 18-406 provides that a member or manager may rely on matters that are reasonably within a manager's expertise, including "information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits and losses of the limited liability company or any other facts pertinent to the existence and amount of assets from which distributions to members might properly be paid." The parties do not discuss the applicability of either statute to the issues in this case.

(FN6.) DEL.CODE ANN. tit. 10, § 342.

(FN7.) *Boxer v. Husky Oil Co.,* 429 A.2d 995, 998 (Del. Ch.1981).

© 2005 Thomson/West. No claim to original U.S. Govt. works.

2004 WL 26858, Grace v. Morgan, (Del.Super. 2004)                                    **Page 4**

(FN8.) *McMahon v. New Castle Assoc.,* 532 A.2d 601, 604-05 (Del. Ch.1987).

(FN9.) *Id.* at 605.

(FN10.) *Id.*

(FN11.) *Id.* at 603.

(FN12.) *Boxer v. Husky Oil Co.,* 429 A.2d 995, 997 (Del. Ch.1981) (quoting *Miller v. Schweickart,* 405 F.Supp. 366 (S.D.N.Y.1975)).

(FN13.) *Clark v. Teeven Holding Co., Inc,* 625 A.2d 869 (Del. Ch.1992) (citing *Restatement of Restitution,* introductory note, p. 9).

(FN14.) *Stephenson v. Capano Dev't, Inc.,* 462 A.2d 1069, 1074 (Del.1983). *See also Clark v.*

*Teeven Holding Co., Inc.,* 625 A.2d 869, 877 (Del. Ch.1992) (observing that a defrauded party who elects to affirm the challenged contract and seek money damages has an action at law, whereas a party who elects to disaffirm the contract and be restored to the status quo ante has an equitable action for rescission).

(FN15.) *Jackson Nat'l. Live Ins. Co. v. Kennedy,* 741 A.2d 377, 393 (Del. Ch.1999).

(FN16.) *Pepsi-Cola Bottling. Co. of Salisbury, Md. v. Handy,* 2000 WL 364199, *6 (Del.Ch.)

(FN17.) *Khoury Factory Outlets, Inc. v. Snyder,* 1996 WL 74125 at *11 (Del. Ch.).

(FN18.) *See Clark v. Teeven,* 625 A.2d at 877.

© 2005 Thomson/West. No claim to original U.S. Govt. works.

E

**\*54423**     Only the Westlaw citation is currently available.

UNPUBLISHED OPINION.    CHECK COURT RULES BEFORE CITING.

Superior Court of Delaware, New Castle County.

**R.M. WILLIAMS CO., INC., Plaintiff,**
v.
**Samuel J. FRABIZZIO and Mary Ellen Frabizzio, Defendants.**

**No. Civ.A. 90C-MY-10.**
Submitted: Dec. 24, 1992.

Decided:  Feb. 8, 1993.

Upon Reserved Decision Following Bench Trial.

Verdict for Plaintiff.

Rachel B. Mersky, Wilmington, for plaintiff.

Brian J. Bartley, Wilmington, for defendants.

OPINION

GOLDSTEIN, Judge.

**\*\*1**   Plaintiff, R.M. Williams Company, Inc., a Delaware corporation, brought this action against Samuel J. Frabizzio (Frabizzio) and Mary Ellen Frabizzio, husband and wife, Defendants, (FN1) asking for damages arising out of Defendants' breach in early 1988 of a real estate contract between the parties.     Plaintiff claimed that Defendants, having agreed to convey a certain parcel of property to Plaintiff, breached the agreement by subjecting that property to easements and rights of way in favor of an adjacent lot which Defendants simultaneously agreed to buy.  The case proceeded to trial on the merits in December of 1992,   and   the   parties   submitted   post-trial memoranda.    Having reviewed the evidence and these memoranda, the Court herein announces its verdict.

I. FINDINGS OF FACT

Robert Williams had been engaged in the business of residential construction for several years.   It is not clear at what point he began to do so through the legal entity of R.M. Williams Company, Inc. Williams is the sole stockholder and director of the corporate Plaintiff.

After spending several years improving single lots, Williams decided he was ready to enter the development market.     As a representative of Plaintiff, he began looking for a piece of property which presented an opportunity for building on several adjacent lots in the more lucrative custom home market.

On September 3, 1987, Plaintiff executed an Agreement of Sale (Agreement) to purchase from Frank Capano, Jr. eight residential building lots to be subdivided out of a property known as 802 Hercules Road.   Mildred E. Hayes was the record owner of 802 Hercules Road (the Hayes Property) at that time.   Among other provisions, the Agreement (New Castle County Board of Realtors, Inc. Standard Form Number 1, as revised on 6/19/86) described the title to be conveyed as follows:

Title to the property is to be conveyed by deed of special warranty and is to be good, marketable, fee simple absolute title of record, free and clear of all liens and encumbrances of record and free and clear of the zoning and governmental subdivision violations, but subject to all existing easements and the restrictions of record.

(Agreement ¶ 7.)    The Agreement contained a contingency clause which obligated the Seller to secure the subdivision of the Hayes Property into eight developable lots.  (Agreement ¶ 11.)

On September 9, 1987, Mann-Talley Engineers was retained to take the Hayes Property through the subdivision process.    A sketch plan prepared by Mann-Talley, reviewed and approved at some point by Plaintiff, (FN2) was received by the New Castle County Department of Planning on or about October 4, 1987.  (Pl.Op.Tr.Mem. at 5.)   This sketch plan provided for subdividing the Hayes Property into eight numbered lots fronting a twenty-six- to thirty-foot road.

Sometime in September, Plaintiff, with the oral permission of Mario Capano, (FN3) erected a trailer on the Hayes Property for the purpose of marketing the lots to be subdivided.   On September 11, 1987, Plaintiff entered into a pre-sale agreement for Lot #

© 2005 Thomson/West. No claim to original U.S. Govt. works.

1993 WL 54423, R.M. Williams Co., Inc. v. Frabizzio, (Del.Super. 1993)                    **Page 2**

5 with Mr. and Mrs. Tom Vari of Wilmington.

**\*\*2** Subsequently, Capano assigned his interest in the Agreement to Samuel J. Frabizzio, a member of the Delaware Bar, under an Assignment Agreement dated October 23, 1987 (Assignment), and Mildred E. Hayes conveyed her interest in the Hayes Property to Samuel J. Frabizzio and Mary Ellen Frabizzio by deed of October 30, 1987.

On December 1, 1987, Plaintiff entered an Agreement of Sale for Lot # 3 with Calvin J. Robol and Carol Robol.

In early January of 1988, Joseph G. Lukshides and Judith I. Lukshides, owners of the adjacent property (the Lukshides Property), raised a concern that the proposed development of the Hayes property would impose a new building setback on the Lukshides property, as the proposed Hayes Property access road would front what had been the side yard of the Lukshides Property. Therefore, the setback would change from a minimum of six feet to a minimum of twenty-five feet. While no existing buildings would have been affected by this change, (FN4) the Lukshides felt that it would adversely affect the value of their interest in their land, if not their ability to make certain improvements in the future. Through their attorney, Richard P. Beck, Esquire, the Lukshides threatened to jeopardize the successful subdivision of the Hayes Property if their concerns were not addressed. (Letter from Beck to Whitfield (FN5) dated 1/11/88; letter from Beck to Whitfield dated 1/11/88.)

On January 25, 1988, the New Castle County Planning Department approved the subdivision plan previously submitted by Defendants in conformance with the Agreement. The plan was then forwarded to the New Castle County Council, which is required to approve subdivision plans recommended by the Planning Department, and has no discretion to do otherwise. (Testimony of Michael A. Poppiti, Esq.) The Planning Department's approval of the subdivision plan conforming to the terms of the Agreement was withdrawn upon their notification of the Lukshides' concerns about their setback.

Frabizzio entered negotiations with the Lukshides to resolve their concerns. At all times during these negotiations, the Lukshides believed in good faith that Frabizzio was negotiating either on Plaintiff's behalf or with Plaintiff's concurrence. Frabizzio,

together with his wife, subsequently purchased the Lukshides Property. While the timing and nature of specific offers and counteroffers are both in dispute, the outcome of the negotiations is not. The Agreement of Sale signed by Defendants and the Lukshides on January 29, 1991 (Lukshides Agreement) contained an Addendum stating as follows, in relevant part:

This Addendum is attached to and forms an integral part of the Agreement of Sale by and between Joseph G. Lukshides and Judith I. Lukshides, as Sellers, and Samuel J. Frabizzio and Mary Ellen Frabizzio, as Buyers, dated January 29, 1988, relating to property known as 810 Hercules Road, Wilmington, Delaware.

A. Buyers' obligation to make settlement is contingent upon:

**\*\*3** (1) Final approval and recordation of Buyers' Record Major Subdivision Plan of Hayes Property, NCC SLD No. 87-357, prepared by Mann-Talley, Inc., and dated January 6, 1988.

(2) Final approval and recordation of a Minor Subdivision Plan for Sellers' property creating five lots (including a lot accommodating Sellers' existing residence), approximately as shown on the sketch appended hereto.

    ....

G. As *consideration* for Sellers having entered into this Agreement of Sale, Buyers covenant and agree to grant Sellers the right to the use of such easements and rights-of-way over and across [the Hayes Property] (using such road or street as shown on said Record Major Subdivision Plan of Hayes Court, and creating such additional utility easements as may be necessary but without interferring [sic] with any residence to be constructed in Hayes Court) as may be necessary or useful to provide utility services, drainage and vehicular-pedestrian ingress, regress and access to Sellers' property and to such lots and/or residences as may be heretofore or hereafter created on Sellers' property.

(Addendum to Lukshides Agreement (emphasis added).)

Frabizzio testified at trial that he entered into two

© 2005 Thomson/West. No claim to original U.S. Govt. works.

agreements with the Lukshides. Under the first, the Lukshides agreed not to oppose the subdivision of the Hayes Property as consideration for easements and rights of way over the Hayes Property. Under the second, the Lukshides agreed to sell their land to Defendants for monetary consideration. Frabizzio testified that the two agreements were completely separate in time as well as in content, and that the possibility of the second was first mentioned after the first was concluded, not contemporaneously. This account is contradicted by the written terms of the Lukshides Agreement, which clearly states that the encumberances imposed upon the Hayes Property were part and parcel of the "consideration for Sellers having entered into this Agreement of Sale." (Addendum to Lukshides Agreement.)

This account is also contradicted by Frabizzio's first written account of the deal, other than the Lukshides Agreement itself:

The Lukshides, through their attorney, were entertaining the possibility of taking any and all necessary legal action to stop the recordation of the Subdivision Plan of Hayes Property pending resolution of [their setback concerns]. After I got involved with the matter with Dick Beck, the Lukshides proposed selling their property to me or at least withdrawing their objection to the recordation of the Plan upon my granting and reserving unto them, their successors and assigns, the use of Hayes Court and the right to connect the utilities in the Hayes Property subdivision in the event of future development of their property. To avoid litigation and unnecessary expense, an agreement was finally entered into by myself and the Lukshides for the purchase of their property in the future. *Part of the consideration of that agreement was for me to grant and reserve unto the Lukshides, their successors and assigns, future rights to the use of Hayes Court and to connect to the utilities in the Hayes Property subdivision. These grants and reservations by my wife and me are partly in consideration of the Lukshides refraining from having instituted any legal action to attempt to stop the recordation of the Plan of the Hayes Property.*

**\*\*4** (Letter from Frabizzio to Pasquale dated 2/11/88 at 1-2 emphasis added).) Significantly, this letter explicitly provides that the easement grant was "part of the consideration" for the purchase agreement respecting the Lukshides Property. In other words, at the time of the writing, shortly after both entering and performing under the Lukshides Agreement, Frabizzio did not apparently understand there to be two separate agreements.

A letter bearing the same date from Beck, the Lukshides' attorney, to Frabizzio also discusses the deal. Significantly, the letter proposes the addition of certain terms to the deed to the Hayes Property which Frabizzio would present to Plaintiff in order to better secure the right of the Lukshides or their successor in interest to actually benefit from the Encumbrances. (Letter from Beck to Frabizzio dated 2/11/88 at 1-2.) In his deposition, Beck recollects the notion that the Lukshides could sell their property arising "[a]t some point in ... negotiating with Sam Frabizzio," which indicates that the negotiations for the sale were intertwined with the other negotiations. (Beck Dep. at 23.) Frabizzio testified at trial that a separate agreement was *concluded* with respect to the Encumbrances and the Lukshides' consent to the subdivision of the Hayes Property *before* he began discussing the potential purchase of the Lukshides Property. Defendants' attempt to draw a bright line between these subjects of agreement is not only unsupported by any contemporaneous documentation, but all the documents relating to transactions between the Lukshides and Defendants tend to support a conclusion that only one agreement was reached.

Furthermore, the Court finds it hard to believe that an experienced attorney would enter an agreement involving an interest in land without some written documentation thereof. In this case, the Court is asked to believe that neither Frabizzio on behalf of Defendants nor Beck on behalf of the Lukshides produced any documentary memorialization of the separate agreement which Defendants allege to have existed.

Thus, all of the roughly contemporaneous documentary evidence which does exist tends to contradict Defendants' claim that two separate agreements were executed. The Court also received and weighed all the other testimonial evidence and documentary evidence submitted by the parties. The weight of evidence requires the Court to find that the Lukshides and the Defendants entered into but one agreement with respect to the conveyance, the easement, and the Lukshides' consent to the subdivision of the Hayes Property, which agreement is documented by the Lukshides Agreement.

© 2005 Thomson/West. No claim to original U.S. Govt. works.

On February 3, 1988, the Defendants executed a declaration of restrictions (Declaration) which burdened the Hayes Property with easements and rights of way "Encumbrances" conforming with the description in Paragraph G of the Addendum to the Lukshides Agreement. The Declaration was approved by the New Castle County Council on February 9, 1988. The Declaration, together with the Subdivision Plan for the Hayes Subdivision, was recorded in the New Castle County Office of the Recorder of Deeds on February 11, 1988.

**\*\*5** On February 13, Plaintiff entered an Agreement of Sale for Lot # 7 with Kenneth L. Clifton and Janice E. Clifton.

Plaintiff and the Defendants planned on a settlement date of February 16, 1988. (Letter from Frabizzio to Pasquale dated 2/12/88 at 1.) Plaintiff did not learn about the Declaration until sometime after February 12, 1988, (FN6) when Frabizzio sent a revised deed to Plaintiff's attorney together with an explanation for the revision, less than four calendar days before the scheduled settlement on the Hayes Property. (*See* Letter from Frabizzio to Pasquale dated 2/12/88 at 1.) On February 16, Frabizzio sent a letter to Plaintiff's counsel, the body of which reads as follows:

At approximately 1:00 p.m. today, you telephoned and advised me that your client, R.M. Williams, would not complete final settlement today as scheduled in order to give you an opportunity to review the matters in my letter of February 12 to you. As you requested, I am enclosing a copy of the Assignment whereby I acquired Capano's rights under the Contract of Sale. Pursuant to paragraph 11 of the Contract of Sale, final settlement is to be completed within 15 days following recordation [of the Hayes Property subdivision plan]. Recordation was complete on February 11, 1988. If you client fails to complete final settlement on or before February 26, 1988, both you and your client are to consider the Contract of Sale to be null and void. I will await your contact.

(Letter from Frabizzio to Pasquale dated 2/16/88.)

On February 18, 1988, Plaintiff notified Frabizzio by hand-delivered letter that his "request for a private right-of-way is unacceptable to [Plaintiff]. We believe this right-of-way does nothing more than

enable you to better sub-divide the Lukshides' property, which is, of course, under contract to you." (Letter from Frabizzio to Pasquale dated 2/12/88 at 1.) In his next communication, Frabizzio again stated that, unless Plaintiff went to final settlement by February 26, 1988, the Agreement would be "null and void and of no further force and effect." (Letter from Frabizzio to Pasquale dated 2/19/88 at 2.) He further stated:

As an aside, if your client fails to complete final settlement and files a suit for specific performance, please be assured that I will file an appropriate counterclaim against you client seeking monetary damages resulting from any delay as well as anticipated loss of profits from another project I am intending to become part of with the use of the funds from the anticipated settlement of the Hayes Property with your client.

(*Id.* at 2. (FN7)). Frabizzio's next communication to Plaintiff's counsel stated as follows:

Pursuant to the terms of the Agreement of Sale of September 3, 1987, R.M. Williams Co., Inc., was to deposit $15,000 cash with Amato & Stella Associates. I had previously been advised by Bob Stella that such deposit had been made. At this point in time, I want to be absolutely assured that R.M. Williams Co., Inc., has so complied. Therefore, I want an immediate verification of such deposit by being provided:

**\*\*6** 1. A copy of the canceled deposit check in the amount of $15,000; and

2. A written certificate from Bob Stella that such check was negotiated into his office escrow account, when it was negotiated, and that such funds still remain on deposit with his office.

If such required deposit has not been made, then I hereby declare the Agreement of Sale of September 3, 1987 to be null and void from its inception for lack of consideration. *Countywide Realty Corp v. Albani*, Del.Supr., 420 A.2d 1181 (1980). However, I will seek payment of $15,000 as damages for having kept the property off the market pursuant to the Agreement of Sale.

If the deposit has been made as required, then in the event your client fails to complete final settlement by February 26, 1988, upon the Contract

© 2005 Thomson/West. No claim to original U.S. Govt. works.

1993 WL 54423, R.M. Williams Co., Inc. v. Frabizzio, (Del.Super. 1993)                                    **Page 5**

of Sale being declared null and void and of no further force and effect, I intend to retain your client's $15,000 deposit as liquidated damages. By carbon copy of this letter to Bob Stella of Amato & Stella Associates, I direct that he not release any of the deposit funds in the event your client fails to make settlement by February 26.

Also, if your client does not make settlement by February 26, I am hereby giving notice that by Saturday, February 27, 1988, he is to have removed from my property his construction trailer, all temporary electric service equipment and to reasonably restore the property to its prior condition.

(Letter from Frabizzio to Pasquale dated 2/22/88.) Frabizzio later offered to sell the Lukshides Property to Plaintiff, (Letter from Frabizzio to Pasquale dated 2/26/88), for $325,000, (Pasquale trial testimony), a figure that Plaintiff contends was unreasonable. Defendants had purchased the Lukshides Property for $132,500. (Lukshides Agreement ¶ 2.) Plaintiff went to settlement on February 26, 1988 under protest, and thereafter initiated the legal proceedings described below.

The Lukshides Property was subsequently conveyed to DiFelice, Inc., which built houses on four of the five lots into which the Lukshides Property was subdivided. Together, twelve of the thirteen lots which were subdivided from the Hayes and Lukshides Properties appear to be part of one development, with the twelve lots fronting on the small, private road ending in a cul-de-sac which was part of the earliest plot plan for subdividing the Hayes Property.

Before the Hayes Property was subject to the Encumbrances which Defendants granted in favor of the Lukshides Property, one side of this private road, from its beginning at Hercules Road up to nearly the first property fronting the cul-de-sac, was not to be developed. A stand of pine trees lined that side of the road, and Williams testified that the pine trees were to have been retained in order to add to the development's air of privacy. Plaintiff planned to market customized homes on the lots, drawing on the private and exclusive nature of the development to command high prices. The Encumbrances granted by Defendants permitted their successor in interest to construct four homes fronting the private road on the Hayes Property. The Court has

reviewed considerable evidence that the houses built by DiFelice, Inc. are smaller and less expensive than the houses built by Plaintiff (while none are particularly modest), and that the lots on which the DiFelice homes were built were also smaller.

## II. LEGAL POSTURE AND PLAINTIFF'S CLAIMS

**\*\*7** Plaintiff originally filed suit in the Court of Chancery under some unusual theories of fiduciary law and a theory of unjust enrichment, as described in *R.M. Williams Co., Inc. v. Frabizzio,* Del.Ch., C.A. No. 9834, Chandler, V.C. (Feb. 22, 1990), Mem.Op. at 3. Defendants counterclaimed for malicious use of legal process. *Id.* at 3. The Vice Chancellor decided that Plaintiff had an adequate remedy at law for breach of contract, and therefore the action was found to be without equity's jurisdiction. *Id.* at 6-8.

The case was subsequently transferred to this Court on May 5, 1990. Plaintiff filed its Amended Complaint with the Court on November 28, 1990, alleging that Defendants breached both the express provisions of Para. 7 of the Agreement and the duty of good faith and fair dealing implied by law into the Agreement. Plaintiff has requested expectancy damages in the amount of $90,000 for the loss in profits Plaintiff claims to have sustained as a result of the devaluation of the Hayes Property homes by the effective integration of the inferior DiFelice, Inc. homes on the former Lukshides Property into Plaintiff's development. Plaintiff has also claimed $92,500 in "unjust enrichment" damages for Defendants' breach of the implied covenant of good faith and fair dealing, and $1,800 for additional costs in constructing the road to provide for the Lukshides Property utility connections.

## III. DEFENDANTS' BREACHES

A. Failure to Convey the Interest Required under the Terms of the Agreement

Plaintiff did not receive the interest to which Plaintiff was entitled under the Agreement. The Seller under the Agreement was required to convey the Hayes Property "subject to all existing easements and the restrictions of record" as of September 3, 1987. (Agreement ¶ 7.) The Encumbrances upon Hayes Property which Defendants granted in favor of the Lukshides Property were not "of record" on

© 2005 Thomson/West. No claim to original U.S. Govt. works.

September 3, 1987. Defendants' breach is obvious.

Defendants contend that, because the Agreement gave the Defendants as "Seller" the responsibility for obtaining the subdivision of the Hayes Property, their grant of the Encumbrances to the Lukshides does not violate the terms of the Agreement. Defendants contend that, because the Planning Department "required" the Lukshides' consent to the proposed subdivision plan for the Hayes Property, and because the Lukshides' consent was contingent upon obtaining the Encumbrances, the Planning Department "required" that Defendants grant the easements. It follows, Defendants contend, that the grant was provided for by the Agreement, as the Agreement required Defendants as Sellers to obtain subdivision. (FN8)

This argument is both logically absurd and factually inaccurate. The Planning Department merely required the consent of the property owner whose interest is affected by a setback resulting from the subdivision of adjoining property. (Poppiti testimony.) The nature of the consideration which induces this consent is not dictated by the county, but is the result of negotiation between the parties in interest. (FN9) Under Defendants' reasoning, if the Lukshides had wanted an easement for access to Hercules Road through the Hayes Property for a four-hundred-unit development, Defendants agreed to grant it, and the county approved the plans, then such an easement also would have been "required" by the county, and therefore under the Agreement. Such "requirements" would render contracts for land speculative, indeed, as they would justify whatever steps a seller took to obtain subdivision to satisfy a demanding neighbor. Whether four or four hundred additional properties gained rights to use the Hayes Property as a result of Defendants' actions, the Encumbrances manifestly diminished the interest remaining in the Hayes Property which Defendants could convey to Plaintiff, and thus constitutes a hornbook violation of the Agreement.

**\*8** In a similar argument, Defendants claim that they complied with terms of the Agreement of Sale, as elucidated in the following letter:

[T]he Deed in the form as tendered provides your client clear title and exactly what he bargained for-- eight (8) residential building lots pursuant to a recorded Record Major Subdivision Plan.

(Letter from Frabizzio to Pasquale dated 1/19/88 at 2.) According to Defendants, the fact that the clear title proffered was subject to additional easements was irrelevant, as Plaintiff received the eight lots bargained for, and the Agreement did not identify a precise plan for subdivision. Under Defendants' interpretation, once again, an easement granted from the Hayes Property to a neighboring development of four hundred lots would conform with the Agreement, as long as the Plaintiff had received eight subdivided lots. In addition to common sense, this argument ignores the Agreement's limiting language stating that the Hayes Property was "subject to all existing easements and the restrictions of record." (Agreement ¶ 7.) "[O]f record" can only refer to the record existing at the time of the Agreement, if the Court is to animate contract terms with common sense.

Defendants claim that the provisions respecting the Encumbrances were inserted into the Lukshides Agreement at the Lukshides' request and for their benefit. But at the same time, Frabizzio testified that the easement "benefitted both properties." The fact that the Lukshides Agreement served to effectively place Defendants on both sides of the transaction tends to weigh heavily against Defendants' altruistic posturing.

But even if all factual inferences are made in Defendants' favor, the Defendants still are in breach of the Agreement. It is undisputed that the Lukshides believed that Frabizzio had authority to act for on Plaintiff's behalf. (Beck Dep. at 40; *see also* Letter from Beck to Frabizzio dated 2/11/88 at 2.) The point is, whether the easement benefitted the Hayes Property was a question for Plaintiff to decide, as the land was currently under contract to it. Defendants breached the written terms of the Agreement by subjecting the Hayes Property to the new Encumbrances in February of 1988. (FN10)

B. Breach of Duty of Good Faith and Fair Dealing Implied in Law

Every contract in Delaware has an obligation of good faith and fair dealing which is implied into the agreement by the law. *See Blish v. Thompson Automatic Arms Corp.,* Del.Supr., 64 A.2d 581 (1948); *Rehoboth Resort Realty, Inc. v. Brittingham Enter., Inc.,* Del.Super., C.A. No. 91C-03-035, Lee, J. (July 21, 1992), Mem.Op. at 3 (citing Restatement (Second) of Contracts § 205 (1981)).

© 2005 Thomson/West. No claim to original U.S. Govt. works.

1993 WL 54423, R.M. Williams Co., Inc. v. Frabizzio, (Del.Super. 1993)    **Page 7**

*See also Merrill v. Crothall-American, Inc.,* Del.Supr., 606 A.2d 96, 101 (1992) (extending the law in this area by holding that "every *employment* contract ... includes an implied covenant of good faith and fair dealing" (emphasis added)). The covenant of good faith and fair dealing "requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the contract." *Wilgus v. Salt Pond Inv. Co.,* Del.Ch., 498 A.2d 151, 159 (1985) (citing Restatement (Second) of Contracts § 205 (1981)), *later proceeding, Salt Pond Inv. Co. v. Wilgus,* Del.Ch., C.A. No. 1205, Hartnett, V.C. (Nov. 16, 1987). The Restatement describes the duty as follows:

**\*\*9**   Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes a variety of types of conduct characterized as involving "bad faith" because they violate community standards of decency, fairness or reasonableness....

    ....

    ... Subterfuges and evasions violate the obligation of good faith in performance even though the actor believes his conduct to be justified. But the obligation goes further: bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.

Restatement (Second) of Contracts § 205 cmts. a, d. The Lukshides Agreement and the Declaration impairing the interest in the Hayes Property which the Defendants held under contract to Plaintiff serve as ample evidence of Defendants' bad faith.

Frabizzio testified that twenty-five to thirty percent of his legal practice consisted of representing clients involved in real estate transactions. Mrs. Frabizzio testified that she and her husband together have bought and sold houses in the past. Frabizzio testified that "MARSAM" is the trade name for a personal account which Defendants use for various purposes, including occasional investment in real estate. Thus, both Defendants have considerable experience in buying and selling property.

This considerable experience weighs heavily against Defendants in this action. Far from novices in the real estate business, Defendants had every reason to comprehend the ramifications of conveying an interest out of a property already under contract to Plaintiff without providing any notice to or obtaining the consent from Plaintiff. The nature of their conduct, in light of their experience, constitutes substantial evidence of bad faith.

Defendants' conduct following the revelation to Plaintiff of Defendants' grant of the easement serves as further evidence of bad faith. They demanded that Plaintiff adhere absolutely to the letter of the Agreement when Defendants had themselves violated the Agreement and sprung that fact upon Plaintiff at a late date. Whether Defendants were motivated by a desire to avoid the deal or to coerce Plaintiff to accept the *fait accompli,* their diminished interest in the Hayes Property, their position was clearly unreasonable.

Further, Defendants were aware that Plaintiff had placed a trailer on the Hayes Property and were seeking to enter transactions in reliance upon Defendants' performance of their obligations under the Agreement. From their experience in the real estate market and their knowledge that Plaintiff had placed a trailer on the property for the purpose of marketing the land, Defendants knew or should have known that Plaintiff was relying on their good-faith performance of the Agreement in entering future obligations. (FN11)

Defendants contend that any coercion which Plaintiff felt was a product of its own financial circumstances, and its lack of foresight in failing to include a contingency clause in its deals involving the Hayes Property providing for the possibility that Plaintiff would not obtain title thereto. This argument is tantamount to saying that Plaintiff never should have relied on Defendants' performance of their contractual obligations. The purpose of the law in this area is to ensure that parties to contracts can rely on each other's good faith efforts to perform under agreements freely entered into by each. Such reliance drives the commercial world.

**\*\*10**   Furthermore, Plaintiff's financial condition is not only irrelevant to Plaintiff's right to rely on Defendants' promises and self-imposed obligations, but serves as evidence of the coercive effect of Defendants' unreasonable position:

© 2005 Thomson/West. No claim to original U.S. Govt. works.

1993 WL 54423, R.M. Williams Co., Inc. v. Frabizzio, (Del.Super. 1993)                    **Page 8**

The obligation of good faith and fair dealing extends to the assertion, settlement and litigation of contract claims and defenses.... *It also extends to dealing which is candid but unfair, such as taking advantage of the necessitous circumstances of the other party to extort a modification of a contract for the sale of goods without legitimate commercial reason....* Other types of violation have been recognized in judicial decisions: harassing demands for assurances of performance, rejection of performance for unstated reasons, willful failure to mitigate damages, and abuse of a power to determine compliance or to terminate the contract.

Restatement (Second) of Contracts § 205 cmt. e (citations omitted) (emphasis added). Plaintiff's attorney at the time of the events in dispute testified that he believed that Plaintiff was "coerced into going to settlement." (Pasquale testimony.) The nature of Defendants' knowing act of conveying an interest in the Hayes Property to a neighboring property in which they simultaneously attained an interest, their failure to inform Plaintiff about the easement until the eve of settlement, and their unreasonable, coercive conduct following Plaintiff's objection, all taken in light of Defendants' extensive experience in the real estate market, require the Court to find that Defendants violated the duty of good faith and fair dealing which is incorporated into every contract in Delaware by law.

C. Defendant Mary Ellen Frabizzio's Liability

1. Breach of Contract

Defendant Mary Ellen Frabizzio contends that she could not have breached the Agreement essentially because she was not named in and did not sign the Assignment from Capano, the former Seller under the Agreement. She contends that she cannot be liable for an agreement to which she was not a party.

While it is true that Mary Ellen Frabizzio was not named in the Assignment, she undertook to purchase the property named in the Assignment together with her husband, and she conveyed the Hayes Property together with her husband to Plaintiff under the terms of the Agreement. Together with her husband, she undertook to perform the duties of the Seller under the Agreement and derived any and all benefits which accrued to the Seller under the Agreement. In short, through so doing, she made

herself a party to the Agreement. *Cf.* Restatement (Second) of Agency § 99, *Retention of Benefits as Affirmance* (1958). Mrs. Frabizzio is therefore estopped from now asserting that she cannot be liable for breach of the Agreement because she is not a party.

2. Breach of Implied Duty of Good Faith and Fair Dealing

The Court also finds that Defendant Mary Ellen Frabizzio was responsible for breaching the duty of good faith and fair dealing implied by law into the Agreement. While she is not trained in the law like her husband, she has participated in buying and selling real estate with him. In her testimony, she stated that she does understand all documents before she signs them, and that she has her husband or someone else explain all documents that she does not understand before she signs them. She acknowledged that she understood the Lukshides Agreement and the Declaration at the time she signed them. She further acknowledged that she understood the transactions involved in transferring the Hayes Property to Plaintiff. *See* Restatement (Second) of Agency §§ 93, 98.

**11 Furthermore, it is apparent that Frabizzio was acting on Mrs. Frabizzio's behalf throughout the course of his dealings with Plaintiff. While she would endeavor to acquire an understanding of the transactions before signing the appropriate documents, Mrs. Frabizzio submitted no evidence that she maintained any close control over the negotiations and proposals made by her husband, and submitted no evidence he was not authorized to do any of the acts Plaintiff complains of. *See* Restatement (Second) of Agency § 43, *Acquiescence by Principal in Agent's Conduct.* Therefore, the Court finds that Frabizzio was acting on her behalf at all relevant times.

At no time has Mrs. Frabizzio distanced herself from any action Frabizzio has taken on her behalf. (FN12) Therefore, she is responsible for all of the actions which Frabizzio took on her behalf in these matters, including those actions which the Court has found to constitute a breach of the duty of good faith and fair dealing implied into the Agreement by law. Therefore, she is jointly liable with Frabizzio for that breach, and for all damages resulting therefrom to Plaintiff, as discussed hereunder.

© 2005 Thomson/West. No claim to original U.S. Govt. works.

1993 WL 54423, R.M. Williams Co., Inc. v. Frabizzio, (Del.Super. 1993)                    **Page 9**

## IV. DAMAGES

### A. Expectancy Damages

#### 1. The Type of Damages to which Plaintiff is Entitled

Plaintiffs have claimed expectancy damages for Defendants' breach of the Agreement. Plaintiffs are entitled to receive the full benefit of the bargain which they entered with Defendants. *See Delaware Limousine Serv., Inc. v. Royal Limousine Serv., Inc.,* Del.Super., C.A. No. 87C-FE-104, Goldstein, J. (Apr. 5, 1991), Letter Op. at 7-8 (citing *J.J. White, Inc. v. Metropolitan Merchandise Mart, Inc.,* Del.Super., 107 A.2d 892, 894 (1954)). *See also* Restatement (Second) of Contracts § 347 (1981). Plaintiff presented expert testimony that its sales of lots from the Hayes Property subdivision were adversely impacted by the development of the Lukshides Property by DiFelice, Inc. Plaintiff's damage claims are limited to losses sustained in connection with three of the Hayes Property lots.

As a result of the Encumbrances which Defendants imposed on the Hayes Property, DiFelice, Inc. was able to build four houses fronting the same private road which Plaintiff's subdivided lots fronted. Therefore, the less expensive DiFelice, Inc. houses on their smaller lots appeared to be integrated into Plaintiff's development project. Once DiFelice, Inc. broke ground on its development of the Lukshides Property, Plaintiff was unable to sell its remaining lots in the Hayes Property for their anticipated price. Robert Stella of Amato & Stella Associates, Plaintiff's expert, testified that the value of three of Plaintiff's lots was reduced by $30,000 dollars each, with total damages of $90,000. Defendants' expert witness, Richard Kokoszka, testified that the difference in price which Plaintiff received for the lots in question was explainable by reference to other factors.

Defendants contend in their brief that, because Plaintiff made a profit on each of the lots, the Court is required to reject "Stella's opinion that the Williams' homes decreased by $30,000.00 in value each because of the size and dollar offering price of homes constructed by DiFelice." (Letter from Bartley to Court dated Dec. 24, 1992 at 9.) This argument misses the mark. The proper question is not whether Plaintiff made a profit, but whether Defendants' breach decreased the value of the interest received by Plaintiff.

**\*\*12** However, Defendants' argument does indirectly touch on a distinction worth noting. Plaintiff constructed a roadway and connected utilities to the Hayes Property lots. Plaintiff was also constructing houses on most of the lots. According to Stella, these significant improvements increased the value of each lot to $75,000. Plaintiff had paid $41,250 per lot to Defendants (the Agreement price of $265,000 divided by eight lots). Plaintiff alleges that the effect of Defendants' breach was to diminish the value of each lot $30,000 from the post-improvement estimated value of $75,000 which Plaintiff contends each would otherwise have had. This $75,000 figure represents, not the value of the lots Plaintiff which expected to receive from Defendants pursuant to the Agreement, but Plaintiff's expected gross return from sales of the subdivided Hayes Property lots as improved with utility connections and paved roadway access.

The correct measure of Plaintiff's damages for loss in value is the value of the lots at the time of settlement of the Lukshides Property had Defendants tendered the land in conformance with the Agreement less the value of the land as tendered, subject to the non-conforming easement. (FN13) If the Hayes Property was worth the actual tender price of $41,250 per lot, then the breach obviously did not diminish the value of the land by $30,000 per lot, or by nearly seventy-five percent. The $30,000 decline in value per lot described by Plaintiff's expert includes more than damages for loss in value at the time of Defendants' nonconforming performance.

Plaintiff's expectancy damages are not limited to loss in value, however, but also include any incidental or consequential damages caused by the breach. (FN14) The Agreement clearly contemplated and Defendants are charged with the knowledge that Plaintiff intended to develop the Hayes Property after Defendants fulfilled their obligation to subdivide it into eight lots along a private road. The Declaration executed by Defendants itself contemplated that Plaintiff would incur certain significant expenses in installing a roadway and utilities for the Hayes Property lots, and apparently sought to make Defendants' breach more palatable by requiring the owners of the Lukshides Property lots to share in the costs of maintenance associated with the road and utilities

© 2005 Thomson/West. No claim to original U.S. Govt. works.

installations on the Hayes Property.

It was foreseeable that the effective integration of four of the five lots on the Lukshides Property into Plaintiff's development would decrease the value of the Hayes Property lots *as improved by Plaintiff.* Notwithstanding the foreseeability of such consequences to Plaintiff's planned investment in improvements upon the Hayes Property, Defendants breached the Agreement. Fairness and the law require therefore that Defendants compensate Plaintiff for all the foreseeable losses caused by their willful breach. *See id.* § 347 and cmt. c.

### 2. Burden of Proof

Defendants' expert Kokoszka stated a number of grounds for disagreeing with Plaintiff's expert Stella's determination that three of Plaintiff's Hayes Property lots decreased in value by $30,000 each as a result of Defendants' breach and the resultant development of four DiFelice, Inc. lots fronting the Hayes Property road. Defendants' expert claimed that Plaintiff was not damaged at all. Some of these grounds were effectively undermined by Plaintiff's counsel on cross-examination, but it is unnecessary to delve into each here. The Court was presented with conflicting expert testimony as to damages which are difficult to quantify. The relative burden of proof of the parties must guide the Court's damage findings.

**\*\*13** The Restatement requires that a party establish its loss with "reasonable certainty" in order to recover damages. Restatement (Second) of Contracts § 352, *Uncertainty as a Limitation on Damages.* However, "[t]he neutrality of contract law towards breach is not absolute." Sandra Chutorian, Note, *Tort Remedies for Breach of Contract: The Expansion of Tortious Breach of the Implied Covenant of Good Faith and Fair Dealing into the Commercial Realm,* 86 Colum.L.Rev. 377, 378 n. 9 (1986) (citing Restatement § 352 cmt. a). Specifically, the egregious nature of Defendants' bad faith conduct reduces Plaintiff's burden of proof with respect to damages:

Doubts [about the extent of damages] are generally resolved against the party in breach. A party who has, by his breach, forced the injured party to seek compensation in damages should not be allowed to profit from his breach where it is established that a significant loss has occurred. *A court may take*

*into account all the circumstances of the breach, including willfulness, in deciding whether to require a lesser degree of certainty, giving greater discretion to the trier of the facts.* Damages need not be calculable with mathematical accuracy and are often at best approximate.

Restatement § 352 cmt a (emphasis added). *See also* Restatement § 205 cmt. a ("The appropriate remedy for a breach of the duty of good faith also varies with the circumstance."). The evidence of Plaintiff's damages are thus entitled to be considered in a more charitable light than if Defendants had acted in good faith.

First, the Court found the testimony of Plaintiff's expert Stella that Plaintiff suffered $90,000 in damages to be credible. Second, Plaintiff has submitted evidence that Defendants and their successor in interest, Mario Capano, (FN15) together gained approximately $90,000 from their disposition of the Lukshides Property. Neither Defendants nor their successor in interest had made any improvements to the Lukshides Property in the short interim of three and a half months before their interests were assigned to DiFelice, Inc., so it is reasonable to conclude that the gain from the sale of the Lukshides Property to DiFelice, Inc. represented the value added to the Lukshides property by the Defendants' grant of rights to use the Hayes Property for the purposes elucidated in the Declaration. The fact that the resale value of the Lukshides Property was enhanced by some $92,500 by the easements tends to bolster Plaintiff's contention that the value of the improved Hayes Property was diminished by $90,000 by the easement. In short, under all the circumstances, the Court finds that Plaintiff has adequately shown expectancy damages totalling $90,000.

### B. "Unjust Enrichment" Damages

Plaintiff submits a separate claim for damages claiming that Defendants must disgorge to Plaintiff the $92,500 gain Defendants and their successor in interest realized on the Lukshides Property as a result of Defendants' bad-faith breach. Plaintiff's "unjust enrichment" claim for damages relies simultaneously on a number of incompatible theories, all of which are inapplicable here.

**\*\*14** Plaintiff relies in part on the equitable theory that Defendants had a duty to prove the entire

© 2005 Thomson/West. No claim to original U.S. Govt. works.

1993 WL 54423, R.M. Williams Co., Inc. v. Frabizzio, (Del.Super. 1993)    **Page 11**

fairness of the transaction with the Lukshides to Plaintiff, as Defendants stood on both sides of that transaction. Not only is this theory unavailable in a court of law, but the Court of Chancery has already disposed of this theory, stating that Defendants did not have any fiduciary duties to Plaintiff. *See R.M. Williams Co., Inc. v. Frabizzio,* Del.Ch., C.A. No. 9834, Chandler, V.C. (Feb. 22, 1990), Mem.Op. at 5-6.

Plaintiff also relies in part on the proposition that Plaintiff is entitled to restitution to prevent the "unjust enrichment" of Defendants. Plaintiff's arguments and uses of authority confuse the separate restitutionary cause of action for "unjust enrichment" under a theory often described as "quasi contractual," with the restitution alternative to expectancy or reliance damages sometimes available in contract cases to prevent "unjust enrichment,"*see* Restatement (Second) of Contracts § 344(c) & cmt. d, § 345 & cmt. c; *see generally id.* Topic 4, *Restitution,* §§ 370-377. While the doctrine of quasi contract is both ill-defined and confusing, (FN16) it is clear that "[t]he measure of damages for a contract *implied in law,* " (Pl.Op.Mem. at 19 (emphasis added) (citing *Fleer Corp. v. Topps Chewing Gum, Inc.,* Del.Supr., 539 A.2d 1060, 1062 (1988)), has nothing to do with the determination of damages in a suit for breach of a written contract. (FN17) Under a separate cause of action for unjust enrichment, "[i]n order to obtain restitution, [a plaintiff] must show not only that [the defendant] was unjustly enriched but also that [the defendant] secured a benefit and that it would be unreasonable to allow [the defendant] to retain the benefit." *Fleer Corp.,* 539 A.2d at 1063. In a case for breach of contract such as this one, resort to such amorphous, essentially equitable principles is both unnecessary and inappropriate, as restitution is simply an alternative remedy for the breach which a plaintiff may elect under certain circumstances, *see* Restatement (Second) of Contracts § 344(c) & cmts a, d.

To the dubious extent that Plaintiff has made a damage claim at law for restitution for Defendants' breach of the Agreement, the claim is inconsistent with Plaintiff's claim for expectancy damages, which the Court has granted. *Cf. id.* § 378 & cmt. d ("[T]he remedy of restitution and that of damages for total breach are inconsistent."). A restitution remedy for breach of contract seeks "to return the parties, as nearly as is practicable, to the situation in

which they found themselves before they made the contract," *id.* § 384 cmt. a, whereas an expectancy remedy seeks to place the parties in the position which they "would have been in had the contract been performed," *id.* § 344(a). Plaintiff's "unjust enrichment" claim for Defendants' alleged $92,500 gain, in addition to Plaintiff's expectancy damages of $90,000, thus constitutes a request for double recovery.

**\*\*15.** Furthermore, Plaintiff is not entitled to request restitution in this case as Plaintiff has retained the performance tendered by Defendants, and does not intend to return it. (FN18) For all of the foregoing reasons, Plaintiff's "unjust enrichment" claim is denied.

C. Additional Costs of Construction

In the Amended Complaint, Plaintiff prays for damages including "[t]he additional cost of construction incurred by Plaintiff as a result of the [Declaration of] Restrictions." (Am.Compl. at 7.) This cost was later alleged to be $1,800. (*See* Def. Pre-Tr. Mem. at 21.) Defendants proved that DiFelice, Inc. offered to pay Plaintiff for the incremental costs associated with providing utility services to the lots on the Lukshides Property, and Plaintiff conceded refusing this offer. Whether or not, as Defendants claim, DiFelice, Inc. was required to make this offer, Plaintiff's failure to accept this offer is a failure to mitigate damages. *See Restatement (Second) of Contracts § 350(1). Therefore, Plaintiff is precluded from recovering these costs.*

V. CONCLUSION

In summation, the Court finds that Defendants breached the express terms of the Agreement in addition to the duty of good faith and fair dealing, and that Plaintiff therefore is entitled to expectancy damages only. Judgment is awarded to the Plaintiff against the Defendants in the amount of Ninety Thousand Dollars ($90,000.00) plus post-judgment interest. An order consistent with the Court's findings and decision is attached.

ORDER

This 8th day of February, 1993, in accordance with the opinion of the Court this date, judgment is awarded to the Plaintiff against the Defendants in

© 2005 Thomson/West. No claim to original U.S. Govt. works.

1993 WL 54423, R.M. Williams Co., Inc. v. Frabizzio, (Del.Super. 1993)    **Page 12**

the amount of Ninety Thousand Dollars ($90,000.00) plus post-judgment interest.

IT IS SO ORDERED.

(FN1.) The original Complaint filed in Superior Court on May 5, 1990, also named Joseph G. Lukshides and Judith I. Lukshides as defendants. These defendants were dropped from the case.

(FN2.) The parties have disputed the time at which the plans were first viewed by Plaintiff, with Plaintiff contending that they were attached to and incorporated into the Agreement, and Defendants contending that the plans did not exist at the time the Agreement was executed. The Court's decision renders this disagreement irrelevant.

(FN3.) While the owner of the Hayes Property at the time was Frank Capano, Jr., the parties understood Mario Capano to have authority to grant such permission.

(FN4.) At trial, Defendants placed heavy emphasis on the existence of a child's treehouse within the relevant area.

(FN5.) Thomas Whitfield was an agent of Amato & Stella Associates, the real estate firm which represented the Seller of the Hayes Property under the Agreement, and which also was representing Plaintiff in his efforts to sell the lots in the planned subdivision.

(FN6.) The records contains evidence that this letter was not received by Plaintiff until the day scheduled for settlement. (Letter from Pasquale to Frabizzio dated 2/18/88 at 2.)

(FN7.) This other "project" was never identified.

(FN8.) Frabizzio testified, "The only way I could have gotten the subdivision achieved was the way that I did." He further stated, "There was no other alternative available to me."

(FN9.) Poppiti testified that, while consent of the adjoining property owner is required, there are many ways of providing the consideration which induces the consent.

(FN10.) The Court notes that the potential defense of merger, which was raised by Defendants in the Chancery Court action, *see R.M. Williams Co., Inc., supra*, at 8, and at an earlier stage in the Superior Court action, was deleted from Defendants' answer by the parties through a Stipulation and Order signed by the Court on February 10, 1992. As this affirmative defense has apparently been waived by Defendants, the Court need not address it.

(FN11.) "That the plaintiff was developing the Hayes parcel, however, was public knowledge. In fact, the plaintiff had a trailer in place on the Hayes parcel from which it was conducting the sale of lots." *R.M. Williams Co., Inc. v. Frabizzio,* Del.Ch., C.A. No. 90C-MY-10, Chandler, V.C. (Feb. 22, 1990), Mem.Op. at 7 n. 2.

(FN12.) "Acquiescence can be inferred from silence, even though the purported agent was theretofore a stranger to the purported principle. Nevertheless, the latter's silence is usually more significant if an agent has exceeded [the agent's] powers in the particular transaction, especially if the agent acted from excess of zeal." Restatement (Second) of Agency § 94 cmt. b. *See also id.* § 43 cmt. a ("Persons ordinarily express dissent to acts done on their behalf which they have not authorized or of which they do not approve.").

**15_  (FN13.) "If defective or partial performance is rendered, the loss in value caused by the breach is equal to the difference between the value that the performance would have had if there had been not breach and the value of such performance as was actually rendered." Restatement (Second) of Contracts § 347(a) cmt. b.

(FN14.) "Consequential losses include such items as injury to person or property resulting from defective performance.... The terms used to describe the type of loss are not, however, controlling, and the general principle is that all losses, however described, are recoverable." Restatement (Second) of Contracts § 347(b) cmt. c.

(FN15.) "According to Frabizzio, the Frabizzios became strapped for cash as a result of other real estate ventures and on May 26, 1988, they assigned their interest in the Lukshides parcel to Mario Capano for $35,000.... [Upon the subsequent disposition of the Lukshides Property to DiFelice, Inc. and] [u]nder the terms of the assignment, the Frabizzios were to receive $35,000.00 and Mario

© 2005 Thomson/West. No claim to original U.S. Govt. works.

Capano was to receive $56,658.00." (Pl.Post-Tr.Mem. at 6.) Elsewhere, Plaintiff alleges that Capano Mario Capano received $57,500 in the Lukshides Property transaction with DiFelice, Inc. (Pl.Op.Mem. at 20. Plaintiff derives its "profit of $92,500," (Pl.Post-Tr.Mem. at 10), more or less from the sum of Defendants' gain and their successor in interest's gain, asking the court "to draw the inference that Defendants [sic] actual benefit" was represented by the gain enjoyed by Mario Capano as well as themselves, (Pl.Op.Tr.Mem. at 20).

(FN16.) One scholar states, "In the law of quasi-contract we have felt our way.... It is still impossible for us to foresee all the implications of our own conception that any unexplained gain (not only money) must ordinarily be restored through quasi-contract if a money judgment will suffice." John P. Dawson, *Unjust Enrichment: A Comparative Analysis* 25-26 (1951).

(FN17.) The modern suit for restitution in quasi contract, or under a contract implied in law, as it is sometimes described, is based on the principle that, "A person who has been unjustly enriched at the expense of another is required to make restitution to that other." *Restatement of Restitution* § 1 (1937). Pomponuis stated a similar principle in the second century A.D.: " 'For this by nature is equitable, that no one be made richer through another's loss.' " Dawson, *supra,* at 3.

"Unjust enrichment is defined as 'the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience.' " *Fleer Corp.,* 539 A.2d at 1062 (quoting 63A Am.Jur.2d, *Restitution and Implied Contracts* § 3, p. 945 (1973)). The separate cause of action for "unjust enrichment" is the doctrinal descendant of the old common law action in general assumpsit, as opposed to a common law action in "special assumpsit" for breach of contract where no money remained due. *See generally* Restatement of Restitution, *Introductory Note* 4-9 (1937); 3 Thomas A. Street, The Foundations of Legal Liability: A Presentation of the Theory and Development of the Common Law, *The Action of Assumpsit* 172-206 (1906).

(FN18.) "If ... the breach is by non-performance [as opposed to repudiation], restitution is available only if the breach gives rise to a claim for damages for total breach and not merely to a claim for damages for partial breach.... A party who has lost the right to claim damages for total breach by, for example, acceptance or retention of performance with knowledge of defects (§ 246), has also lost the right to restitution." Restatement (Second) of Contracts § 373 cmt a. *See also id., Requirement That Party Seeking Restitution Return Benefit* § 384 & cmt. a.

F

2002 WL 31667901, Total Care Physicians, P.A. v. O'Hara, (Del.Super. 2002)                Page 1

**\*31667901**    Only the Westlaw citation is currently available.

UNPUBLISHED OPINION.    CHECK COURT RULES BEFORE CITING.

Superior Court of Delaware.

**TOTAL CARE PHYSICIANS, P.A., and Total Care Physicians, Glasgow, P .A., Plaintiffs,**
**v.**
**Kevin W. O'HARA, M.D., et al., Defendants.**

No. Civ.A.99C-11-201-JRS.

Submitted July 12, 2002.

Decided Oct. 29, 2002.

Jeffrey S. Welch, and Garvan McDaniel, Welch & Associates, P.A., Wilmington, DE, for Plaintiffs.

Charles M. Oberly, III, and Karen V. Sullivan, Oberly, Jennings & Rhodunda, P.A., Wilmington, DE, for Defendants.

MEMORANDUM OPINION

SLIGHTS, J.

*DECISION AFTER NON-JURY TRIAL AND POST-TRIAL MEMORANDA. VERDICT FOR PLAINTIFF ON COUNT VI. JUDGMENT FOR DEFENDANTS AS A MATTER OF LAW AS TO COUNTS I AND VII.*

I. INTRODUCTION

**\*\*1**    Plaintiff, Total Care Physicians, P.A. ("TCP"), initiated this litigation against defendants, Kevin W. O'Hara, M.D. ("O'Hara") and Millcreek Medical Associates P.A. ("Millcreek"), after O'Hara terminated his employment with TCP to form Millcreek with another physician. TCP has alleged that O'Hara wrongfully solicited TCP patients to join him at his new medical practice. The Court previously addressed this case on cross-motions for summary judgment and, at the conclusion of that process, substantially pared down the issues remaining for trial. (FN1) Three counts of the plaintiff's amended complaint survived summary judgment: Count I--unjust enrichment; Count VI--misappropriation of trade secrets; and

Count VII--breach of fiduciary duty. (FN2) The Court ordered bifurcation of the issues of liability and damages. (FN3)

The matter was tried to the Court over three days in June, 2002. At the conclusion of the trial, the Court requested the parties to submit post-trial memoranda focusing on the distinction between, on the one hand, a physician properly *notifying* his patients of his departure from one medical practice to join another practice in keeping with his ethical responsibilities and, on the other hand, a physician improperly *soliciting* patients of a medical practice to join him in a new practice. The Court advised the parties that the notification-versus-solicitation distinction likely would be at the heart of the Court's decision on at least one of TCP's three claims for relief.

As can be discerned below, the Court has determined that O'Hara improperly solicited TCP patients to transfer their care to Millcreek. The Court also has determined that O'Hara identified the targets of his solicitation by utilizing TCP's confidential and proprietary information. Consequently, the Court has concluded that O'Hara misappropriated TCP's trade secrets. Accordingly, the Court's verdict is in favor of TCP on Count VI of the complaint. As to Counts I and VII, the Court will enter judgment as a matter of law in favor of the defendants for the reasons stated below.

II. FINDINGS OF FACT

A. O'Hara's Practice At TCP

O'Hara joined TCP in June of 1992. The letter agreement memorializing O'Hara's relationship with TCP, dated June 2, 1994 (the "letter agreement"), provided that O'Hara would "provide medical services for [TCP] as an independent contractor." (FN4) In the years that followed, O'Hara developed a large following of patients whom O'Hara considered to be his own. He would also, on occasion, treat individuals he considered to be patients of TCP or other individual TCP physicians.

The letter agreement required TCP to offer O'Hara a "financial interest" in TCP no later than December 30, 1995. When O'Hara became convinced that no such offer would be forthcoming from TCP, he began to explore other opportunities in the Wilmington medical community. These

© 2005 Thomson/West. No claim to original U.S. Govt. works.

2002 WL 31667901, Total Care Physicians, P.A. v. O'Hara, (Del.Super. 2002)    **Page 2**

explorations led O'Hara to Stuart Felzer, M.D. ("Felzer") who was looking for a physician to join his practice for the purpose of sharing an existing (and ever-growing) patient load. Felzer did not plan to add new patients to his practice. Nevertheless, O'Hara acknowledges that Felzer did not discourage him from bringing patients with him from TCP, and O'Hara's conduct after he struck a deal with Felzer suggests that he did not wish to leave patients behind when he left TCP.

### B. O'Hara Leaves TCP

**\*\*2** O'Hara notified TCP of his intent to leave the practice by letter dated December 29, 1995. Near the end of March or beginning of April, 1996, O'Hara met briefly with Dr. Constantine Michell ("C.Michell"), a principal of TCP, to discuss O'Hara's impending departure from the practice. Both parties agree that during this brief encounter O'Hara and C. Michell discussed the need to notify O'Hara's patients that he was leaving TCP and to advise them where he was going.

That a discussion occurred and that it addressed generally the topic of patient notification are the only aspects of this key piece of the factual puzzle on which the parties agree. O'Hara recalls that C. Michell authorized him to notify his patients but did not specify the means or the content of such notification. According to O'Hara, this "blanket authorization" later was echoed by TCP's other principal, Dr. Theodore Michell ("T.Michell"). C. Michell testified that he gave O'Hara very specific instructions that the notification was to be provided orally when patients came to see O'Hara, and that the notification should be limited to: (i) the fact that O'Hara was leaving TCP; (ii) where he was going; and (iii) advising the patients that they may chose to follow O'Hara or remain at TCP. C. Michell believes that he specifically admonished O'Hara not to send a mass-mailed letter to patients.

The preponderance of the evidence supports O'Hara's recollection of this discussion. C. Michell readily acknowledged that O'Hara had a professional and ethical responsibility to notify his patients that he was leaving TCP and to advise them where he was going. This duty did not extend only to those patients who happened to see O'Hara in the office between April and June, 1996. (FN5) The duty to notify patients extended to all of O'Hara's patients, whether they were seen in the office or not.

The limitations imposed upon O'Hara in C. Michell's rendition of his conversation with O'Hara would allow no means by which patients not seen by O'Hara in the office would be notified. This result would be contrary to the stated goal of both TCP and O'Hara that all of O'Hara's patients receive notification of O'Hara's move. The Court finds, as a matter of fact, that TCP authorized O'Hara to notify patients and did not restrict him with respect to the means by which the notification would occur.

Having concluded that O'Hara was authorized by TCP to notify his patients of his departure from the practice, and that he was not restricted in the means by which he could effect this notification, the Court next must consider whether O'Hara was authorized to utilize TCP's records to obtain the information needed to contact the patients he did not see in the office. O'Hara acknowledges that he did not discuss this issue with anyone from TCP. Instead, he assumed that implicit in the authorization to notify patients was the authority to obtain patient identity and address information from TCP's records. O'Hara utilized TCP's super bills, (FN6) insurance lists and medical records to compile a list of his patients and their addresses so that he could send a mass-mailed letter purportedly to advise patients of his departure from TCP and his new association with Felzer. O'Hara estimates that the letter went to as many as 900 patients.

**\*\*3** TCP's general endorsement of O'Hara's authority to notify patients of his departure compels the conclusion that O'Hara was authorized to use TCP information to compile a list of patients (with addresses) to effect the notification. TCP acknowledges that it assumed no responsibility whatsoever for notifying O'Hara's patients; O'Hara was to perform whatever notification was to occur on his own. Under these circumstances, when TCP authorized O'Hara to notify patients, it implicitly authorized him to utilize the TCP information that was available to him to compile a list of his patients and their addresses. To conclude otherwise would be to conclude that TCP authorized O'Hara to notify all of his patients but forbade him from determining the identity and addresses of those patients. Nothing in the record suggests that TCP had resorted to this kind of gamesmanship in its dealings with O'Hara or with patients.

### C. O'Hara's Mass-Mailed Letter to Patients

© 2005 Thomson/West. No claim to original U.S. Govt. works.

2002 WL 31667901, Total Care Physicians, P.A. v. O'Hara, (Del.Super. 2002)    **Page 3**

On June 17, 1996, O'Hara mailed the following letter to more than 900 of his TCP patients: (FN7)

I am pleased to inform you that on July 1, 1996 I will be leaving Total Care Physicians to join Stuart Felzer in our new office listed above [the letterhead provided Felzer's office address]. Dr. Felzer is an excellent physician whom I have known since 1982.

You can feel confident that we will provide top quality healthcare for you and your family in our new location. We are board certified physicians who offer comprehensive and preventative care for patients starting from the age of six. Our office is conveniently located at the center of many health services, including on-site laboratory, radiology, physical therapy, and many additional medical services close by.

You are receiving this letter because either we have an established relationship and/or you have selected me as your primary care physician (PCP) with your insurance plan. In order for me to continue as your PCP at my new location, the insurers require that *you* notify them directly. You *will not automatically* be transferred with me.

Therefore, if you wish to retain me as your PCP, please contact your member services number listed below and inform them of your intentions *as soon as possible*. Please make sure to include all applicable family members. Failure to do so may result in problems with insurance coverage for office visits.

Also, Total Care Physicians will require a signed request in order to forward your records to my new office. Therefore, I have included a records request form for that purpose. Simply list all family members requesting transfer, sign the form, and mail it to the office where your records are filed.

I appreciate your taking the time to do these tasks now as this will make the transition much smoother for all of us.

Sincerely,

Kevin W. O'Hara, M.D. (FN8)

O'Hara constructed this letter on his own; he did not seek input from Felzer or from legal counsel. And he did not clear the letter with TCP before sending it. According to TCP, between June 17 (the date the letter was mailed) and July 3, TCP received upwards of 500 requests for records from patients who had received O'Hara's letter. On average, TCP fielded 15-20 calls per day from O'Hara's patients in the weeks following his departure. Needless to say, the transition, from TCP's perspective, was anything but smooth. O'Hara estimates that approximately 640 patients ultimately left TCP to join him in his new practice.

**4 The Court already has determined that TCP authorized O'Hara to *notify* his patients of his departure from the practice and of his new location. Thus, to the extent the letter simply notified patients as authorized by TCP, there can be no actionable claim based on the letter, even if its sending caused disruption at TCP. The question, then, prompted by the evidence is: did O'Hara's letter constitute an authorized *notification* of patients or an unauthorized *solicitation* of patients? The answer to this question is significant because if O'Hara utilized (appropriated) TCP's trade secret information to solicit TCP's patients without TCP's permission, then O'Hara may be liable for, among other claims, misappropriation of trade secrets. The resolution of this issue, and the implications flowing therefrom, implicate mixed questions of law and fact. The Court will address them below.

### III. CONCLUSIONS OF LAW

#### A. Misappropriation of Trade Secrets

In Delaware, the claim of misappropriation of trade secrets is a creature of statute. (FN9) The elements of the claim are well-settled: (1) a trade secret; (2) communicated by the plaintiff to the defendant; (3) pursuant to an express or implied understanding that the secrecy of the matter would be respected; and (4) which the defendant improperly has used to the injury of the plaintiff. (FN10) The Court will address the proof with respect to these elements *seriatim*.

#### 1. The Existence and Communication of Trade Secrets

The Court already has determined that TCP's super bills constituted trade secrets and were entitled to the statutory protection from misappropriation codified

© 2005 Thomson/West. No claim to original U.S. Govt. works.

2002 WL 31667901, Total Care Physicians, P.A. v. O'Hara, (Del.Super. 2002)    **Page 4**

in Delaware's Uniform Trade Secrets Act. (FN11) And the parties do not dispute that TCP "communicated" the trade secrets--the super bills--to O'Hara by giving him unfettered access to them. (FN12) Nothing in the trial record suggests to the Court that its conclusions in this regard should be revisited.

2. Did O'Hara Understand That the Super Bills Were to Remain Secret?

O'Hara was not a rookie when he joined TCP. He had associated with at least one other medical practice prior to associating with TCP and had left that practice in a context which required him to adhere to restrictive covenants. He also was a savvy businessman, as recognized by the Court in its prior decision. (FN13) The manner in which he secured, copied, and later used the super bills reflects an understanding on his part that the information contained in those documents was valuable to TCP (and its physicians) and that it was not for public consumption. Finally, even though he did not sign the document, the record reflects that O'Hara was made aware of a revised contract TCP was asking its physicians to sign which expressly provided that all TCP documents were to be kept confidential. (FN14)

Based on the foregoing, the Court is satisfied that TCP proved by a preponderance of the evidence that O'Hara used the super bills with an implied (if not express) understanding that the information was to be kept secret and was to be utilized only in accordance with TCP's authorization.

3. Did O'Hara Improperly Use The Trade Secret Information?

**5 " 'Misappropriation' shall mean ... [d]isclosure or use of a trade secret of another without express or implied consent by a person who, ... [a]t the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade [sic] was ... [a]cquired under circumstances giving rise to a duty to maintain its secrecy or limits its use." (FN15) The success of TCP's claim of misappropriation turns on whether O'Hara's use of the trade secret information was with or without TCP's "express or implied consent."

To reiterate, the Court has concluded, as a matter of fact, that TCP implicitly authorized O'Hara to

utilize its trade secret information (super bills and other patient identifiers) for the purpose of notifying appropriate TCP patients that he was departing the practice and advising them of his new location. Even if TCP had not authorized O'Hara to notify patients (expressly or implicitly), the Court, for reasons discussed below, would conclude that applicable standards of professional ethics and Delaware public policy compelled O'Hara to notify his patients that he was leaving TCP and joining Millcreek. Accordingly, to the extent the June 1 letter simply notified patients, O'Hara's use of TCP's trade secrets to construct and/or mail the letter would not constitute a misappropriation of trade secrets. Such use either was expressly authorized by TCP, implicitly authorized by TCP, or mandated by governing rules of professional responsibility and Delaware public policy. (FN16)

The Court also has concluded, as a matter of fact, that TCP did not authorize O'Hara to solicit patients from TCP to his new practice at Millcreek. Thus, to the extent O'Hara used TCP's super bills to launch an unauthorized solicitation of TCP patients, the Court would be obliged to conclude that O'Hara misappropriated TCP's trade secrets. (FN17)

To determine whether O'Hara's June 1, 1996 letter was a notification or solicitation, and to confirm that this distinction is relevant in the context of a physician's responsibilities and proscriptions when departing a medical practice, the Court has sought direction from ethical standards of the American Medical Association ("AMA"), Delaware's public policy as embodied in its statutes, and analogous case law. (FN18)

a. The AMA Code of Medical Ethics

The AMA begins its analysis of the physician's duty to patients when he departs one medical practice to join another with the fundamental (practically Hippocratic) recognition that "[t]he interest of the patient is paramount in the practice of medicine, and everything that can reasonably and lawfully be done to serve that interest must be done by all physicians who have served or are serving the patient." (FN19) In this regard, the AMA has determined that the best interests of the patient mandate that when a physician leaves a group practice, the physician's patients "must be notified that the physician is leaving the group." (FN20) "Patients of the physician must also be notified of

© 2005 Thomson/West. No claim to original U.S. Govt. works.

the physician's new address and offered the opportunity to have their medical records forwarded to the departing physician at his or her new practice." (FN21) Finally, the AMA admonishes that "[i]f the responsibility for notifying patients falls to the departing physician rather than to the group, the group should not interfere with the discharge of these duties by withholding patient lists or other necessary information." (FN22)

**6** The AMA's Code of Medical Ethics provides meaningful guidance on at least two fronts. First, it confirms that the departing physician's ethical duty is to *"notify"*, not solicit, patients when he leaves a medical practice. (FN23) Second, it confirms that the practice from which the physician is departing has responsibilities along with the departing physician--the practice either notifies the appropriate patients of the departure of one of its physicians or it stands out of the way of the departing physician as he discharges his duty to notify. (FN24) Either way, it is understood that all patients of the departing physician will be notified and that it may be necessary to utilize patient lists or other confidential information to identify these patients and to facilitate the notification.

At trial, both TCP and O'Hara recognized the mandate of patient notification as codified by the AMA. For its part, TCP contended that the AMA did not require TCP to permit O'Hara to notify his patients of his departure by a mass-mailed letter. The Court already has concluded that TCP's proffered alternative method of notification was, at best, unreasonable and, more likely, chimerical. The AMA supports the notion that all patients must be notified of the physician's departure, not just those patients who happen to see the physician in the office before he leaves the practice. For his part, O'Hara claims that he was motivated, at least partially, to prepare his June 1 letter by the mandate of the AMA's ethical standards. Yet, when pressed, he admitted that he had not referred to them when he actually constructed the letter. Thus, it appears that he was unaware that while the AMA required him to notify his patients of his departure, to advise them of his new location, and to provide a means by which they could transfer their records to the new practice if they wished to do so, it did not give him license to solicit their business.

b. Delaware's Public Policy

Although at times expressed by our courts, Delaware's public policy most frequently is expressed in the voice of our General Assembly. And, when it comes to a patient's right of access to healthcare, Delaware's General Assembly has spoken loud and clear. Delaware provides a right to healthcare to eligible citizens who are unable to pay for care, (FN25) rights to fair treatment from healthcare insurers, (FN26) and a highly regulated framework within which physicians are licensed, are required to obtain continuing medical education, and are subject to discipline. (FN27) The General Assembly also has recognized the importance of maintaining the continuity of care by protecting the physician-patient relationship. Not only has the physician-patient relationship been recognized to create a protected privilege, (FN28) it also is the source of Delaware's statute prohibiting restrictive covenants in physician "employment, partnership or corporate agreements." (FN29) Indeed, the synopsis to Senate Bill 294 recognizes that "[b]ecause patients establish relationships with their physicians and/or enter into courses of treatment with particular physicians, the patients should not be deprived of the services of the physician of their choice because of an economic contract entered into between two physicians." (FN30) It is not surprising, then, that one year after disallowing contracts that restrict a physician's right to provide medical services to his patients within the State, the General Assembly enacted a law which required physicians to notify their patients when they discontinue their practice within the State for any reason. (FN31)

**7** It is against this statutory framework, in which the sanctity of the physician-patient relationship is embroidered in the fabric of Delaware's public policy, that the Court takes comfort in recognizing a physician's right to notify his patients when he departs one medical practice and joins another. Thus, as stated above, even if TCP had not expressly or implicitly authorized O'Hara to notify his patients of his departure, the Court would have sanctioned his notifications in any event as an act compelled by the spirit (if not the letter) of Delaware's statutory treatment of the physician-patient relationship. But nothing in Delaware's statutes or public policy encourages or authorizes a physician to solicit patients from one medical practice to another, particularly when he uses the protected trade secrets of the target medical practice to accomplish the inducement.

© 2005 Thomson/West. No claim to original U.S. Govt. works.

The Court is satisfied that the distinction it seeks to fashion between a proper notification of patients and an improper solicitation of patients is well-grounded in Delaware's public policy. Aside from confirming that the distinction is valid, however, Delaware statutory law offers nothing by way of interpretive guidance in determining whether O'Hara's letter notified patients or solicited them.

### c. The Distinction Between Notification and Solicitation As Recognized in the Case Law

The parties have suggested that the propriety of a physician's conduct when communicating with patients regarding his departure from a medical practice raises questions of first impression in Delaware. This may be so, but at least one Delaware court has offered meaningful guidance. In *Dickinson Medical Group, P.A. v. Foote,* (FN32) Chancellor Brown addressed a medical practice's claim that a departing physician had misappropriated trade secrets by surreptitiously removing confidential patient records for use in starting a new practice. Like O'Hara, the departing physician (Foote) argued that she had a "professional responsibility" to notify patients that she was leaving the medical practice (Dickinson) to start her own practice. And, like O'Hara, Foote argued that she should be permitted to utilize Dickinson's patient lists to make contact with patients for whom she had provided care. The Court disagreed. Concluding that the patient lists were trade secrets, (FN33) the court enjoined Foote from utilizing the lists to make direct contact with Dickinson's patients. (FN34)

Chancellor Brown's holding reveals that he was concerned that Foote would solicit Dickinson's patients improperly and that Dickinson would be harmed irreparably as a result. (FN35) But the court also recognized that Dickinson's patients should be notified that Foote no longer was practicing with Dickinson and that they should be offered a choice of where to seek medical care. Accordingly, the court directed Dickinson to notify patients of Foote's departure and of her "professional whereabouts" and also to advise patients that they may continue to treat with Dickinson, follow Foote to her new practice, or seek a new physician of their choice. (FN36) While perhaps not directly addressed by Chancellor Brown in *Dickinson,* the distinction between notifying and soliciting patients was at least implicitly recognized by him as he "fashioned [the court's] remedy to fit the occasion." (FN37)

**8     Courts elsewhere have addressed the distinction more directly. For instance, when interpreting California's Uniform Trade Secrets Act, the United States Court of Appeals for the Ninth Circuit has held:

The UTSA definition of "misappropriation" has been clarified by case law which establishes that the right to announce a new affiliation, even to trade secret clients of a former employer, is basic to an individual's right to engage in fair competition, and that the common law right to compete fairly and the right to announce a new business affiliation have survived the enactment of the UTSA. (citation omitted) However, misappropriation occurs if information from a customer data base is used to solicit customers. (citation omitted) Merely informing a former employer's customers of a change of employment, without more, is not solicitation. (citation omitted) (FN38)

Several other courts have drawn this distinction as well. (FN39)

The Supreme Court of California has referred to Black's Law Dictionary to define "solicit":

"Solicit" is defined as: 'To ask for the earnestness, to make petition to, to endeavor to obtain, to awake or excite to action, to appeal to, or to invite.' (Black's Law Dictionary, 3d ed., p. 1639) 'It implies personal petition and importunity addressed to a particular individual to do some particular thing ...' (citation omitted) It means: "To appeal to (for something); to apply to for obtaining something; to ask earnestly; to ask for the purpose of receiving; to endeavor to obtain by asking or pleading; to entreat, implore, or importune; to make petition to; to plead for; to try to obtain." (FN40)

In a later decision of the California Court of Appeals, the court referred to *Aetna's* definition of "solicit" when considering the propriety of the following letter written by an insurance agent to customers of his former firm as he was departing the business:

After almost fifteen years as both an agent and policyholder, I have left [ACI] and am very pleased

© 2005 Thomson/West. No claim to original U.S. Govt. works.

2002 WL 31667901, Total Care Physicians, P.A. v. O'Hara, (Del.Super. 2002)                                    **Page 7**

to announce the formation of an independent insurance agency. I shall continue to specialize in Credit Insurance but will now primarily be representing Fidelity and Deposit Company of Maryland, who [sic] is offering companies a very interesting alternative to the types of policies being written by both [ACI] and Continental. If you would like to learn more about the [F & D] policy, I will be happy to discuss it in detail with you when you are ready to review your ongoing credit insurance needs at renewal time. In the meantime, ACI will assign a new agent to your policy. If I can be of assistance to you during the transition period or answer any questions for you at any time, please do not hesitate to call me. I have really enjoyed our past association and hope we don't lose touch! (FN41)

After recognizing the agent's right to announce her departure from the firm to customers with whom she had conducted business, the court held that her letter to customers "went beyond an appropriate professional announcement and constituted a solicitation of the ACI customer list." (FN42) The court went on to explain how the "announcement letter" was transformed into an improper solicitation:

**9** Although the letter begins as an announcement of her departure from ACI and affiliation with F & D, it soon assumes a different tone. Sacks (the agent) informs ACI's customers of the interesting competitive alternative F & D offers as compared to ACI's policies. She invites their inquiry about the F & D policy and indicates she would be happy to discuss it in detail when they are ready to renew. She personally petitions, importunes and entreats ACI's customers to call her at any time for information about the better policies F & D can provide and for assistance during the agent transition period. Phrased in the terms used in the *Aetna* definition, Sacks is endeavoring to obtain their business. Sacks, in a word, solicited. Therefore, as a matter of law, Sack's letter ... constituted a solicitation. (FN43)

In contrast, a mass-mailed letter to customers of an accounting firm by a departing accountant which simply announced his departure and provided the name, address and telephone number of his new firm was deemed not to be an improper solicitation. (FN44) "Merely informing customers ... of a change of employment, without more, is not

solicitation." (FN45) And, when approached by customers, the former employee may discuss transferring the customer's business to the new firm. (FN46)

d. O'Hara's Letter Solicited TCP Patients

The Court has discerned the following guidance from the AMA standards, Delaware public policy and the case law: (1) a proper notification will supply the patient with information which will allow him to continue to receive care from the physician after he leaves a medical practice; (2) this information should include the fact that the physician is leaving a practice, the location of the new practice, and the means by which the patient can transfer his medical records from the old practice to the new practice if he so chooses; and (3) the notification should not include statements which will either encourage the patient to leave the physician's former practice or transfer care to the new practice-- stated differently, the physician should not "endeavor to obtain [the patient's] business." (FN47)

O'Hara's June 1 letter "endeavors to obtain [the] business" of TCP patients. Like the insurance agent in *Sacks,* O'Hara begins his letter with a proper announcement of his departure from TCP and relocation to Millcreek. This was authorized by TCP and mandated by governing rules of professional responsibility and Delaware public policy. Later in the letter, O'Hara advises patients how to transfer their records to Millcreek if they so choose. Again, this information is proper in that it does not encourage the transfer of care; it simply provides the means by which a transfer would occur if the patient elects to follow O'Hara to Millcreek. (FN48) But, like the agent in *Sacks,* O'Hara did not stop there. He goes on to tout the quality of care that will be offered at the new practice and the quality of the facilities in which the care will be rendered. This is solicitation. (FN49) Since TCP did not authorize O'Hara to utilize its trade secrets to solicit TCP patients, and the Court can see no other basis to sanction the solicitation, the Court must conclude that O'Hara misappropriated TCP's trade secrets.

e. TCP May Proceed To The Second Phase Of The Trial To Prove Its Damages

**10** The Court ordered bifurcation of the issues of

© 2005 Thomson/West. No claim to original U.S. Govt. works.

liability and damages. Having concluded that misappropriation has occurred, the Court must look ahead to the next phase of these proceedings. Certainly, TCP may now endeavor to prove its damages. Yet the Court must confess that its vision of how the damages phase of the trial will unfold, or at least the framework in which it will proceed, is less than clear. The Court has determined that some portions of the June 1 letter were proper, others were not. Arguably, TCP would be required to prove that patients left TCP as a result of the solicitous portions of the letter, as opposed to those portions of the letter which properly announced O'Hara's departure from the practice. (FN50) The Court will expect the parties to address this issue in advance of the next phase of the trial.

B. Unjust Enrichment

"The elements of unjust enrichment are: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and the impoverishment, (4) the absence of justification, and (5) the absence of a remedy at law." (FN51) In light of the Court's decision on TCP's misappropriation of trade secrets claim, the unjust enrichment claim may be disposed of as a matter of law. TCP has an adequate remedy at law: its claim for damages resulting from the misappropriation of its trade secrets. It need not invoke this Court's sense "of justice or equity and good conscience" to secure relief. (FN52) When a plaintiff may avail itself of an adequate remedy at law, this Court will not hear a claim sounding in unjust enrichment. (FN53) The Court will enter judgment for the defendants on TCP's unjust enrichment claim is dismissed as a matter of law. (FN54)

C. Breach of Fiduciary Duty

In its decision on the cross motions for summary judgment, the Court determined that O'Hara owed a fiduciary duty to TCP to protect TCP's trade secrets. (FN55) This determination was made after reviewing an undisputed record with respect to the nature of the relationship between TCP and O'Hara as recounted in TCP's amended complaint. The Court also relied upon then Vice Chancellor Chandler's decision in *Marsico v. Cole* in which he concluded that an independent contractor physician owed "a duty of loyalty" to the medical practice in which he worked to "protect[ ] trade secrets or confidential, proprietary information." (FN56)

Unfortunately, at no time during the pendency of the cross motions for summary judgment did either of the parties advise the Court that the Court of Chancery had already addressed the breach of fiduciary claim when the case was pending there. Specifically, in connection with a motion to dismiss filed on behalf of all defendants, the Court of Chancery concluded that it lacked jurisdiction over the controversy because TCP had failed to plead a claim for breach of fiduciary duty. (FN57) By its order dismissing the case for lack of equitable jurisdiction, the Court of Chancery, in effect, dismissed the breach of fiduciary duty claim. This is the law of the case. Absent a finding by this Court that the Vice Chancellor's ruling was "clearly erroneous," the issue should not be re-litigated here. (FN58)

**11 Although it is not clear whether the Court of Chancery considered *Marsico* in reaching its conclusion that a fiduciary duty could not exist under the circumstances presented here, the Court is not "left with the definite and firm conviction that a mistake has been committed." (FN59) Reasonable minds could differ with respect to the nature and character of the parties' relationship. Accordingly, the Court will respect the law of the case. Judgment will be entered in favor of the defendants on Count VII as a matter of law.

IV. CONCLUSION

The Court has concluded that O'Hara misappropriated TCP's trade secrets by using them to conduct an unauthorized solicitation of TCP's patients. TCP may now attempt to prove its damages with respect to this claim. The Court also has determined that judgment should be entered as a matter of law in favor of the defendants as to Counts I and VII. The Prothonotary will enter these judgments on the docket forthwith.

IT IS SO ORDERED.

(FN1.) *Total Care Physicians, P.A. v. O'Hara,* 798 A.2d 1043 (Del.Super.2001).

(FN2.) *Id.*

(FN3.) Prior to trial, the parties requested the Court to clarify this order, specifically with respect to causation, in the hopes that clarification might

© 2005 Thomson/West. No claim to original U.S. Govt. works.

assist the parties in their efforts to settle the case. Specifically, the parties inquired whether the Court was expecting to receive evidence in the first phase of the trial on the issue of whether any misappropriation of trade secrets that may have occurred proximately caused damages to TCP. As the issue was refined, the question evolved into whether TCP would have to prove that each patient who left TCP to join O'Hara at Millcreek did so as a proximate result of the alleged misappropriation. While the Court did provide the parties with some advisory guidance with respect to this issue as requested, ultimately the Court told the parties that the causation issue would be addressed in the second phase of the trial to the extent a second phase was necessary.

(FN4.) (Pl.'s Ex. 1 at ¶ 1)

(FN5.) Both parties agreed that O'Hara was authorized to begin notifying patients of his departure in April, 1996. He left TCP at the end of June, 1996.

(FN6.) A "super bill" is a written compilation of patient data, including the patient's identity, diagnosis, treatments, insurance and address information used by the practice internally to process requests for reimbursement for medical services from insurance carriers and government programs.

(FN7.) The letter was dated June 1, 1996 but mailed on June 17. At trial, the parties disputed whether all 900 patients who received this letter were, in fact, O'Hara's patients. TCP contends that some of the 900 patients had never been treated by O'Hara and others had been treated by O'Hara on a limited basis on behalf of other physicians at TCP. TCP did not prove this contention by a preponderance of the evidence. The record was, at best, opaque with respect to this issue. The Court has determined that all of the patients who received O'Hara's letter had an interest in knowing that he was leaving TCP.

(FN8.) (Pl.'s Ex. 5)(emphasis in original).

(FN9.) *See* DEL.CODE ANN. tit. 6, §§ 2001-2009 (1999).

(FN10.) *Total Care Physicians, P.A.,* 798 A.2d at 1053 (citation omitted).

(FN11.) *Id.* at 1053-54.

(FN12.) *Id.* at 1054.

(FN13.) *Id.* at 1052 (noting that O'Hara negotiated a favorable contract with conditional restrictive covenants which were triggered only if TCP offered him an equity stake in the practice, and that he carefully conducted his activities in accordance with the contract to avoid its restrictive covenants).

(FN14.) (Pl.'s Ex. 4 at ¶ 18).

(FN15.) DEL.CODE ANN. tit. 6, § 2001(2)(b)(2)(B)(1999).

(FN16.) By no means should this conclusion be read as an endorsement of a patient's right of action against a physician for failure of the physician to notify the patient of his departure from a medical practice. This question is not before the Court. Nor has the Court concluded as a matter of law that all employees leaving an employer may utilize the employer's trade secret information to notify customers of their departure. The Court's holding in this case is limited to the factual scenario presented here: a physician with an existing patient base who departs one medical practice to join another.

(FN17.) DEL.CODE ANN. tit. 6, § 2001(2)(b)(2)(B)(1999).

**11 (FN18.) At the outset, the Court notes that O'Hara has never argued that he was authorized by TCP, or otherwise permitted, to solicit TCP patients to join him at Millcreek. Instead, he has argued that he was authorized by TCP to *notify* patients and that his letter to patients did nothing more than that. And, although he cites to AMA ethical standards and Delaware statutes in support of his argument that patient notification was mandated, O'Hara has not utilized this authority to justify the actual text of his June 1, 1996 letter to patients.

(FN19.) AMERICAN MEDICAL ASSOCIATION, CODE OF MEDICAL ETHICS § 7.01 (1994).

(FN20.) *Id.* at § 7.03.

(FN21.) *Id.*

© 2005 Thomson/West. No claim to original U.S. Govt. works.

2002 WL 31667901, Total Care Physicians, P.A. v. O'Hara, (Del.Super. 2002)                **Page 10**

(FN22.) *Id.*

(FN23.) Notification, from the AMA's perspective, involves: (1) telling the patient the physician is leaving; (2) telling the patient where the physician is going; and (3) telling the patient that he may follow the physician if he so chooses. *Id.*

(FN24.) Here, the evidence clearly demonstrated that TCP did nothing to notify its patients of O'Hara's departure. The responsibility for doing so, therefore, fell to O'Hara.

(FN25.) DEL.CODE ANN. tit. 31, § 505 (1997).

(FN26.) DEL.CODE ANN. tit. 18, §§ 3301-3343, 3501-3566, 3401-3409, 4401-4420, 6301-6309, 6401-6408, and 7101-7109 (1999).

(FN27.) DEL.CODE ANN. tit. 24, § 1701 (1997).

(FN28.) *See* Del. R. Evid. 503 (codifying the physician-patient privilege).

(FN29.) DEL.CODE ANN. tit. 6, § 2707 (1999).

(FN30.) S.B. 294, 132nd Gen. Assem., Reg. Sess. (synopsis)(Del.1983)(enacted as DEL.CODE ANN. tit. 6, § 2707).

(FN31.) DEL.CODE ANN. tit. 24, § 1761(a)(1997)(enacting H.B. 870, 132nd Gen. Assem., Reg. Sess. (Del.1984)).

(FN32.) 1984 Del. Ch. LEXIS 429 (Del. Ch.).

(FN33.) *Id.* at *6-7.

(FN34.) *Id.* at *7.

(FN35.) *Id.* at *2-3("Dickinson seeks an order temporarily enjoining Dr. Foote from using the patient for purposes of [a] competing business solicitation....").

(FN36.) *Id.* at *8.

(FN37.) *Id.*

(FN38.) *MAI Systems Corp. v. Peak Computer, Inc.,* 991 F.2d 511, 521 (9th Cir.1993).

(FN39.) *See e.g., Rao v. Verde,* 635 N.Y.S.2d 660, 661 (N.Y.Supr.1995)(deciding that physician may notify patients of departure but may not solicit); *Core v. Martin,* 543 So.2d 619, 622 (La.App.1989)(stating that veterinarian may announce his departure but may not solicit); *Maryland Metals, Inc. v. Metzner,* 382 A.2d 564, 568 (Md.App.1978)(asserting that employee may notify customers of departure but may not solicit); *Crane Co. v. Dahle,* 576 P.2d 870, 872 (Utah 1978) (same); *Alder, Barish, Daniels, Levin & Creskoff v. Epstein,* 393 A.2d 1175, 1184-86 (Pa.1978)(same).

**11 (FN40.) *Aetna Building Maintenance Co., Inc. v. West,* 246 P.2d 11, 15 (Cal.1952).

(FN41.) *American Credit Indemnity Co. v. Sacks,* 213 Cal.App.3d 622, 625 (Cal.App.1989).

(FN42.) *Id.* at 633.

(FN43.) *Id.* at 636.

(FN44.) *See Moss, Adams & Co. v. Shilling,* 179 Cal.App.3d 124, 127 (Cal.App.1986).

(FN45.) *Aetna,* 246 P.2d at 15.

(FN46.) *See Hilb, Rogal & Hamilton Ins. Sevs. Of Orange County v. Robb,* 33 Cal.App. 4th 1812 (Cal.App.1995)(deciding that former employee did not misappropriate customer list and other client information by informing agency's clients of his change of employment and then complying with their instructions to move their accounts).

(FN47.) *Sacks,* 213 Cal.App.3d at 636.

(FN48.) *See* AMERICAN MEDICAL ASSOCIATION, *supra* note 19.

(FN49.) O'Hara has offered no justification for this portion of the letter and the Court can think of none other than to entice patients to leave TCP and join O'Hara at Millcreek.

(FN50.) *See Marsico v. Cole,* 1995 Del. Ch. LEXIS 78, at *25 (Del. Ch.) ("No reliable or credible evidence was presented as to the extent to which [the departing physician] has been enriched, if at all, by virtue of the misappropriation of trade secrets."); *Williams v. Riedman,* 529 S.E.2d 28 (S.C.App.2000)(noting that there was no evidence

© 2005 Thomson/West. No claim to original U.S. Govt. works.

2002 WL 31667901, Total Care Physicians, P.A. v. O'Hara, (Del.Super. 2002)                    **Page 11**

presented that clients' decision to transfer their business to defendant's new employer was the result of the solicitation on the part of the employee); *Western Electro-Plating Co. v. Henness,* 196 Cal.App.2d 564, 571-72 (Cal.App.1961)(asserting that trial court should receive evidence that transfer of business to employee's new business was not the result of solicitation); *Dunsmore & Assoc., Ltd. v. D'Alessio,* 2000 Conn.Super. LEXIS 114, at *33 ("Actual loss in this context [a misappropriation claim] means the amount of money that the plaintiff lost from the defendant's misappropriation; it is measured by how much better off the plaintiff would have been but for the defendant's misappropriation.").

(FN51.) *Jackson Nat'l Life Ins. Co. v. Kennedy,* 741 A.2d 377, 393 (Del. Ch.1999) (citations omitted).

(FN52.) *See Fleer Corp. v. Topps Chewing Gum, Inc.,* 539 A.2d 1060, 1062 (Del.1988)("Unjust enrichment is defined as 'the unjust retention of a benefit to the loss of another ... against fundamental principles of justice or equity or good conscience.' ").

(FN53.) *See e.g., R.M. Williams Co., Inc. v. Frabizzio,* 1993 Del.Super. LEXIS 55, at *42-44 (Del.Super.) (dismissing unjust enrichment claim when remedy at law was available to the plaintiff).

(FN54.) At the conclusion of the trial, the Court suggested that the unjust enrichment claim would be displaced by the misappropriation of trade secrets claim. *Cf. Leucadia, Inc. v. Applied Extrusion Techs.,* 755 F.Supp. 635, 637 (D.Del.1991)(stating that the Uniform Trade Secrets Act "was intended to preserve a single tort cause of action under state law for misappropriation ... and ... to eliminate other tort causes of action founded on allegations of trade secret misappropriation")(citing DEL.CODE ANN. tit. 6, § 2007(a)(1999)). On reflection, the Court has determined that it is more accurate to say that the misappropriation of trade secrets claim affords TCP an adequate remedy at law which, in turn, disables its unjust enrichment claim. The unjust enrichment claim is not a tort-based claim and is not, therefore, subject to the statutory preemption addressed in *Leucadia.*

(FN55.) *Total Care Physicians, P.A.,* 798 A.2d at 1058.

**11    (FN56.) *Id.* at 1059 (citing *Marsico,* 1995 Del. Ch. LEXIS 78, at *5-7).

(FN57.) *See Total Care Physicians, P.A. v. O'Hara,* C.A. No. 16313-NC (Del. Ch. Nov. 8, 1999)(Tr. at 29)("I don't think that the allegation suffices to plead to the facts creating a special relationship between Dr. O'Hara and Total Care. In fact, I'd be quite troubled to recognize such a fiduciary obligation.").

(FN58.) *See Gannett Co., Inc. v. Kanaga,* 750 A.2d 1174, 1181 (Del.2000).

(FN59.) *Berglund v. Horgan,* 1997 Del. Ch. LEXIS 153, at *12 (Del. Ch.) (defining "clearly erroneous").

© 2005 Thomson/West. No claim to original U.S. Govt. works.